UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

BRETT KIMBERLIN,
    Plaintiff,

    v.                     No.   GJH15 CV 0723

HUNTON & WILLIAMS LLP,
UNITED STATES CHAMBER OF COMMERCE,
PALANTIR TECHNOLOGIES,
BERICO TECHNOLOGIES,
MANTECH INTERNATIONAL,
HB GARY/FEDERAL,
JOHN WOODS,
RICHARD WYATT,
ROBERT QUACKENBOSS,
GREG HOGLUND,
AARON BARR,
ALEX KARP,
MATT LONG,
NICHOLAS HALLAM,
MATTHEW STECKMAN,
PAT RYAN,
SAM KREMIN,
JOHN DOE CHAMBER OF COMMERCE EMPLOYEES,
PACIFIC NORTHWEST NATIONAL LABORATORY,
BILL NICKLESS.
WILLIAM HOGE,
    Defendants.

**COMPLAINT FOR DAMAGES**

**Summary of the Case**

    For the past six years, the core Defendants in this case secretly conspired to and

did engage in racketeering activity, obstruction of justice, fraud, espionage, and

defamation with the intent to destroy Plaintiff Brett Kimberlin and his ability to earn

a living in retaliation for his work as the director of a non-profit organization that

used legal means to expose unethical and/or criminal activities of the United States

Chamber of Commerce ("COC") and its senior principals. The core Defendants, over that period of time, formed an enterprise and committed and conspired to commit repeated criminal predicate acts, including obstruction of justice, conspiracy to commit fraud, extortion and money laundering, and used Defendant Hunton&Williams ("H&W") to facilitate and provide cover for those illegal activities. The Defendants engaged in their conduct in order to protect the COC from criminal investigation, grand jury investigations and administrative investigations, and to derail those investigations and deter Plaintiff and others from cooperating with and providing information to federal officials and a criminal grand jury. Initially, some of the Defendants used legal threats, ad hominem attacks, defamation and coordinated death threats to deter Plaintiff from continuing his work exposing the Chamber's criminal activity. When that did not succeed, the Defendants entered into the world of criminal racketeering as set forth below. The members bragged about being "gangsta[s]." Many of the Defendants and their criminal actions were exposed in February 2011 when more than 60,000 of their emails and documents were publicly released. However, this did not stop the Defendants from continuing their racketeering and defamatory activity, which they repackaged and continued until the present time with additional predicate acts through additional Defendants and an overlapping conspiracy involving additional actors. This resulted in harm to Plaintiff, including physical injury, treatment for those injuries at a hospital, and pain.

This is a lawsuit about Defendants' un-American activities such as domestic spying, subterfuge, and using hacking, malware, propaganda, disinformation,

forgery, fraud, extortion, and computer fraud to destroy and harm a fellow American engaged in legal and protected First Amendment and business activities. The Defendants' secret plans included infiltration of non-profits with fake insiders, creation of fake documents, waging electronic warfare, investigating and exploiting staff and their families, and utilizing former military and intelligence contractors to carry out these operations. This is a case about a powerful law firm, H&W, in its role as a leader, conduit, bagman and consigliere to commit these reprehensible acts on behalf of the United States Chamber of Commerce ("COC"). This is a case about H&W soliciting and contracting with military cyber security intelligence contractors with a history of targeting foreign terrorists to target Plaintiff using the same techniques. Plaintiff was designated as a "Tier I" target, the highest-level target in their lexicon. Why? Because he was cooperating with federal officials in investigations of the Chamber's criminal activity. H&W and its lawyers, Defendants John Woods, Richard Wyatt, and Robert Quackenboss, provided the means, opportunity and legal cover for the other Defendants to conspire and engage in RICO activity and violate Plaintiff's civil rights by targeting him for that cooperation. These lawyers were part of a Nixonian black ops team within H&W that engaged in extra legal activities to protect their corporate clients. This team acted in secret and reported only to the senior partners of H&W. Some documents related to the activities of the team were kept off or removed from the official premises of H&W. During the time period set forth in this Complaint, H&W received millions of dollars in compensation from COC, some of which was used to fund its criminal conduct.

Defendants Woods, Wyatt, and Quackenboss are members of the District of Columbia Bar and were or are employed by H&W in its Washington, D.C office. These lawyers, on behalf of their client, the COC, engaged in an extended pattern of unethical behavior, and criminal and racketeering conduct. Much like the mafia, they considered Plaintiff and others as federal informants who had to be silenced in order to stop any federal criminal investigations of the COC. Specifically, they solicited, conspired with and counseled three of their investigative private security firms to engage in obstruction of justice, domestic spying, fraud, forgery, extortion, cyber stalking, money laundering, defamation, harassment, destruction of property, spear phishing, destruction of property, identity theft, computer scraping, cyber attacks, interference with business, civil rights violations, harassment, interference with business relations and theft. All of this was done to deter, intimidate, and retaliate against Plaintiff for exposing criminal wrongdoing by the COC and its senior staff, and undermine his credibility so federal officials would not rely on his information.

This unethical and criminal conduct involves *"dishonesty, fraud, deceit, or misrepresentation"* and violates criminal statutes, the Rules of Professional Conduct, and undermines the rule of law, respect for the law and confidence in the law and civil society. Incredibly, in dozens of calls, emails, proposals, meetings and conferences over the first six months of this racketeering enterprise and campaign of tortious conduct, as set forth below, none of the H&W lawyers ever expressed any reservation or doubt about the unethical and criminal conduct proposed and committed by themselves or their defendant intelligence contractors. In fact, they

actively solicited and approved everything that was proposed and presented, and made contractual agreements to engage in the illegal conduct. This, despite the fact that Defendant Woods had published an article in the February 2010 issue of *Data Protection Law and Policy*, titled "Social Networking and the e-Discovery Process," which stated that conduct such as that committed by the H&W investigators would "amount to misconduct under Rule 8.4 prohibiting 'dishonesty, fraud, deceit or misrepresentation." Exhibit A, p. 2.

http://www.velvetrevolution.us/images/H_WWoods_Social_Networking_Article.pdf

Even when caught, H&W, although never issuing a statement, pushed the twisted meme through proxies that since they were caught before they were able to complete the Team Themis contract or pay Team Themis in full, no one was harmed and therefore no one can sue. The senior partners at H&W rallied around their unethical lawyers and kept them on as partners to ensure their silence and continued participation in more nefarious black bag operations. Defendants Berico and Palantir blamed Defendant Barr, and Defendant COC, protected by the silence of H&W, professed to be in the dark about the whole affair.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 USC 1331 (federal question), 28 USC 1332 (diversity of citizenship), and 18 USC 1964(c) (RICO).

2. This Court has supplemental jurisdiction over the state causes of action based on state law pursuant to 28 USC 1367(a), as the state law claims arise out of the same nucleus of operative facts which support the federal claims.

3. Venue is proper in the District of Maryland under 18 USC 1965 and 28 USC 1391, in that Plaintiff resides in Maryland, many of the actions of Defendants took place in Maryland, the injury occurred in Maryland, and a portion of the communications, transactions, events or omissions occurred in Maryland.

## PARTIES

1.      Plaintiff Kimberlin is the Director of Justice Through Music, a Maryland based 501(c)(3) non-profit that uses music to inspire and educate young people to get involved with civic participation. In 2005, Justice Through Music and Brad Friedman launched VelvetRevolution.us, a 501(c)(4) advocacy organization dedicated to fair and transparent elections, and corporate accountability, with more than one hundred affiliated organizations and more than 10,000 members. Plaintiff has been involved with both Justice Through Music and VelvetRevolution for more than eleven years, and he resides and works in Montgomery County Maryland. Plaintiff is also a musician, manager, music producer, and composer engaged in the business of music.

2. At all relevant times, the RICO Defendants are "persons" within the meaning of that term as defined by RICO, 18 USC 1961(3).

3. At all relevant times, Defendants were engaged in interstate commerce or in the production of goods or services for sale or use in interstate commerce.

4. Defendant Hunton&Williams LLP is a law firm headquartered at 951 E Byrd St #200, Richmond, Virginia 23219 in Richmond, Virginia and has offices in Washington, DC and other cities.

5. Defendants John Woods, Richard Wyatt and Robert Quackenboss are attorneys who are or were employed by H&W at its Washington, DC office during a multi year period between 2010 and 2015.

6. Defendant Chamber of Commerce is a 501(c)(6) business league organization that focuses on representing the interests of its corporate members at all costs, and is located at 1615 H St. NW, Washington, DC 20062.

7. Palantir Technologies is a data/intelligence company located at 100 Hamilton Ave. Suite 300, Palo Alto, California 94301 serving government, military and corporate clients. Palantir's only client from 2005 to 2008 was the Central Intellligence Agency, and its name comes from the "seeing stones" in *Lord of the Rings*, which are communication and tracking tools that have the ability to see into the minds of enemies.

8. Berico Technologies is a data/intelligence company located at 11130 Sunrise Valley Drive #300, Reston, Virginia 20191 serving government, military and corporate clients.

9. ManTech International Corporation is a cyber security company located at 12015 Lee Jackson Highway, Fairfax, Virginia 22033 serving the US military. ManTech acquired HBGary in 2012. HB Gary/Federal is/was a data/intelligence company with an expertise in malware.

10. Aaron Barr is/was a software engineer and was the CEO of HBGary/Federal during a portion of the time period set forth in the Complaint and is located at 1900 Bragg Way South, Odenton, Maryland 21113.

11. Alex Karp is CEO of Palantir Technologies located at 100 Hamilton Ave, Suite 300, Palo Alto, California 94301.

12. Matt Long is the General Counsel of Palantir Technologies located at 100 Hamilton Ave, Suite 300, Palo Alto, California 94301.

13. Nicholas Hallam is COO of Berico Technologies located at 11130 Sunrise Valley Drive, #300, Reston, Virginia 20191.

14. Mathew Steckman is a sofware engineer employed by Palantir Technologies who resides at 1205 N. Garfield Street, Arlington, Virginia 22201.

15. Greg Hoglund is or was the CEO of HBGary and HBGary Federal who resides at 6900 Wisconsin Ave, Ste 706, Chevy Chase, Maryland 20815.

16. Pat Ryan is a software engineer who works for Berico Technologies and his address is 11130 Sunrise Valley Drive #300, Reston, Virginia 20191

17. Sam Kremin is a software engineer who works for Berico Technologies and his address is 11130 Sunrise Valley Drive #300, Reston, Virginia 20191

18. Pacific Northwest National Laboratories ("PNNL") focuses on government and military research for countering terrorism through cyber security and it is located a 902 Battelle Blvd, Richland. Washington 99352.

19. Bill Nickless is a senior research scientist at PNNL specializing in cyber-security with a focus on adversarial relations, and he resides at 1761 George Washington, Richland, Washington 99354.

20.     Defendant William Hoge is engineer employed at the Goddard Space Center in Maryland and resides at 20 Ridge Road, Westminster, Maryland 21157 and the owner of the www.Hogewash.com blog.

## H&W DIRECTS A CRIMINAL ENTERPRISE

D.C. Rules of Professional Conduct Rule 8.4—**Misconduct**, states in pertinent part:
*"It is professional misconduct for a lawyer to:*

*(a) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;*

*(b) Commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;*

*(c) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;*

*(d) Engage in conduct that seriously interferes with the administration of justice; ...."*

D.C. Bar Rule 1.2(e) states: "A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent." The scope of this rule is explained further: "a lawyer may not knowingly assist a client in criminal or fraudulent conduct. There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity."

Defendant attorney John W. Woods, Richard L. Wyatt Jr., and Robert T. Quackenboss violated the above four provisions and counseled and assisted their client, the U.S. Chamber of Commerce, and their three private security contractor investigators, HBGary Inc, Palantir Technologies and Berico Technologies (collectively known as Team Themis), to commit criminal, racketeering and fraudulent conduct over a multi year period of time.  It is well established that attorneys are accountable for the conduct of their investigators. It is also well established that a law firm is liable under RICO for the criminal conduct of its attorneys. Indeed, H&W, when it contracted with Defendant Palantir/Team Themis, was well aware that Palantir engaged in unethical, illegal and racketeering activity since, just weeks before, Palantir had been charged in another federal lawsuit in the Eastern District of Virginia with fraud, RICO, interference with business,

9

misappropriation of trade secrets and other torts, which was later settled in the i2's

favor. *i2 v. Palantir, et al*, 1:10-cv-00885-LO.

http://www.scribd.com/doc/36371667/i2-v-palantir-080910

## STATEMENT OF THE CASE

### StopTheChamber/Velvet Revolution

StopTheChamber.com ("STC") is a campaign of VelvetRevolution.us ("VR"), a

501c(4) public charity since 2005 dedicated to corporate and government

accountability.  STC was launched in September 2009 in order to expose unethical

activity, excesses and lack of transparency of the Chamber of Commerce.  STC urged

the COC to represent the interests of Americans by being transparent, non-partisan,

and civic minded.  When it did not, STC urged companies and members to quit their

membership of the COC to protest its apparent illegal tactics and strong-armed

opposition to environmental protection, financial reform, health care reform,

election protection, worker safety and transparency.  As a result, since 2010, dozens

of large companies, such as Apple, PG&E and Excelon, and local Chambers of

Commerce have quit the COC, and political leaders such as President Obama and

Senators Baucus and Franken have called for IRS and FEC investigations of the COC

for a variety of reasons including its use of foreign funds to engage in electioneering.

Other advocacy organizations and unions have also taken public stances against the

COC's unethical conduct.

STC also sought out whistleblowers to provide inside information about the

operations of the COC and its board members.  STC offered rewards for insiders to

provide confidential information about the Chamber's nefarious activities. STC

received several tips, including a three-page letter from a professed Chamber employee, which it turned over to the FBI because the conduct disclosed involved allegations criminal activity inside the COC. STC led the call for the indictment of Massey Coal Mine CEO and COC Board Member Donald Blankenship for the criminal death of 29 miners in the Big Branch coalmine disaster on April 5, 2010. STC provided evidence to the Department of Justice against Mr. Blankenship and COC President Tom Donohue, including whistleblower information.  STC lawyer and spokesperson Kevin Zeese appeared on major news broadcasts and published an article in *Huffington Post* setting out the criminal case against Mr. Blankenship for homicide and paying bribes to federal officials.  Plaintiff and Mr. Zeese personally met with the FBI and had many other communications with the FBI about the COC's criminal activities and Plaintiff offered to testify at any grand jury proceedings regarding these matters. COC lawyers responded by threatening STC and Mr. Zeese with legal action and unleashing a coordinated campaign of death threats against VR/STC.  Mr. Blankenship was formally arrested and charged on November 14, 2014 in a 43-page criminal indictment, which alleged most of the illegal conduct first exposed by STC.

During the 2010 election campaign, STC exposed apparent violations of campaign finance law by COC, including reports of its use of illegal foreign money in elections, excessive compensation by COC CEO Tom Donohue, misuse of tax-exempt status, money laundering, and use of the COC for the enrichment of its members.  STC also reported on COC's partnering with American Crossroads/Crossroads GPS to coordinate the illegal spending of millions in secret money to support Republican

candidates. The CEO of American Crossroads/Crossroads GPS is former COC chief counsel, Steven Law.  STC's sister organization, Protect Our Elections ("POE"), filed complaints against Crossroads GPS with the FEC, IRS and DOJ alleging violations of the Federal Election Campaign Act, and provided direct evidence of such violations to the FBI.  That FEC complaint is now a federal lawsuit in United States District Court for the District of Columbia, *Public Citizen v. FEC*, 14-148 (RJL).  POE led the call for a criminal investigation of COC member, News Corp, an American company, for violating the Foreign Corrupt Practices Act ("FCPA") by bribing foreign officials to allow it to hack and spy on people in Europe.   Shortly after that call, Attorney General Holder announced that very criminal investigation.  Incredibly, News Corp responded by giving the COC a one million dollar donation in order to lobby Congress to change the FCPA so that its provisions could not be used to prosecute News Corp.

The COC wanted to stop all the above criminal investigations and conspired with its law firm, H&W, to obstruct justice through a campaign to intimidate and deter Plaintiff so he would not cooperate with the FBI in court proceedings and criminal investigations, and to undermine his credibility in order to cast doubt on the credibility of any information he provided to federal officials and to deter him from testifying at any federal grand jury proceedings.

### Chamber Of Commerce And Hunton & Williams Dirty Tricks Campaign Against STC/VR And Others

1. Upon information and belief, in 2009, the COC and various Defendant John Doe COC employees directed Defendants Woods, Wyatt and Quackenboss, lawyers at H&W, a law firm that had represented it for years, to target and crush COC

opponents, including Plaintiff, through any means possible, including using illicit and secret black operations in order to stop them from exposing criminal activity and cooperating with federal officials and investigations. Those lawyers obliged.

2. Over the ensuing six years, the COC and its lawyers at H&W have responded to STC, not by having a debate in the public domain, but by intimidation, Segretti-type dirty tricks, and criminal racketeering activity. In December 2009, when STC contacted the FBI to request a criminal investigation of the COC, Exhibit OO, COC/H&W responded by contacting FOX News, which wrote an article defaming Plaintiff and his employer that resulted in STC being attacked with a coordinated campaign of more than 100 threats of violence, including death threats, which STC reported to the FBI. Exhibit B. H&W also hired investigators to dig into the personal lives of STC and its principals, including Plaintiff, and provided defamatory information to reporters at FOX News, which FOX then published in various articles. On April 14, 2010, VR/STC counsel, Kevin Zeese, wrote a letter to the Attorney General requested a full scale criminal investigation of COC board member Donald Blankenship, and listed a dozen or so crimes he had committed.  Exhibit PP.  On May 4, 2010, H&W lawyers wrote a letter to STC's Public Relations Agent Ilene Proctor repeating defamatory information about STC and Plaintiff that was intended to smear and harm him by scaring her into dropping Plaintiff's employer as a client. Exhibit C. On or about July 15, 2010, H&W wrote a letter to PR Newswire demanding that it remove a press release sent that week, and disparaging STC and Plaintiff. PR Newswire felt so threatened by the H&W letter that it scrubbed the press release from its Internet site. PR Newswire then refused to release more press releases for

Plaintiff's employer.  H&W took these actions to harm Plaintiff's reputation, employment and business activities, and to intimidate and deter him from cooperating with the FBI or testifying before a grand jury.

3. On October 17, 2010, Kevin Zeese, counsel for Velvet Revolution/STC wrote a letter to the FBI titled: "**Third request for criminal investigation of threats, harassment, and use of Internet for attempted intimidation and incitement of violent threats by supporters of U.S. Chamber of Commerce and its CEO Tom Donohue, and obstruction of justice.**" Exhibit QQ.  A portion of the letter states:

> Although we have been working for over a year to expose the Chamber's criminal activity, it was not until the past few weeks that those activities have received the type of scrutiny they deserve. Senators, Members of Congress, and even the President have called for IRS, DOJ and FEC investigations into the Chamber's receipt of foreign money and secret accounting practices. Various NGOs, including ours, have provided evidence to law enforcement authorities about alleged tax violations, financial improprieties, excessive compensation, and campaign finance misdeeds. A Chamber whistleblower provided us with a roadmap of the Chamber's improprieties, which we turned over to the FBI. In the past, Mr. Donohue has been implicated in criminal activity through several complaints filed by NGO's such as Public Citizen and Citizens for Reform and Ethics in Washington, some before the FEC. Also, stockholders have filed complaints with the SEC against Mr. Donohue for insider trading and false reporting. State Attorneys General have accused Mr. Donohue of covering up criminal activity committed by members of the Chamber of Commerce. And attorneys in several states have filed complaints against the Chamber for violating campaign finance laws through the use of shell organizations and false reporting. The national press has begun reporting these allegations with regularity.

> Here are examples of some of the more blatant threats we have received this year:

> - **"Leave the Chamber of Commerce alone, this is your only warning;"**
> - **"You WILL be confronted and stopped... I am quite probably a member of the fasting (sic) growing group that is your direct enemy...;"**
> - **"The more torture of Islamohitlerite babykilling Fascist pigs, the better. You should be with them;"**
> - **"Your (sic) all on borrowed time. The real revolution will come to those soon;"**
> - **"You peices (sic) of shit should all be fucking burned at the stake;"**
> - **"Be careful what you ask for..;"**
> - **"Bounty on your head. Beware;"**
> - **"I dont make threats. Only promises. You better back the hell off;"**
> - **"I will inform friends and family of your thoughts and movements;"**

- **"Keep this $200,000 'tip' business going for the CEO of the Chamber and you will find yourself as the target.... You will only receive a limited number of warning --- this may be the only one --- before your punishment is delivered."**
- **"Please let the world know who is behind this bounty offer so that they can be 'recognized' for their decision."**
- **"Try yourselves for treason againsst [*sic*] the U.S. and then we can hang you for your crimes against this country."**

Attached find an article about even more of these threats. Recent online posts have falsely accused VR associates of murder, pedophilia, terrorism, and financial scams, and have warned ominously that they "can run but can't hide." These posts are intended to incite crackpots like those who have written the above emails to commit violent action against our organization and staff. We have met with local law enforcement officials and reported these threats.

We ask that the FBI conduct an investigation into these threats and intimidation tactics, including Mr. Donohue and the Chamber's ties to them. We ask that the FBI prosecute those who conspired to commit these criminal acts and those who sent the actual threatening emails. We ask you to determine if in fact the Chamber is orchestrating a smear campaign against our organization in order to stop us from continuing our campaign to root out criminal activity. We ask you to determine whether the Chamber is engaging in obstruction of justice and intimidation of witnesses by targeting our organization and its staff after we asked the Department of Justice to investigate its activities.

Threats of violence are abhorrent and cannot be tolerated. Our organization is a grassroots non-profit dedicated to clean, honest and transparent government. We have been exposing wrongdoing for six years against those at the highest levels of Government yet we have never been attacked and threatened with death until we launched our campaign against the Chamber. Clearly, the Chamber, and those closely allied with it, believe that they are above the law and can use thuggish and criminal tactics to frighten us away from our legally protected activities. We see these tactics as more evidence that the Chamber is currently engaged in a pattern of criminal activity that must be investigated under the racketeering statutes. Clearly, the Chamber does not want scrutiny of its activities and will engage in smears, threats and criminal behavior to stop such scrutiny.

We offer our complete cooperation in your investigation and will maintain originals of all present and future threats and electronic tracking logs. We urge you to act quickly in order to ensure that these threats of violence do not result in actual injury."

4.       On November 22, 2010, Plaintiff met with agents of the Washington

DC Field Office to provide evidence to them regarding criminal activity by the COC

and it senior staff. Plaintiff provided a confidential "White Paper" with documents,

whistleblower information and hard evidence of criminal wrongdoing. [That

document is considered a confidential law enforcement document so it is not

attached to this Complaint]. Over the next several years, Plaintiff continued to provide information to the FBI about Chamber criminal activities.

5. In October 2010, H&W lawyers asked one of its investigator/contractors, Palantir Technologies, to help respond to a crisis facing another client, Bank of America, regarding a massive data leak to Wikileaks. H&W then asked Palantir to help its other client, the COC, to destroy a growing opposition movement that was demanding criminal and administrative investigations of the COC. On October 25, 2010, just a week after the STC letter to the FBI, a Palantir employee, Matthew Steckman, wrote to H&W attorney John Woods ("Woods") that he would like to bring in two other private security companies, HBGary Federal and Berico Technologies to help with the project. *"Together, our three companies represent all facets of a complete intelligence and analysis capability. Ideally, we would like to set up a time to meet next week to brief you and Richard [H&W attorney Wyatt]...."* Exhibit D. Defendants Steckman, Barr and Ryan on October 19, 2010 discussed *"offering a complete intelligence solution to a law firm [H&W] that approached us [using] social media exploitation."* On October 25, 2010, Steckman introduced H&W attorney Woods to Ryan and Barr, and they agreed to meet on November 4th because Woods says, *"I have to make our formal pitch to the client [COC] early the following week."* Defendant Barr and HB Gary CEO Greg Hoglund agreed to the meeting and Hoglund supervised Barr's Team Themis activities, the cover-up and the fraudulent conveyance of HB Gary Federal. (HB Gary and HB Gary Federal are considered one entity for the purposes of this Complaint and are used interchangeably in this Complaint.)

6. According to a Themis member quoted in Wired.com, H&W and COC *"suspect that most of the [opponents] actions and coordination take place through online means – forums, blogs, message boards, social networking and other parts of the 'deep web. But they want to marry those online 'cyber' sources with traditional open source data-tax records, fundraising records, donation records, letters of incorporation, etc. I believe they want to trace all the way from board structure down to the individuals carrying out actions."* http://www.wired.com/2011/02/spy/ *"Aaron Barr is the Man Who Knew too Little."*

7. Part of Team Themis' conspiracy was to *"create a false document, perhaps highlighting periodical financial information and monitor to see if [an opponent] acquires it. Afterward, present explicit evidence proving that such transactions never occurred.... Create a fake insider persona and generate communications with [an opponent]. Afterward, release the actual documents at a specified time and explain the action [of the opponent] was a contrived operation. Both instances will prove that [the opponent] cannot be trusted with information and/or to tell the truth."*

8. Another part of the Team Themis conspiracy was to wage electronic warfare against COC opponents using "Information Operations," a military term for electronic warfare. The conspiracy included HB Gary's expertise in "Vulnerability Research/Exploit Development," "Malware Analysis and Reverse Engineering," and "custom bots." http://www.corporatepolicy.org/spookybusiness.pdf pp 19-20.

9.       On November 1, 2010, Barr emailed others at Palantir and Berico that he had scraped H&W attorneys' social media accounts, including Defendant Woods' family. He *"grabbed all the partners friends that have Facebook accounts,"* 21 in all.

*"One of the steps we will do once we start on contract is do [sic] automate some of the scraping an artifact collection into single files and the develop a helper app that can parse all this information in to the right fields.  Should be easy."* The three companies formed a team called "Themis," named after the Greek God of law and order. Palantir General Counsel Matt Long, HB Gary CEO Aaron Barr, and Berico COO Nicholas Hallam signed "Teaming Agreements" on November 16, 2010. Exhibit RR. Themis created a "Corporate Information Reconnaissance Cell" proposal for H&W to present to COC showing how it could target, track, and neutralize people, organizations, and companies as directed by H&W.  Exhibit E. *"Team Themis is ideally suited to provide Hunton & Williams this critical capability...."* (page 2) *"Team Themis will provide full production and planning support throughout the entire targeting cycle in order to ensure that Hunton & Williams LLP has a clear, comprehensive understanding of the intelligence picture.  We will work closely with the key leaders and decision-makers from Hunton & Williams to develop production requirements that meet their diverse needs."* (page 9) *"We will work closely with the key leaders from Hunton & Williams to determine key tasks and functions and ensure that we adjust our plan based on refined customer needs."* Id.

10.     The techniques Themis described in the proposal were previously employed against terrorist organizations such as the Colombian revolutionary organization FARC to track its rebels, and against violators of the trade ban with Iran as part of contracts with U.S. Government agencies, such as the Department of Defense and the FBI.

11.    On November 7, 2010, Defendant Woods told Defendant Ryan that he would be meeting on November 9th *"with the team at HW who has gathered the underlying data...."* Barr bragged that he can analyze "the internals" of organizations to unknown data "to see if there are forensic markers that are a match." The H&W attorneys asked Team Themis if it could use the same Themis techniques and cyber technology against people and organizations opposed to the COC. *See* Exhibits JJ and KK. Woods said later that it was the Palantir "Iranian shipping" presentation that "sold the Chamber." Exhibit Z. *See that presentation at*

http://www.youtube.com/watch?v=iqMNzcspEyM Team Themis said that it could, and began preparing a massive $12 million plot to undermine STC, Plaintiff, reporters Glenn Greenwald and Brad Friedman and others, including SEIU, Change to Win, Chamber Watch, Plaintiff's employer, Justice Through Music, and Think Progress. Brad Friedman is also a principal of STC/VR. HB Gary, Berico and Palantir agreed to a 40/30/30 split of the contract.

12.    On November 9, 2010, Woods wrote an email to HBGary CEO Aaron Barr ("Barr"), saying *"If you really want to impress Richard, I would look at the following web-site and tell him something about the guys behind it: http://velvetrevolution.us/stop_chamber/"* Exhibit F.  STC is a campaign of VelvetRevolution.

13.    Later that day, Barr sent Woods an email: *"John, here is what I have found today.  The real good stuff will come once we identify all these organization fronts and then start enumerating common players, influences, distributors, etc. Velvet revolution is a network of more than 120 progressive organizations...."* Exhibit G.  It

lists personal information about the principals of VR and their family members, promising to exploit "*pressure points*" of the named targets.

14.      In another email that day, Barr wrote to Woods: "*Also I am already starting to collect information, associations on: [fixtheuschamber, US Chamber Watch Facebook pages, Stop The Chamber Facebook pages, stopthechamber and velvetrevolution]....*" Exhibit H.

15.      Barr responded with information about targets SEIU, Change To Win and Chamber Watch, concluding with: "*I will focus on VR [Velvet Revolution]."* Exhibit I. In still another email that day, Barr told his partners: "*... I got a call from John while he was in the meeting with Richard at about 4:30 or so.  We talked through some of the data, all went really well I think."* Exhibit J.   In that email thread, Woods told Pat Ryan from Berico that H&W had been gathering data about the Chamber opposition groups and would provide it on a data disc.  "*Thanks for this, I am meeting on Tuesday with the team at HW who has gathered the underlying data...."* Id.

16.      Barr demonstrated his expertise at social media intrusions by creating dossiers of families, friends and associates of those targeted by the COC, including Plaintiff and his business partner, Brad Friedman. Exhibit MM.  To impress H&W with his skills, Barr sent an email to Defendant Woods showing how he intruded on the social media accounts of Defendant Wyatt's wife, even providing photos of her young children, along with the warning that they were "vulnerable," and he could "exploit" Defendant Wyatt through his wife's home network.  Exhibit GG. He did the same to another target, Mike Gehrke, pointing to the "Jewish church" (sic) he

attended and attaching photos of his wife and children.  Barr made it clear that he could and would use anything and everything to smear COC targets.  Exhibit MM.

17.     On November 10, 2010, Woods wrote to Barr, "*I think we are good with Richard, let me work my end now.  We may try to do a meeting with Richard on Friday – I will let you know shortly....*" Exhibit K.

18.     On November 11, 2010, Barr sent an email entitled "HW Meeting" with zip files of "*scraped Facebook*" pages from five non-profits and Plaintiff. Exhibit LL.  The email also included a six-page WORD document titled "Chamber Opposition," which listed information about non-profits, and personal information about principals and staff of STC/VR, including Plaintiff and their friends and family. Exhibit MM.

19.     On November 16, 2010, Barr wrote to his boss at HBGary, Greg Hoglund, about the contract with H&W.  "*I have been sucked up for the last, seems like almost 2 weeks working the [H&W] law firm deal.  The potential is huge for us.  We are starting the pilot this week, 50K effort.  After the pilot, the end customer  [COC] gets briefed.  We were talking to the senior partner of the law firm on Friday and he wants a firm fixed price by month for 6 months and the figure we have come to settle on is $2M per month for the 3 team members.  That will equal $500-$700K for HBG Federal, that's (sic) per month.*" Exhibit L. Defendant Berico formally sub-contracted HB Gary Federal "*to submit a proposal to Hunton & Williams .... In response to their request for assistance within the realm of legal discovery to provide certain software platforms and maintenance, and systems integrators and analysts in order to better conduct*

*cyber investigations and Corporate Campaign Analysis."* Berico COO Nicholas Hallam and Defendant Barr signed that contract. Exhibit RR.

20. In another email that day, Woods responded to Pat Ryan at Berico: *"Thank you. Please have Danielle work with Steve Patterson on the various documents...."* Exhibit M. In that email thread, Ryan said: *"Hi John, Just wanted to send you a quick update as we follow-up from Fri's meeting. ... The TA will include language to cover exclusivity related to any other corporate campaign projects. We are also putting together a brief amended proposal which will lay out tasks and deliverables for Phase I (initial analysis and products to support 23 Nov meeting with client) and Phase II (follow-on six months of enduring operations...."* Id.

21. On November 17 and 18, 2010, Palantir's Eli Bingham set up Team Themis on the Palantir platform, an ontology designed to hold social media profiles of COC targets. Palantir then imported Defendant Barr's Facebook intrusion information, *"mugshots are included."* Palatir's Steckman said, *"we got approval from [Palantif CEO] Dr. Karp and the Board to go ahead with the modified 40/30/30 breakdown proposed"* for pricing the project.

22. On November 23, 2010, Themis members emailed each other about a conference call to *"discuss how the call with H&W should go?"* Exhibit N. In that email thread, Woods tells the team, *"Thank you for this. What I think would be very helpful is if we could set up a call later today of tomorrow where I could have my colleague Bob Quackenboss talk through with some folks on your team what tasks members of the team would actually be performing...."* Id. Defendant Kremin emailed copies of the Teaming Agreements to Defendant Woods along with a costing

proposal of a total of $12.2 million. The proposal includes creating *"in-depth target dossiers for key entities and groups; will incude key biographical data, relationships, intentions, etc."* In the thread, they discussed setting up a conference call with Defendant Quackenboss who Woods described as "our key client contact operationally."

23.     The following day, the principals of Team Themis and HW had a conference call.  After the call, Defendant Steckman said" *We need to blow these guys away with descriptions of our capabilities, IP, and talent.  Make them think that we are Bond, Q, and money penny all packaed up with a bow. ... Most of all that we are the best money can buy! Dam [sic] if feels good to be a gangsta."*  By the end of the day, a Themis staffer sent a more detailed breakdown of the abilities of the Themis staff to H&W in a "labor category spreadsheet."

24.     On November 29, 2010, Sam Kremin from Berico wrote to Barr: " ... *Also, when I give these to Bob, I will emphasize that these are just examples to give to him an idea of what he is pitching to the Chamber and not at all indicative of our capabilities...."* Exhibit O. In that email thread Barr proposed a dirty tricks campaign against the Chamber opposition organizations. Regarding Change to Win/ChamberWatch/VelvetRevolution, Barr outlines the *"need to discredit the organization"* by *(1) "tying it to the unions," (2) "creating a false document and see if they pick it up," (3) creating "a fake insider persona and start communications with CtW.  At the right point release the actual documents and paint this as an (sic) CtW contrived operation. They can't be trusted to stick to the truth, etc.," (4) connecting CtW "to velvet revolution and their radical tactics," (5) creating "two fake insider*

23

*personas using one to discredit the other giving the second immediate legitimacy."* Regarding VR, Barr says, *(1) "Attack [one of the VR principals] and after a series of attacks on his person start making ties to the back office folks ... discrediting them by association. Done in the right way this can cause them to distance themselves and also funders from [the principal]." (2) "Attack their antics as self-serving and childish." (3) "[c]reate some [false] information and get them to run with it."* Id.

25.     On December 1, 2010, Sam Kremin from Berico wrote to Woods and Quackenboss: *"John and Bob, Attached are the example reports that you request to give you a better idea of what we will be producing...."* Exhibit P. Attached to that email were four documents: (1) H&W Information Operations Recommendation with a list of dirty tricks to be used against Chamber opposition organizations, Exhibit Q; (2) H&W Organizational Assessment about Chamber Watch. Exhibit R; (3) Significant Activity Report about a "Protest near US Chamber of Commerce Building on October 7, 2010" Exhibit S; and (4) H&W Team Themis Slides, which is a series of eight color slides identifying the targets of Themis in a military/intelligence style presentation with different tiers and a "Priority Intelligence Requirement." Exhibit T.

26.     On December 3, 2010, Palantir staffer Matthew Steckman wrote Woods: *"Updated with Strengths/Weaknesses and a spotlight on [reporter/lawyer] Glenn Greenwald...."* Exhibit U. In that email thread, Barr said: *"I think we need to highlight people like Glenn Greenwald. Glenn was critical in the Amazon to OVH transition and helped wikileaks provide access to information during the transition. It is this level of support we need to attack. These are established proffessionals (sic)*

*that have a liberal bent, but ultimately most of them if pushed will choose professional preservation over cause, such is the mentality of most business professionals. Without the support of people like Glenn wikileaks would fold."* And Steckman wrote: *"Here is the collated first cut to brief John with at 9. I am going to send this to him at 8:15...."*

27.     On December 10, 2010, Sam Kremin wrote Barr an email titled, "Ingesting FB Friends data," about scraping Facebook friends and placing that data in Palantir spreadsheets.  Exhibit NN.

28.     On January 13, 2011, Defendant Barr gave a two-hour presentation on social media exploitation at the US Army Intelligence and Security Command in Springfield, Virginia.

29.     On January 14, 2011, Ted Vera from HBGary confirmed that H&W agreed to the Themis proposal *"50K to start – for a 30-day pilot project."* Exhibit V. In that email thread, Barr said; *"Lawfirm IO work is finally worked out...."* Sam Kremin said: *"Exciting news. We've received the data from H&W and it is a 189kb xml document.  Ryan ... could you integrate it into Palantir?  Regarding the contract, Bob [Quackenboss] is really busy for the rest of this week, so we will meet to take care of that and receive his guidance and vision for the project sometime early next week.  It would be great if we could get this data and the instance ready as soon as possible so we can start putting together products that will blow them away."*  Kremin also said: *"This afternoon an (sic) H&W courier is bringing over a CD with the data from H&W from phase 1.  We are assuming that this means that phase 1 is a go...."* Id.

30.     On January 19, 2011, Barr and HBGary staffer Mark Trynor discussed the *"scraping"* of Facebook pages and data, including that of Plaintiff. Exhibit W. That

same day, Defendant Barr told HB Gary President Penny Hoglund: "*The law firm deal has been agreed upon but the law fiirm has still not written us a contract. Berico says that they have verbally areed (sic) to the pricing and want us to get started but we don't have the contract yet.*"

    31.    In another email that day, Barr, Trynor and Ted Vera discussed technical aspects of scraping VR's Facebook and social networking pages and specifically mentioned Plaintiff's pre-teen daughter and the school she attended. Exhibit X.

    32.    On January 26, 2011, Woods emailed Barr about using Themis for a client working through another law firm, Booz Allen. Exhibit Y.

    33.    In a PowerPoint presentation Team Themis prepared for H&W, it promised to "mitigate effect of adversarial groups" and discussed the youthful criminal record of Plaintiff, and said that its goal was to "discredit, confuse, shame, combat, infiltrate and fracture" COC opponents.

    34.    On February 3, 2011, Defendant Barr wrote to other Themis members that he had talked with Quackenboss "*ref our H&W support to the Chamber….*" He said that H&W wanted Themis to create a Phase 1 demo "*and then present jointly with H&W to the Chamber….*" Specifically, Barr suggested creating a "*5-10 min demo (along the lines of the Iranian shipping demo – which is what Bob Q said sold the Chamber in the first place….)… Bob apologized for the confusion/misunderstanding and said he thinks there is a high likelihood of selling the Chamber on this, but asked that we be willing to share the risk with H&W up-front. …. Please let me know where*

26

*you ... stand on this so I can get back to Bob ASAP and coordinate the next steps. ..."*
Exhibit Z.

35.     Palantir stated that it planned to include on the staff of the project an
employee who *"ran the foreign fighter campaign on the Syrian border in 2005 to stop*
*the flow of suicide bombers into Baghdad and helped to ensure a successful election.*
*As commander, [he] ran the entire intelligence cycle; identified high-level terrorists,*
*planned missions to kill or capture them, led the missions personally then exploited the*
*intelligence and evidence gathered on target to defeat broader enemy networks."*

36.     In its proposal to H&W, Team Themis wanted to "highlight...key
personnel as representative of the outstanding talent within our organizations" who
would conduct or oversee its espionage activities against Plaintiff and others.

> • Guy Filippelli, "a former U.S. Army Military Intelligence officer with service
> in Germany, Korea, Iraq and Afghanistan, and as a civilian Special Assistant to
> the Director of the NSA....He most recently returned from several weeks in
> Afghanistan in June 2010, conducting a comprehensive assessment for senior
> defense and intelligence officials."
> • Doug Philippone "deployed to Afghanistan, Iraq and Pakistan for a total of 6
> deployments from 2003-2007. He commanded multiple Joint Special
> Operations Command outstations in support of the global war on terror. Doug
> ran the foreign fighter campaign on the Syrian border in 2005 to stop the flow
> of suicide bombers into Baghdad.... As a commander, Doug ran the entire
> intelligence cycle: identified high-level terrorists, planned missions to kill or
> capture them, led the missions personally, then exploited the intelligence and
> evidence gathered on target to defeat broader enemy networks."
> • Aaron Barr, who "served as the Director of Technology for the Cyber
> security and SIGINT Business Unit within Northrop Grumman's Intelligence
> Systems Division....[He] served 12 years in the United States Navy as an
> enlisted cryptologist, senior signals analyst, software programmer, and
> system administrator....Mr. Barr has pioneered many uses of the Internet and
> new media for the purposes of conduction broad information operations
> campaigns for key intelligence customers."
> http://www.corporatepolicy.org/spookybusiness.pdf p 20.

37.     According to these emails and published reports, H&W was constantly in contact with its client, COC, about the Team Themis campaign. Id.

## The H&W Team Themis Black Ops Campaign Is Exposed

*38.*     On February 4, 2011, Defendant Barr gave an interview to the *Financial Times* in which he stated that he had identified the leaders of the Anonymous network, a group of hackers that have supported Wikileaks and other freedom causes around the world.  Barr indicated that he used techniques similar to those developed by Themis to gather this information. Exhibit AA. Joseph Menn, "Cyber Activists Warned Of Arrest," *Financial Times,* February 4, 2011 http://www.ft.com/cms/s/0/87dc140e-3099-11e0-9de3-00144feabdc0.html#axzz1EkOO41O2

In response, within two days, Anonymous seized control of HBGary's website, defaced its pages, extracted more than 70,000 company e-mails, deleted backup files, seized Barr's Twitter account, and took down the founder's website rootkit.com. It then posted all those emails in a searchable form on the Internet. Exhibit BB. "Anonymous Hackers Attack US Security Firm HBGary," *BBC Technology News,* February 7, 2011 http://www.bbc.co.uk/news/technology-12380987

The released emails created a frenzy of media coverage in major publications such as the *New York Times, Washington Post, LA Times, Forbes,* and *NPR,* in tech publications such as *Ars Technica, Wired, Tech News, The Tech Herald* and *The Hacker News*, in legal publications such as *Law Tech News, Corporate Counsel, Legal Times* and *National Law Journal,* and in independent media such as *Think Progress, The Brad Blog, Salon* and *FireDogLake.*  With each new revelation, reporters noted

the breathtaking scope of the illegal dirty tricks campaign, and the long list of crimes

involved. Quotes from a few of the articles are set forth below.

- *"It proposed services to clients like a law firm working with Bank of America and the U.S. Chamber of Commerce that included cyber attacks and misinformation campaigns, phishing emails and fake social networking profiles, pressuring journalists and intimidating the financial donors to clients' enemies including WikiLeaks, unions and non-profits that opposed the Chamber."* Andy Greenberg, "HBGary Execs Run For Cover As Hacking Scandal Escalates," *Forbes,* February 15, 2011. Exhibit CC. http://blogs.forbes.com/andygreenberg/2011/02/15/hbgary-execs-run-for-cover-as-hacking-scandal-escalates/

- *"One of the files in those emails was a PowerPoint presentation that described 'the WikiLeaks Threat,' created by a group of three security firms that suggested Nixonesque tactics for sabotaging the site on behalf of Bank of America, including spreading misinformation, launching cyber attacks against the site, and pressuring journalists."* Andy Greenberg, "HBGary CEO Also Suggested Tracking, Intimidating WikiLeaks' Donors," *Forbes* Feb. 14 2011. Exhibit DD. http://blogs.forbes.com/andygreenberg/2011/02/14/hbgary-ceo-also-suggested-tracking-intimidating-wikileaks-donors/

- *"What is set forth in these proposals for Bank of America quite possibly constitutes serious crimes. Manufacturing and submitting fake documents with the intent they be published likely constitutes forgery and fraud. Threatening the careers of journalists and activists in order to force them to be silent is possibly extortion and, depending on the specific means to be used, constitutes other crimes as well. Attacking WikiLeaks' computer infrastructure in an attempt to compromise their sources undoubtedly violates numerous cyber laws."* Glenn Greenwald, "The Leaked Campaign to Attack WikiLeaks and Its Supporters," *Salon,* February 11, 2011. Exhibit EE. http://www.salon.com/news/opinion/glenn_greenwald/2011/02/11/campaigns

- *"But the real party here which deserves much more scrutiny is Hunton & Williams -- one of the most well-connected legal and lobbying firms in DC -- and its partner John Woods. Using teams of people scouring all the available emails, FDL has done its typically thorough job of setting forth all the key facts and the key players -- including from Booz Allen -- and Woods is at the center of all of it: the key cog acting on behalf of the Bank of America and the Chamber. It's Woods who is soliciting these firms to submit these proposals, pursuant to work for the Chamber and the Bank; according to Palantir emails,*

*H&W was recommended to the Bank by the Justice Department to coordinate the anti-WikiLeaks work.*

*For a lawyer to be at the center of an odious and quite possibly illegal scheme to target progressive activists and their families, threaten the careers of journalists as a means of silencing them, and fabricate forged documents intended for public consumption -- and then steadfastly refuse to comment -- is just inexcusable. Perhaps some polite email and telephone encouragement from the public is needed for Woods to account for what he and his firm have done. In exchange for the privileges lawyers receive (including the exclusive right to furnish legal advice, represent others, and act as officers of the court), members of the Bar have particular ethical obligations to the public. At the very least, the spirit -- if not the letter -- of those obligations is being seriously breached by a lawyer who appears to be at the center of these kinds of pernicious, lawless plots and then refuses to account to the public for what he did.*" Glenn Greenwald, "More Facts Emerge About The Leaked Smear Campaigns," *Salon*, February 15, 2011. Exhibit HH. http://www.salon.com/news/opinion/glenn_greenwald/2011/02/15/palan tir

- *"For those new to the story, it involves email revelations that the U.S. Chamber of Commerce, the nation's largest corporate lobbying firm, was working with the law firm Hunton & Williams (H&W), to develop a scheme with three well-connected, government-contracted cyber-security/intelligence firms (HBGary Federal, Berico Technologies and Palantir Technologies --- calling themselves 'Team Themis' collectively) to use nefarious and likely illegal schemes in hopes of discrediting VR, myself and other progressive citizens, journalists and organizations who had opposed the Chamber's extremist corporate agenda."* Brad Friedman, "U.S. Chamber Plot Update: Malware, Fake Personas, Government Contracts, Public Shame, Bar Complaints, Media Failures and Other News," *The Brad Blog*, February 18, 2011 Exhibit FF. http://www.bradblog.com/?p=8363

- *"Last Thursday, ThinkProgress revealed that lawyers representing the U.S. Chamber of Commerce, one of the most powerful trade associations for large corporations like ExxonMobil and CitiGroup, had solicited a proposal from a set of military contractors to develop a surreptitious campaign to attack the Chamber's political opponents, including ThinkProgress, the Change to Win labor coalition, SEIU, StopTheChamber.com, MoveOn.org, U.S. Chamber Watch and others. The lawyers from the Chamber's longtime law firm Hunton and Williams had been compiling their own data set on some of these targets. However, the lawyers sought the military contractors for assistance.*

*As ThinkProgress has reported, the proposals — created by military contractors Palantir, Berico Technologies, and HBGary Federal, collectively*

*known as 'Team Themis' — were <u>discussed at length</u> with the Chamber's*
*lawyers over the course of several months starting in October of 2010. The core*
*proposals called for <u>snooping</u> on the families of progressive activists, creating*
*<u>phony</u> identities to penetrate progressive organizations, creating bots to*
*'<u>scrape</u>' social media for information, and submitting <u>fake</u> documents to*
*Chamber opponents as a false flag trick to discredit progressive organizations."*
Lee Fang, "<u>ChamberLeaks: Plan Solicited By Chamber Lawyers Included</u>
<u>Malware Hacking Of Activist Computers,</u>" *Think Progress,* <u>February 17, 2011.</u>
Exhibit GG. <u>http://thinkprogress.org/2011/02/17/chamberleaks-malware-</u>
<u>hacking/</u>

39.     Upon information and belief, on or about March 15, 2011, after the

Team Themis campaign of illegal dirty tricks was exposed, Defendant Wyatt

removed incriminating evidence from the offices of H&W.

40.     On February 11, 2011, Palantir CEO Alex Karp issued the following

mea culpa/apology for the actions of his company's involvement in Team Themis.

As the Co-Founder and CEO of Palantir Technologies, I have directed the
company to sever any and all contacts with HB Gary. Palantir Technologies
provides a software analytic platform for the analysis of data. We do not
provide – nor do we have any plans to develop – offensive cyber capabilities.
Palantir Technologies does not build software that is designed to allow
private sector entities to obtain non-public information, engage in so-called
"cyber attacks" or take other offensive measures. I have made clear in no
uncertain terms that Palantir Technologies will not be involved in such
activities. Moreover, we as a company, and I as an individual, always have
been deeply involved in supporting progressive values and causes. We plan to
continue these efforts in the future.
   The right to free speech and the right to privacy are critical to a flourishing
democracy. From its inception, Palantir Technologies has supported these
ideals and demonstrated a commitment to building software that protects
privacy and civil liberties. Furthermore, personally and on behalf of the entire
company, I want to publicly apologize to progressive organizations in general,
and Mr. Greenwald in particular, for any involvement that we may have had
in these matters.[http://www.businessinsider.com/palantir-wikileaks-
apology-2011-2#ixzz3T4ho07gv]

41.     Berico also issued a statement disavowing involvement in the Team Themis agreements drafted by its own employees and signed off on by their senior staff.  Exhibit SS.

42.     In April 2011 and throughout 2012, Congress Members, led by Representative Hank Johnson, held hearings for the Armed Services Committee and demanded documents from Team Themis to investigate whether it used government funded software created for military applications to engage in domestic spying of civilians and non profits. The House Armed Services Subcommittee on Emerging Threats and Capabilities asked the Defense Department and the National Security Agency to provide any contracts with HBGary Federal, Palantir Technologies and Berico Technologies for its investigation. Plaintiff worked closely with the staff on those committees.

43.     In 2011 an 2012, Plaintiff filed FOIA requests with the NSA and CIA for contracts related to the Team Themis companies' social media, spying and cyber security activities.  These agencies refused to comply for various reasons.

44.     Upon information and belief, one or more of the Defendants, in the spring of 2011, conspired with other actors in an overlapping conspiracy to adopt and implement the central tactics outlined by Team Themis against Plaintiff.  These included obstruction of justice tactics, false flag stories, defamation, attacks on family members, stalking, cyber intrusions, spying, infiltration, harassment, malware attack attempts, identity theft, misappropriation of likeness, and social media exploits. Over the next four years, these other actors used the Team Themis proposal and tactics to engage in a campaign of retaliation, intimidation, defamation,

stalking, assault, propaganda, disinformation, fraud, extortion, money laundering and other tortious acts aimed at harming Plaintiff, his family, children, business activities and employment opportunities.

45.     On February 23, 2011, STC filed bar complaints with the District of Columbia Bar Counsel against Defendants Woods, Wyatt and Quackenboss and followed that up with a supplement on March 31, 2011.

46.     On or about March 11, 2011, STC in a document hold letter, notified Defendant HB Gary/Federal and most other Defendants of its intent to seek legal remedies in a court of law for the conduct alleged in the instant Complaint.

47.     On May 6, 2011, STC sent a letter to the FBI requesting a formal criminal investigation into the illegal activities of the COC, H&W and Team Themis.

48.     On August 14, 2011, Protect Our Elections, a campaign of VR's, sent a letter to the FBI again asking for a criminal investigation of Team Themis.

49.     Upon information and belief, in 2012, Defendant HB Gary/Federal shuttered its operations in order to limit its liability regarding the Team Themis activity.  It then intentionally sold its assets to Defendant ManTech to protect them from liability.  Defendant ManTech purchased these assets on or about April 1, 2012, with full knowledge that HB Gary/Federal had been involved with the illegal Team Themis activities, and knowingly structured its purchase to limit its purchase to assets and to avoid liabilities.  This sale/purchase constitutes a fraudulent conveyance and illegal asset transfer.

50.     The COC made false statements to the press in 2011 asserting that it did not know anything about Team Themis and never participated in any

discussions with H&W about paying Team Themis to conduct its black bag operations against Plaintiff and others.  These statements were intended to cover up its involvement in the matter and deflect any criminal investigations.

51.      Upon information and belief, Defendant Wyatt has justified his conduct on the ground that attorneys have a right to conduct opposition research on their clients' opponents.

52.      Many of the Defendants conspired to cover up their involvement in the Team Themis operation by falsely accusing Aaron Barr of being a rogue actor who acted on his own.

53.      In the fall of 2014, another intelligence contractor, Defendant Pacific Northwest National Laboratory and one of its top operatives, Bill Nickless, began a covert and then overt campaign to defame, harass and bully Plaintiff with disinformation and defamatory blog posts/tweets meant to harm him. Defendant Nickless used his position at PNNL for credibility and cover, and PNNL allowed and paid Defendant Nickless to engage in that conduct. Defendant Nickelss tweeted that he was acting on behalf of PNNL and on January 27, 2015, urged a reporter to "go to pnnl.gob.contacts/to learn how to contact an official media spokesperson" to discuss his conduct toward Plaintiff.   When Plaintiff complained to PNNL, he was met with inaction while Defendant Nickless continued his activities and made threats to use his cyber-security skills to, Plaintiff believes, harm Plaintiff.

54.      An example of the defamatory attacks by Nickless and PNNL is:

> @Bill Nickless #FIFY @Xcitizen10: @OsborneInk in BRETT's world
> every 12 yr old with an GRANDMA needs to be TAKEN BY OLDER MEN
> TO DISNEY WORLD (& kill Gram)  January 31, 2015 3:45 pm

55.     Defendant Hoge has stated that he is a forensic expert in data analysis and digital fingerprinting, and that he constantly probes and analyzes every aspect and minutia of Plaintiff's life, including his family, employment, websites, photos, videos, music business and associates, as planned by Team Themis. He has compiled and categorized gigabytes of such data, meta data, and forensic markers searching for smoking guns, and routinely publishes posts on his www.Hogewash.com blog asserting that his work will result in Plaintiff's imprisonment and financial ruin. He shares his digital work with others so they will repost that work, and works closely with Defendant Nickless, who regularly posts on HogeWash using various astroturf names.

56.     Defendant Hoge uses that blog to stalk, defame and harass Plaintiff with daily posts using Plaintiff's name, and Hoge uses his Twitter account to drive traffic to his HogeWash website. He directs and assigns keywords using Plaintiff's name in order to trade off of Plaintiff's name and reputation. He targets Plaintiff's family and children with harassment and stalking in order to stoke controversy so he can continue to trade on Plaintiff's name.

57.     Defendant Hoge has used the Team Themis playbook to attempt to "discredit, confuse, shame, combat, infiltrate and fracture" Plaintiff. Defendant Hoge has exhibited a disturbing level of interest in the same daughter of Plaintiff targeted by Defendant Barr in his Themis presentation to H&W.  Exhibit X. Defendant Hoge has mirrored the acts of Defendant Barr by monitoring, investigating and probing her social media accounts, and using interactive computer devices to troll her social media sites, attempt to friend and follow her, and engage in a course of conduct that

has alarmed, annoyed, and harassed her to the point of causing her severe
emotional distress.

58.     Defendant Hoge has conspired with others to cause bodily harm to
Plaintiff, and he applauded a brutal assault on Plaintiff by his close associate that
resulted in bodily injury to Plaintiff that was so severe that he was treated at the
Emergency Room at Suburban Hospital in Bethesda for a contusion to the eye,
possible concussion, and back pain.  On March10, 2015, Defendant Hoge's alter ego,
"Paul Krendler," fantasized about killing Plaintiff with a baseball bat, tire iron and
chains.  This was just days after Defendant Hoge/Krendler published a perverted
fantasy about Plaintiff's teenage daughter.

59.     News Corp, a member of the COC and one of its biggest contributors,
has been prosecuted and sued for illegal hacking, spying and intimidation in Europe.
This has resulted in scores of arrests, many convictions and tens of millions in
lawsuit settlements.  Ralph Nader sued General Motors, a sponsor and contributor
of the COC, for hiring private investigators to engage in a spying and smear
campaign against him for exposing faults in its automobiles, resulting in a nine
million dollar judgment. In both of these cases, the corporations initiated reforms
prohibiting further spying and similar criminal activity.  However, in the case of
H&W and the other Defendants, other than an illusory apology by Alex Karp, the
Defendants have not done one single thing to demonstrate that they have not
continued and will not continue to engage in the type of lawless and nefarious
conduct outlined above.  In fact, they have done just the opposite by doubling down,

using proxies, and taking steps to make their nefarious criminal activities even harder to detect.

## VIOLATIONS OF CRIMINAL STATUTES AND RULES OF PROFESSIONAL CONDUCT

H&W lawyers, Richard Wyatt, John Woods and Robert Quackenboss, violated the D.C. Rules of Professional Conduct by counseling, assisting, advising, and conspiring with Themis to engage in unethical and criminal conduct against Plaintiff on behalf of H&W client, the Chamber of Commerce.

H&W and its lawyers, Defendants Woods, Wyatt and Quackenboss knew of and participated in the following crimes and torts with Themis and the other Defendants, and these lawyers never advised the other Defendants to not to commit them. In fact, they did just the opposite by soliciting the illegal conduct and conspiring to engage in the conduct. They knew they were violating the law because Defendant Woods specifically wrote an article stating that such conduct would be unethical.

> *"Noting that lawyers are accountable for the behavior of their investigators, the Committee found that the 'friending' action proposed would amount to misconduct under Rule 8.4 prohibiting 'dishonesty, fraud, deceit or misrepresentation'. Therefore, 'friending' the witness on a social networking site without revealing that the purpose of the contact was to gain access to the restricted section of her profile constituted an act of 'deception' under the ethical rules. After reviewing the conflicting views of other State Bars on covert investigation by the legal profession, the Committee decided to refuse to acknowledge an exception as found in New York and other states ethics opinions and court decisions. Parties can also go too far when searching for 'evidence' on social networking sites. In the District of New Jersey case of Pietrylo v Hillstone Restaurant Group, a restaurant employee formed a by invitation-only discussion group called Spec-Tator on his MySpace page, intending it to be a space where other restaurant employees could negatively comment about their jobs. One member of Spec-Tator later provided uninvited members of the restaurant management with her access information. The*

*management viewed the discussion group page and fired a number of employees as a result of information posted on Spec-Tator. Two of the terminated employees filed a lawsuit, claiming invasion of privacy.*

*Although the jury found that the plaintiffs did not have a reasonable expectation of privacy in the online group, the Defendants were found to be in violation of the federal and state versions of the Stored Communications Act – 18 USC §§2701-11 and N.J.S.A2A:156A-27 - which make it an offense to access stored communications intentionally without authorization or in excess of authorization. The jury found that the employee who provided access to management had felt coerced, and so the access was not authorized. The jury subsequently awarded the plaintiffs $17,000 in compensatory and punitive damages."* Exhibit A.
http://www.velvetrevolution.us/images/H_WWoods_Social_Networking_Art icle.pdf

Many of the crimes committed by these lawyers are considered predicate acts of

RICO, and others are considered "Cyber Crimes," and are proscribed by a variety of

federal statutes, while others violate civil rights statutes. The Department of

Justice's manual, "Prosecuting Computer Crimes," lists a dozen statutes applicable to

the crimes committed and planned by Themis and H&W. *See*

http://www.justice.gov/criminal/cybercrime/ccmanual/ccmanual.pdf. The

manual's appendix listing a litany of computer crimes is attached as Exhibit II. The

crimes and torts committed by H&W/Themis include, obstruction of justice, forgery,

defamation, cyber stalking, spear phishing, violation of privacy, wire and mail fraud,

extortion, money laundering, harassment, stalking, destruction of property, spying,

cyber espionage, scraping computer data, identity theft, cyber attacks, interference

with business relations, violation of civil rights, conspiracy to commit the above and

other crimes.

1. **Obstruction of Justice-**The reason that H&W and Team Themis engaged in the nefarious conduct against Plaintiff was to thwart criminal investigations of the Chamber and its senior staff that had been discovered, publicized and

38

exposed by STC, VR and POE, all entities associated with Plaintiff. These Defendants' goal was to deter and intimidate Plaintiff so that he would not cooperate with federal investigations and to undermine his credibility so he would not be called to testify about the crimes committed by Defendants. Moreover, it was retaliation for that cooperation with federal officials. See 18 USC 1503, 1512, 1513.

2. **Forgery and Fraud:** Themis planned and conspired to create forged documents with the intent that they be distributed and relied on by STC and other advocacy organizations for the sole purpose of discrediting them and reporters. See Exhibits O, P, Q, T. Forgery and fraud are serious crimes under both federal and state law, and the same crime that resulted in the prosecution of Donald Segretti of Watergate infamy for forging documents to discredit Edmund Muskie, and are actionable under RICO. See 18 USC 1028, 1341, and 1343.

3. **Defamation:** Themis conspired to and did defame and extort the reporters and principals of the advocacy organizations, including Plaintiff, and their families and staff in order to harm their reputations. See Exhibits O, P, Q, T. This constitutes an intentional tort under state extortion law and is actionable under RICO.  See Maryland Criminal Code 7-306.

4. **Cyber stalking and Harassment:** Themis not only conspired to but in fact began cyber stalking the principals, family, friends and members of the reporters and advocacy organizations, including Plaintiff, in order to intimidate them into stopping disclosure of COC wrongdoing. . See Exhibits H, P-U, FF. Cyber stalking, including when done anonymously, is a federal crime under both 18 U.S.C. § 875 and 47 U.S.C. § 223(h)(1)(C) and is a state crime in many jurisdictions. Other possible statutes violated are 47 U.S.C. § 223(a)(1)(C) (anonymously using a computer to threaten or harass a person); 18 U.S.C. § 2261A (using a computer in interstate commerce to engage in a course of conduct that places a person in fear of death or injury, including spouse and immediate family). Ralph Nader sued General Motors for hiring private investigators to "conduct a campaign of intimidation against him in order to 'suppress plaintiff's criticism of and prevent his disclosure of information' about its products." He won a $9 million dollar judgment for conduct that paled in comparison to the H&W/Team Themis campaign.

5. **Violation of Privacy:** Themis conspired and did invade the privacy of reporters, and the principals of advocacy organizations, including Plaintiff, and their families and friends. See Exhibits W, X, MM. They scraped vast amounts of data from social networking sites -- in violation of their Terms of Service -- identifying Plaintiff's pre-teen daughter and the school she attends, another principal's "life partner" and sister, and then using that information to create reports on home addresses, dates of birth, and identifying staff of advocacy organizations, including wives, sisters and children.  Invasion of privacy is an intentional tort.

6. **Spear phishing:** Themis conspired to spy on the computers belonging to advocacy organizations, reporters and Plaintiff through the implantation of

illegal malware software programs that would open a back door access to those computers. *See* Exhibit CC, GG. This is an illegal form of hacking prohibited by the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

7. **Extortion:** Themis conspired to use extortionate tactics against Plaintiff and reporter Glenn Greenwald and others by uncovering information about weaknesses and using that information to "exploit" and "pressure" them to modify their positions or face ruin. *See* Exhibit O, U, GG. Extortion is a serious crime under both federal and state law. *See* e.g., 18 U.S.C. §§ 875–877, which prohibits using the mail to transmit in interstate commerce certain threats with the intent to extort, including threats to accuse of a crime or to injure person, property, or reputation. *See also*, 18 U.S.C. § 1030(A)(7) (transmitting and communication with intent a threat to cause damage) and Maryland Criminal Code 7-306.

8. **Destruction of Property and Cyber Attacks:** Themis conspired to use viruses and malware to destroy the computers and data of advocacy organizations and even engage in denial of service attacks against them. *See* Exhibits FF, GG. This violates 18 U.S.C. § 1030(a)(5)(A) (transmission of a program, information, code, or command, resulting in damage) as well as many state statutes.

9. **Theft, Identity Theft, and Internet Scraping:** Themis conspired and in fact engaged in theft, identity theft, violation of the Digital Millennium Copyright Act, copyright infringement, and illegal scraping of advocacy organization websites and social networking sites. *See* Exhibits H, O, W, X, FF, GG. This violates 17 U.S.C. § (DMCA), 17 U.S.C. § 506 and 18 U.S.C. § 2319 (criminal copyright infringement), 18 U.S.C. § 1028 (identity theft) and 18 U.S.C. § (wire fraud). Moreover, Facebook and LinkedIn specifically prohibit the use of software programs to harvest information from their sites. https://www.facebook.com/terms.php **(**"You will not collect users' content or information, or otherwise access Facebook, using automated means such as harvesting bots, robots, spiders, or scrapers without our permission.**")** http://www.linkedin.com/static?key=user_agreement (prohibits "manual or automated software, devices, scripts robots, other means or processes to access, "scrape," "crawl" or "spider" any web pages or other services contained in the site" or to "[c]ollect, use or transfer any information, including but not limited to, personally identifiable information obtained from LinkedIn except as expressly permitted in this Agreement or as the owner of such information may expressly permit.").

10. **Spying and Interception of Electronic Communications:** Themis conspired to use invasive cyber attacks to spy on advocacy organizations and their staff, and intercept electronic communications, and stored communications by accessing their personal and work computers. *See* Exhibits H, P-U, FF, CC, GG. This violates 18 U.S.C. § 2511 (intercepting electronic communications), 18 U.S.C. § 2701 (accessing stored communications), and 18 U.S.C. § 1030(a)(2) (accessing a computer and obtaining information).

11. **Interference with Business:** Themis conspired to use deceptive means to ruin advocacy organizations and undermine their funding. *See* Exhibit O, CC, DD, FF, GG.   Interference with business and contracts is an intentional tort actionable in state and federal court.

12. **Civil Rights Violations:** H&W targeted advocacy organizations and reporters for engaging in activities protected by the First Amendment, including the right to free speech, peaceful assembly, and petitioning the government for redress of grievances. *See* Exhibits O, CC, DD.  Three private security contractors that received federal funding -Themis - were used by H&W to target the organizations and reporters.  Themis members used a portion of their federal funding to create the programs that were employed against organizations, Plaintiff and reporters.  Themis used federal funding to create its Phase I pilot program for the COC, Bank of America and H&W. Because of this nexus to federal funds, Themis and H&W violated the civil rights of STC, VR and others as proscribed by 18 U.S.C. § 241 (conspiracy against rights) and § 242 (deprivation of rights under color of law).

13. **Conspiracy:** The lawyers of H&W conspired with members of the Themis team to violate all of the above statutes.  Therefore, they are subject to prosecution under the general conspiracy statute, 18 U.S.C. § 371. They also conspired to violate Plaintiff's civil rights under 42 USC 1985(2) by conspiring and intimidating him, as a party and witness in federal proceedings against the COC, from cooperating in those proceedings.

## CLAIM 1
## Conspiracy To Violate The Civil Rights Act
## 42 USC 1985(2)
## (All Defendants Except PNNL, ManTech, Nickless and Hoge)

60.     Plaintiff adopts the foregoing including paragraphs 1-44.

61.     All Defendants, with the exception of Defendants PNNL, Nickless,

Mantech and Hoge, conspired to use the tactics set forth above to deter Plaintiff by

force, intimidation, or threat, from testifying to any matter pending in a federal

court, freely, fully, and truthfully, and to injure Plaintiff in his person or property on

account of his having so attended or testified, and to influence the presentment, and

indictment of any grand or petit juror in any court.

62.     Defendants knew that Plaintiff had met and repeatedly provided

information to the FBI about Defendant Chamber of Commerce's illegal conduct and

the illegal conduct of COC board member Donald Blankenship and COC President

Tom Donohue and the illegal conduct of COC member NewsCorp, and that there

were grand juries empaneled to investigate this criminal activity.   One grand jury

issued an indictment against Mr. Blankenship in November 2014, and grand juries'

investigative duties continue as to other matters. Defendants conspired to use illegal

means to deter and intimidate Plaintiff from testifying about these matters and to

undermine his credibility so he would not be called to testify.   This conduct violates

section one of 42 USC 1985(2).

63.      The named Defendants knowingly, willfully, maliciously, intentionally,

and without justification planned and acted to deprive Plaintiff of his rights.

64.      As a result of the unlawful acts of the named Defendants' conspiracy

to violate his rights, Plaintiff has suffered damages and harm, including physical

harm.

## CLAIM II
### Fraudulent Conveyance
### (Defendants HB Gary/Federal, Greg Hoglund and Mantech)

65.      Plaintiff adopts the foregoing including paragraphs 1-44.

66.      Defendants HB Gary/Federal, Hoglund and Mantech conspired to and

did fraudulently, knowingly and intentionally transfer assets belonging to HB

Gary/Federal in order to shield them from legal process in this case, and created a

sales agreement to specifically limit liability of Mantech for the illegal conduct

alleged above by HB Gary/Federal.

67.      Defendants HB Gary/Federal and Hoglund were advised by letter in

March 2011 that they was facing legal action with regard to the illegal conduct

alleged above.  Upon receiving that letter, it initiated action to transfer assets to Defendant Mantech to keep them beyond the reach of Plaintiff, a future creditor, thereby causing him harm.

68.     This constitutes a fraudulent conveyance under Md. Comm. Code 15-201 et seq.

## CLAIM III
### Conspiracy to Invade Privacy-Intrusion into Seclusion
### (All Defendants except Mantech)

69.     Plaintiff adopts the foregoing including paragraphs 1-44.

70.     Defendants, from October 2010 through March 2015, conspired to invade Plaintiff's privacy through unreasonable intrusion upon the seclusion of Plaintiff as outlined above.

71.     The named Defendants' intrusion into Plaintiff's seclusion, as stated above, caused substantial injury to Plaintiff's reputation, business interests, and mental well-being.

72.     The named Defendants' intrusion into Plaintiff's seclusion caused Plaintiff to sustain substantial damages.

73.     The named Defendants' actions against Plaintiff were willful, wanton and malicious, and were intended to deliberately harm Plaintiff, including physical harm.

74.     Thus, the named Defendants acted with an improper and outrageous motive or careless indifference to Plaintiff's rights and interests.  Defendants' outrageous conduct warrants the imposition of significant compensatory and punitive damages.

**CLAIM IV**
**Invasion of Privacy**
**Appropriation of Name, Intrusion into Seclusion, and Unreasonable**
**Publicity**
**(Hoge)**

75.     Plaintiff adopts the foregoing including paragraphs 1-44.

76.     From July 1, 2014 through the present time, Defendant Hoge has

appropriated and traded on Plaintiff's first and last names for commercial purposes,

including raising funds, selling merchandise and creating fraudulent financial scams.

Defendant Hoge uses his WordPress *HogeWash* blog as the primary vehicle to do

this by placing Plaintiff's name on a daily basis in the titles of his blog posts and in

keywords attached to those posts.  He then promotes those blog posts through his

@wjjhoge Twitter account, again using Plaintiff's name in those daily tweets. He

does this to raise his Seatch Engine results and drive traffic to his site.

77.     During the same time period, Defendant Hoge gave unreasonable

publicity to Plaintiff's private life by daily publishing blog posts and tweets about

Plaintiff that are intended to and do smear Plaintiff in order to cause him maximum

harm.

78.     During that same time period, Defendant Hoge intruded on Plaintiff's

seclusion by investigating and probing every aspect of Plaintiff's life, his family, his

business, his associates, his social connections, and his music in order to harass and

harm him and deprive him of business opportunities.  He then published his

intrusions in the most unfavorable light with constant statements and warnings that

Plaintiff will be arrested, exposed, humiliated, and embarrassed by the results of his

investigations.  Defendant Hoge creates conspiracy theories tying Plaintiff to bizarre

and nefarious activity by a host of people, and then labels them under a daily blog post heading, which always includes the words, "Team Kimberlin."

79.     Plaintiff has never given Defendant Hoge permission to use his name in any manner and has repeatedly asked Defendant Hoge in various venues to leave him alone.

80.     The actions of Defendant Hoge are reckless, intentional and knowing, and done in order to cause substantial injury to Plaintiff's reputation, business interests, and mental well-being. He has caused Plaintiff to sustain substantial damage and to go to great lengths to protect his family that are far beyond those done by average American civilians.

81.     Defendant Hoge's actions are willful, wanton and malicious, and done with an improper and outrageous motive and careless indifference to Plaintiff's rights and interests. This warrants the imposition of significant compensatory and punitive damages.

## CLAIM V
## Defamation and False Light
### (Nickless and PNNL)

82.     Plaintiff adopts the foregoing including paragraphs 1-44.

83.     Defendant Nickless, with the knowledge, support, direction and financial backing of Defendant PNNL, has engaged in campaign of defamation and false light against Plaintiff as a continuing component of the Team Themis cyber campaign to destroy Plaintiff's name, business and reputation. The actions of these two Defendants began in the fall of 2014 and continue through the present time. Defendant Nickless uses his Twitter account, @BillNickless, and his pseudonyms on

Defendant Hoge's blog as his primary vehicles to publish defamatory statements and portray Plaintiff in a false light.

84.     This defamation and false light have caused and continue to cause substantial injury to Plaintiff, his business and personal well-being, especially since they come from an organizations and from a person which, until now, have maintained good reputations.  The statements have caused deep embarrassment, humiliation, opprobrium, emotional distress and mental suffering to Plaintiff.

85.     The defendant's false light and defamatory statements and the implications drawn from them concerning Plaintiff are defamatory per se because they allege crimes, including sex crimes, that make him appear odious, infamous and or frightening.

86.     Defendants published these false and defamatory statements to third parties who reasonably understood them to be defamatory.

87.     Defendants were aware of the defamatory implication of their statements and intended and endorsed their defamatory implication.

88.     Defendants published these false and defamatory statements about Plaintiff even though they knew that they were not based on fact or truth.

89.     Defendants published the false statements without conducting reasonable due diligence or contacting Plaintiff to determine if they were in fact true.

90.     Defendant PNNL, after Plaintiff formally advised it that the published statements were not true, took no affirmative action to correct or withdraw the false statements.

91.     Alternatively, the Defendants published the false statements negligently as to the truth or falsity of what they were saying.

92.     The Defendants published these defamatory statements with both common law and actual malice, and with the intent of harming Plaintiff.

93.     The Defendants published multiple defamatory statements in order to compound the harm to Plaintiff.

94.     Defendants published these defamatory statements in order to create controversy so that they could harm Plaintiff and increase Internet traffic to their blogs and websites.

95.     Defendants' actions were willful, wanton, and malicious, were intended to deliberately harm Plaintiff, and were made with a callous indifference to Plaintiff.  The Defendants acted with an improper and outrageous motive or callous indifference to Plaintiff's rights and interests.

96.     As a result of Defendants' outrageous and repeated conduct, Defendants should be ordered to pay substantial compensatory and punitive damages.

## CLAIM VI
### COMMISSION OF AND CONSPIRACY TO COMMIT CIVIL RICO UNDER 18 USC 1962(c) and 18 USC 1962(d)
### (All Defendants Except Hoge, PNNL, Nickless and Mantech)

97.     Plaintiff adopts the foregoing including paragraphs 1-44.

98.     Plaintiff is a person with standing to sue within the meaning of 18 USC 1964(c).

47

99.     Each of the named Defendants is a "RICO person" within the meaning of 18 USC 1963(1) because they are individuals or entities capable of holding a legal or beneficial interest in property.

100.    The named Defendants have wrongfully participated in the conduct of an enterprise through a pattern of racketeering activity which has directly injured Plaintiff in his business and property in violation of 18 USC 1962(c).  The Defendants have conspired to participate in the conduct of an enterprise through a pattern of racketeering as set forth below in violation of 18 USC 1962(d).

**The Rico Enterprise**

101.    All named Defendants and unnamed persons constitute an association-in-fact, and therefore an enterprise ("RICO Enterprise"), within the meaning of 18 USC 1961(4).  The association in fact enterprise is a group of people and entities associated together for the common purpose of acting to promote COC's business interests and protecting the COC and its senior staff from any external opposition and criminal and administrative investigations.  Specifically, the enterprise worked and continues to work towards a common purpose of harming Plaintiff in order to retaliate against him for exposing the COC and its senior staff, and deter him from continuing to cooperate with federal administrative and law enforcement agencies.  As Team Themis stated in its formal Power Point presentation to H&W, it would "discredit, confuse, shame, combat, infiltrate and fracture" Plaintiff and his employer.

102.    At all relevant times from September 2010 through February 27. 2015, the RICO Enterprise was an ongoing relationship, business and criminal,

among the named Defendants, with the common purpose of engaging in conduct to destroy the reputation and livelihood of Plaintiff in retaliation for his work as a principal in non profit advocacy organizations which exposed criminal wrongdoing by the Chamber of Commerce and its executive staff, Board and members.

103.    At all relevant times, the RICO Enterprise was engaged in interstate commerce in that its activities and transactions relating to its fraudulent and criminal activities as related above affected interstate commerce and frequently required travel, communications and financial transactions across state lines.

104.    At all relevant times, the members of the RICO Enterprise functioned as a continuing unit. And the association in fact enterprise constitutes an ongoing organization because it began its initial illicit activities in May 2010 and continues those activities to the present time.

105.    H&W and its attorneys, John Woods, Richard Wyatt and Robert Quackenboss, have served as the primary leaders of the association in fact enterprises' illicit actions as alleged herein.  Under their direction, the other "persons" actively participated in a pattern of activity as alleged below.

106.    At all relevant times, the named "persons" conducted or participated in, and conspired to conduct or participate in, the affairs of the RICO Enterprise through a pattern of numerous acts of racketeering in violation of 18 USC 1962(c) and 1962(d), related by their common goal to harm, deter, intimidate and neutralize Plaintiff.

107.    Specifically, the named Defendants conducted or participated in and agreed to conspire to conduct the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering under 18 USC 1961(1):

- Mail fraud to further their unlawful scheme in violation of 18 USC 1341;

- Wire fraud to further their unlawful scheme in violation of 18 USC 1343;

- Obstruction of justice to further their unlawful scheme in violation of 18 USC 1503;

- Retaliation against a witness and victim to further their unlawful scheme in violation of 18 USC 1512 and 1513;

- Extortion to further their unlawful scheme in violation of 18 USC 1951;

- Money laundering to further their unlawful scheme in violation of 18 USC 1957.

- Extortion under Maryland Code, 3-706 to bring Plaintiff into contempt and disrepute, to inflict emotional distress, and cause economic damage.

108.    The named Defendants' engagement in the above listed predicate acts vis a vis the conduct of affairs of the RICO Enterprise was intended to result in the individual financial gain of each Defendant, through actual funds, contracts, professional billing, advertising and increased traffic to their publications, and by

increased funding by the COC to H&W once it neutralized its opponents, including

Plaintiff, all at the expense of business, property and personal injury to Plaintiff.

109.    On November 24, 2010, Defendant Steckman encapsulated the RICO

enterprise in these words: *"We need to blow these guys away with descriptions of our

capabilities, IP, and talent. "Make them think that we are Bond, Q, and money penny

[sic] all packaged up with a bow. ... Most of all that we are the best money can buy!

Dam [sic] if feels good to be a gangsta."* RICO was enacted to prosecute gangsters

engaged in organized crime.  Team Themis, as portrayed by its own members, is a

"gangsta" racketeering enterprise that engaged in illegal conduct.

110.    Plaintiff's business/property interests were harmed by the actions of

the named Defendants and the RICO Enterprise. Plaintiff had a "property interest" in

continuing his employment as the director of a non-profit that he has worked for 11

years.  He had a "property interest" in being able to raise funds for that business to

pay his salary and the other salaries and expenses of the business without secret

illegal espionage activities to undermine that funding.  He had a property interest in

pursuing his livelihood and music career without molestation and a harmed

reputation. Yet Defendants attempted and engaged in conduct intended to deprive

Plaintiff of those property interests. They conspired to "fracture" and destroy the

non-profits by stopping their funding and to undermine Plaintiff's business and

personal relationships through a campaign of criminal racketeering. This amounts

to conspiracy and attempt to harm Plaintiff's property interests.

## PREDICATE ACTS

### Mail Fraud, 18 USC 1341

111.    The named Defendants through the RICO Enterprise, sent documents and data discs through the United States mails in furtherance of their fraudulent conspiracy to harm Plaintiff.  These documents and discs were sent in interstate commerce.

112.    The named Defendants *conspired* with one another through the RICO Enterprise, to send money through the United States Postal Service/Fed Ex/UPS to finance criminal activities such as extortion, cyber crimes, and fraud.

113.    The named Defendants through the RICO Enterprise willfully, knowingly and intentionally committed and conspired to commit multiple predicate acts of mail fraud in violation of 18 USC 1341, as set forth above.

### Wire Fraud, 18 USC 1343

114.    The named Defendants through the RICO Enterprise, sent documents, contracts, proposals, emails and software in interstate commerce through telecommunications and wire and Internet services and interactive computer services in furtherance of their conspiracy to harm Plaintiff. They conspired to transmit money through telecommunications and wire and Internet services to the finance criminal activities described in this Complaint.

115.    These wire communications included thousands of emails with attached documents between the COC, H&W and Team Themis that all furthered Defendants' illicit activity to harm Plaintiff and his business. The specific number of predicate acts of wire fraud cannot be fully alleged without access to discovery.

Defendant's H&W and the COC have utilized mail fraud and wire fraud to conduct their racketeering activities and enterprise, and these activities have been ongoing and continuous since 2010, and are likely to continue in the future, absent relief in this action.

116.    The named Defendants through the RICO Enterprise willfully, knowingly and intentionally committed and conspired to commit multiple predicate acts of wire fraud in violation of 18 USC 1343, as set forth above.

### Obstruction of Justice; 18 USC 1503

117.    The named Defendants through the RICO Enterprise corruptly and by threats and by communication, conspired to influence, obstruct, imped, and endeavor to influence, obstruct, or impede, the due administration of justice by conspiring to, intimidating and smearing and physically harming Plaintiff in order to deter him from cooperating with the FBI and testifying in a grand jury proceeding about criminal activity by senior members of the Chamber of Commerce.

118.    The named Defendants through the RICO Enterprise furthered their obstruction of justice by conspiring to create and provide false and forged documents in order to discredit Plaintiff so he would not be deemed a credible witness.

119.    The named Defendants through the RICO Enterprise furthered their obstruction of justice by threatening Plaintiff and causing threats of injury and death to be directed at Plaintiff in order to intimidate him from cooperating with law enforcement officials and from exercising his right to seek legal redress in a court of law.  On one occasion, a person who had targeted Plaintiff committed battery

against Plaintiff, causing him to be treated for physical injuries at Suburban Hospital.

120.    These willful, knowing and intentional acts constitute obstruction of justice in violation of 18 USC 1503(a).

### Retaliation of a Witness and Victim; 18 USC 1512 and 1513

121.    The named Defendants through the RICO Enterprise have engaged in a multi-year campaign of retaliation against Plaintiff in order to intimidate him from being a witness, and to retaliate against him for providing information to law enforcement officials regarding federal offenses committed by principals of the Chamber of Commerce. This retaliation came in the form of the Team Themis campaign to "discredit" and fracture his credibility, threats of death and injury, actual physical injury, and injury caused by articles and tweets published or planted by Defendants portraying Plaintiff as untrustworthy and not credible. 18 USC 1513(e) prohibits retaliation against any person who provides to a law enforcement officer any truthful information relating to the commission or possible commission of a federal offense.

122.    These willful, knowing and intentional acts constitute retaliation of a witness and a victim in violation of 18 USC 1512(d) and 1513(b) and (e).

### Extortion, Conspiracy and Attempted Extortion; 18 USC 1951

123.    The named Defendants through the RICO Enterprise conspired to engage in extortion by intruding into Plaintiff's legally protected business and First Amendment activities, and personal, family and business relationships, and then

54

conspiring to "exploit vulnerabilities" to "pressure" Plaintiff to stop exposing the COC, cooperating with the FBI and testifying before any grand jury.

124.    These willful, knowing and intentional acts constitute extortion in violation of 18 USC 1951.

### Money Laundering; 18 USC 1957

125.    The named Defendants through the RICO Enterprise conspired to engage in money laundering by transferring money from the COC to H&W disguised as legal fees for payment of the illegal Team Themis black bag cyber spying campaign.

126.    The named Defendants through the RICO Enterprise conspired to engage in these monetary transactions derived through fraud in a value greater than $10,000 in interstate commerce.  These monetary transactions included deposits, withdrawals, transfers and exchanges to, from and through financial institutions in the United States.

127.    These willful, knowing and intentional acts constitute engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 USC 1957.

### Maryland Extortion: Md Crim Code 3-706

128.    The named Defendants conspired to and did make written communications under real and fictitious names with the intent to extort things of value, including Plaintiff's livelihood and reputation, by falsely accusing Plaintiff of crimes in order to cause him contempt and disrepute; and inflict emotional distress and economic harm to Plaintiff

129.     These willful and intentional acts violate Md. Criminal Code, 3-706.

### PATTERN OF RACKETEERING ACTS

130.     The named Defendants engaged in the racketeering activity and commission of predicate acts as described in this Complaint, targeting Plaintiff beginning in August 2010 and continuing until the present time.

131.     As set forth above, the named Defendants have committed at least two predicate acts of racketeering activities in the past 10 years. In fact, they have committed many more than two predicate acts.

132.     The named Defendants implemented the racketeering acts described in this Complaint as a business model for the RICO Enterprise to be used against Plaintiff and against other persons and advocacy organizations that exposed COC criminal activity.

133.     The named Defendants' racketeering acts have or had similar purposes to harm opponents of the Chamber of Commerce, including Plaintiff.

134.     As set forth above, the named Defendants' racketeering acts have or had similar participants; some in supervisory roles such as H&W and its attorneys, and others in support roles such as the other named Defendants, and even others not named in this Complaint.

135.     As set forth above, the named Defendants, through the RICO Enterprise, directed their activities at Plaintiff, the non-profits he was associated with, and other opponents of the COC.  The named Defendants created the RICO Enterprise as a business model to enable it to engage its illegal, secret, black ops team in missions to destroy opponents of the COC over a multi-year period of time.

136.    The named Defendants' acts have or had similar methods of commission, consistent practices with respect to engaging in breathtaking, secret domestic spying and criminal activity, and the use of stonewalling and lies when asked for transparency and accountability.

137.    The named Defendants' racketeering acts have or had a similar purposes, including to profit from their activities, to profit from their money laundering schemes, to increase the value of their companies, and to destroy their opponents.

138.    The named Defendants agreed and conspired to pursue the same criminal objectives even though some of the Defendants were primary actors while others were supporters.  These conspirators intended to further the endeavor of harming Plaintiff, which, if completed, satisfied all the elements of a civil RICO claim.

## DIRECT INJURY TO PLAINTIFF'S PERSON, BUSINESS AND PROPERTY

139.    Plaintiff was injured in his business and property by reason of Defendants' pattern of racketeering activity.  As a direct and proximate result of the named Defendants' willful, knowing and intentional predicate acts, as set forth above, Plaintiff has suffered injury to his name, property and businesses, including, but not limited to: having his name falsely smeared; having his employer defamed based on those smears; having to spend untold hours, days, weeks, months and years defending against the criminal actions of the Defendants; having to spend money defending against the Defendants' actions; losing employment and funding opportunities; having attempted interference with his business relationships and his contract to remain employed by his employer, having interference with

prospective business advantage, having interference with his business as a musician, composer and manager, and other pecuniary and losses to real or personal property. Plaintiff has also suffered damage to his body, which constitutes property under RICO, when he was assaulted by an person not named in this Complaint who adopted the Team Themis racketeering playbook to harm Plaintiff.

140. The Defendants' illicit activities injured Plaintiff in an amount subject to proof at trial, but which greatly exceeds the $75,000 jurisdictional limit of this Court. Plaintiff is entitled to an award of damages in an amount to be determined at trial, including treble damages and other fees and costs associated with this action.

**CLAIM VII**
**CONSPIRACY TO INTERFERE WITH BUSINESS RELATIONS**
**and**
**CONSPIRACY TO INTERFERE WITH PROSPECTIVE ECONMOMIC ADVANTAGE**
**(All parties except Hoge, PNNL, Nickless, Mantech)**

125. Plaintiff adopts the foregoing including paragraphs 1-44.

126. The named Defendants maliciously and wrongfully interfered with Plaintiff's business relations and prospective economic advantage. Specifically, Plaintiff has worked as director of Justice Through Music and principal in VelvetRevolution for eleven years and has an agreement to continue that work. The named Defendants knew of the existence of that employment relationship and they intentionally attempted to interfere with it by illegally conspiring to fracture, undermine and destroy in order to deprive Plaintiff of his livelihood. As Defendant Barr stated in an email on November 29, 2010: *"Attack [one of the VR principals] and after a series of attacks on his person start making ties to the back office folks ...*

*discrediting them by association. Done in the right way this can cause them to distance themselves and also funders from [the principal]."*

127.    Defendants further conspired to harass companies associated with Plaintiff's non-profit employer by falsely defaming and disparaging Plaintiff in the vilest ways in order to destroy it reputation, funding and business opportunities.

128.    Plaintiff has been damaged by the named Defendants' malicious conspiracy to interfere with his business relations.

129.    Defendants knew that Plaintiff was engaged in business and conspired and engaged in conduct to covertly disrupt that business and deprive Plaintiff of future business and they did.

130.    The named Defendants' actions against Plaintiff were willful, wanton and malicious, and were intended to deliberately harm Plaintiff.

131.    Thus, the named Defendants acted with an improper and outrageous motive or careless indifference to Plaintiff's rights and interests.  The named Defendants' outrageous conduct warrants the imposition of significant compensatory and punitive damages.

## VII
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants except Mantech)

132.    Plaintiff adopts the foregoing including paragraphs 1-44.

133.    Defendants' conduct, as set forth above, constitutes extreme behavior so far outside the norms of civil society that an ordinary citizen would consider it outrageous conduct.

134.    Defendants' stated purpose to harm Plaintiff in every way imaginable, including death threats, harm to his family and business, and reputational harm, demonstrates malice with intent to cause maximum harm.

135.    Defendants' actions were done intentionally and/or recklessly in conscious disregard of the high probability that Plaintiff's mental distress would follow.  In fact, the Defendants intended that such distress would follow.

136.    There was a causal connection between the tortious acts of Defendants and the emotional distress suffered by Plaintiff.  In a civilized society, governed by the rule of law, it is unconscionable that supposedly legitimate and educated people who work for established entities would engage in the conduct outlined above.

137.    As a result of Defendants' actions, Plaintiff has suffered severe emotional distress and mental anguish.

### Relief

**Wherefore,** Plaintiff prays for judgment as follows:

133.    That Defendants, and each of them, as well as their agents, servants, employees, and all other persons acting in concert or participating with them, be preliminarily and permanently enjoined and ordered without limitation:

•       To deliver all software, documents, computer files, products or other tangible items in their possession, control or custody, that were created or generated in any way by them about Plaintiff, Justice Through Music, Stop The Chamber or Velvet Revolution, including any associated employee or family member;

- To immediately and permanently dispossess themselves of any and all software, documentation, confidential, personal and proprietary information about Plaintiff, Justice Through Music, Velvet Revolution, Stop the Chamber, and any associated employee or family member;

- To immediately cease any further use or disclosure of any confidential, personal and/or proprietary information about Plaintiff, Justice Through Music, Velvet Revolution, Stop the Chamber and any associated employee or family member;

134.   For compensatory damages and consequential damages for harm, including physical harm, subject to proof at trial in an amount exceeding $75,000;

135.   For disgorgement of all profits received or generated, and income billed or earned as a result of Defendants' wrongful conduct;

136.   For punitive/exemplary damages;

137.   For treble damages pursuant to 18 USC 1964(c);

138.   For an order enjoining Defendants from engaging in future tortious acts against Plaintiff;

139.   For an order permanently barring Defendants from retaliating against Plaintiff for bringing this action;

140.   For such other and further relief as this Court deems just and appropriate.

141.   A jury trial on all issues triable as of right by a jury.

Dated this 16th day of March, 2015.

By: _____

Brett Kimberlin
8100 Beech Tree Rd
Bethesda, MD 20817
(301) 320 5921