**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

**BRETT KIMBERLIN**,

Plaintiff,

*v.*

Civil Action No. 8:15-cv-00723-GJH

**HUNTON & WILLIAMS LLP**, *et al.,*

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS**
**BY THE CHAMBER OF COMMERCE OF THE UNITED STATES**

July 20, 2015

Bobby Burchfield, Esq.
Johnny Walker, Esq.
Emily Apte, Esq.
**KING & SPALDING** LLP
1700 Pennsylvania Avenue, NW
Washington, District of Columbia 20006

# CONTENTS

OVERVIEW OF MR. KIMBERLIN'S ALLEGATIONS ............................................................1

    A.    Mr. Kimberlin's Claimed Activism Against the Chamber. ...........................................2

    B.    Emails Detailing a Pitch that Team Themis and Hunton & Williams
           Planned to Make to Hunton & Williams Clients. ..........................................................3

          1.    Background. ......................................................................................................3

          2.    Preparation of the Pitch...................................................................................3

          3.    Demise of the Pitch. ........................................................................................6

          4.    Mr. Kimberlin's Awareness of the Hacked Emails. ........................................8

    C.    Mr. Kimberlin's Conclusory Allegations that Team Themis's
           Aborted Plan Was Nonetheless Carried Out...................................................................8

ARGUMENT .......................................................................................................................9

I.   MR. KIMBERLIN'S CLAIMS AGAINST THE CHAMBER ARE UNTIMELY. .................9

II.  THE COMPLAINT DOES NOT ALLEGE COGNIZABLE LEGAL INJURY. ...................11

III. NONE OF THE CLAIMS AGAINST THE CHAMBER ARE PROPERLY
     PLEADED OR SUPPORTED BY THE ALLEGED FACTS.................................................14

    A.    The Allegations are Neither Plausible Nor Particular....................................................15

    B.    Mr. Kimberlin Fails to Plead Facts Supporting a RICO Claim. (Claim VI) ...............17

          1.    Mr. Kimberlin Does Not Allege Facts Showing that the Chamber
               Conducted or Participated in an Enterprise. ....................................................18

          2.    Mr. Kimberlin Has Not Pleaded Facts Showing a Pattern
               of Racketeering Activity. ................................................................................19

               a)    Mail Fraud, 18 U.S.C. § 1341......................................................20

               b)    Wire Fraud, 18 U.S.C. § 1343. .....................................................21

               c)    Obstruction of Justice, 18 U.S.C. § 1503......................................22

       d)      Intimidation and Retaliation against a Witness,
                 18 U.S.C. §§ 1512, 1513.................................................................24

       e)      Extortion, 18 U.S.C. § 1951............................................................26

       f)      Money Laundering, 18 U.S.C. § 1957..........................................27

       g)      Written Extortion, Md. Crim. Code § 3-706..................................28

C.    Mr. Kimberlin Fails to Plead Facts Supporting a Civil Rights Claim. (Claim I) ........29

D.    Mr. Kimberlin Fails to Plead Facts Supporting a Claim for
       Invasion of Privacy. (Claim III)...................................................................................31

E.    Mr. Kimberlin Fails to Plead Facts Supporting a Claim for Intentional  Interference
       with Business and Prospective Economic Advantage. (Claim VII) ...........................33

F.    Mr. Kimberlin Fails to Plead Facts Supporting a Claim for Intentional
       Infliction of Emotional Distress. (Second Claim VII) .................................................34

CONCLUSION...........................................................................................................................35

# AUTHORITIES

**Federal Cases**

*Adams v. NVR Homes, Inc.*,
193 F.R.D. 243 (D. Md. 2000)........................................................................20, 21, 22

*Agency Holding Corp. v. Malley-Duff Assocs., Inc.*,
483 U.S. 143 (1987)............................................................................................10

*In re Am. Honda Motor Co, Inc. Dealership Relations Litig.*,
958 F. Supp. 1045 (D. Md. 1997)............................................................................23

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)............................................................................................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................11, 12, 15, 17

*Baron Fin. Corp. v. Natanzon*,
471 F. Supp. 2d 535 (D. Md. 2006) ........................................................................33

*Bediako v. Am. Honda Fin. Corp.*,
850 F. Supp. 2d 574 (D. Md. 2012) *aff'd*, 537 F. App'x 183 (4th Cir. 2013) ....................................12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................15

*Bhari Info. Tech. Sys. Private Ltd. v. Sriram*,
984 F. Supp. 2d 498 (D. Md. 2013) ........................................................................20

*Boyle v. United States*,
556 U.S. 938 (2009)........................................................................................18, 19

*Brooks v. City of Winston-Salem, N.C.*,
85 F.3d 178 (4th Cir. 1996) ................................................................................9

*Chisolm v. TranSouth Fin. Corp.*,
95 F.3d 331 (4th Cir. 1996) ........................................................................20, 21, 22

*Fare Deals Ltd. v. World Choice Travel.Com, Inc.*,
180 F. Supp. 2d 678 (D. Md. 2001) ........................................................................1

*Four Navy Seals v. Associated Press*,
413 F. Supp. 2d 1136 (S.D. Cal. 2005)....................................................................32

*Francis v. Giacomelli*,
   588 F.3d 186 (4th Cir. 2009) ..................................................................................................1

*Gallipeau v. Correct Care Solutions*,
   No. CA 3:10-2017-JFA-JRM, 2011 WL 4502043 (D.S.C. Sept. 29, 2011)........................12

*Glynn v. Impact Science & Tech., Inc.*,
   807 F. Supp. 2d 391 (D. Md. 2011) ......................................................................................12

*H. J. Inc. v. Nw. Bell Tele. Co.*,
   492 U.S. 229 (1989)..............................................................................................................19

*Holmes v. Sec. Investor Protection Corp.*,
   503 U.S. 258 (1992)..............................................................................................................14

*Kimberlin v. Nat'l Bloggers Club*,
   No. GJH-13-3059, 2015 WL 1242763 (D. Md. Mar. 17, 2015)................................. *passim*

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
   313 U.S. 487 (1941)..............................................................................................................31

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..............................................................................................................12

*Mattison v. Click Corp. of Am.*,
   No. CIV.A. 97-CV-2736, 1998 WL 325927 (E.D.Pa. Jan. 27, 1998) ..................................30

*Park v. Jack's Food Sys., Inc.*,
   907 F. Supp. 914 (D. Md. 1995)...........................................................................................20

*Philips v. Pitt Cnty. Mem'l Hosp.*,
   572 F.3d 176 (4th Cir. 2009) ..................................................................................................1

*Rotella v. Wood*,
   528 U.S. 549 (2000)..............................................................................................................10

*Scheidler v. Nat'l Org. for Women, Inc.*,
   537 U.S. 393 (2003)..............................................................................................................27

*Sedima S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985).......................................................................................................12, 17

*Trundle v. Homeside Lending, Inc.*,
   162 F. Supp. 2d 396 (D. Md. 2001) ................................................................................31, 32

*United States v. Aguilar*,
    515 U.S. 593 (1995)................................................................23, 24

*United States ex rel. Wilson v. Kellogg Brown & Root*,
    525 F.3d 370 (4th Cir. 2008) ....................................15, 20, 22

**State Cases**

*Kaser v. Fin. Prot. Mktg.*,
    831 A.2d 49 (Md. 2003) ...................................................................33

*Lab. Corp. of Am. v. Hood*,
    911 A.2d 841 (Md. 2006) ................................................................31

*Manikhi v. Mass Transit Admin.*,
    758 A.2d 95 (Md. 2000) ..................................................................35

*Pearce v. Whitenack*,
    440 S.W.3d 392 (Ky. Ct. App. 2014) ............................................32

**Federal Statutes**

18 U.S.C. § 1341 ..........................................................................................20

18 U.S.C. § 1343 ..........................................................................................21

18 U.S.C. § 1503 ....................................................................................22, 23

18 U.S.C. §§ 1512 ..................................................................................24, 25

18 U.S.C. § 1951 ..........................................................................................27

18 U.S.C. § 1957 ....................................................................................27, 28

18 U.S.C. § 1961 ....................................................................................18, 19

18 U.S.C. § 1962 ...................................................................9, 13, 14, 17, 20

**State Statutes**

Maryland Code § 3-706 ..........................................................................28, 29

Maryland Code § 5-101 ..................................................................................11

**Rules**

Federal Rule of Civil Procedure 8 ...........................................................................15

Federal Rule of Civil Procedure 9(b)........................................................15, 20, 21

Federal Rule of Civil Procedure Rule 12(b)(6).........................................................10

**Other Authorities**

5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at
    352 (1990).........................................................................................................10

Accepting Mr. Kimberlin's collection of dated news clippings, long-ago leaked e-mails, and speculative assertions on its face, the Complaint fails to state a claim against the Chamber of Commerce of the United States for at least three reasons.  *First*, the allegations in the Complaint, read most favorably to Mr. Kimberlin, establish that he brought his claims after the expiration of every applicable limitations period.  *Second*, Mr. Kimberlin has pleaded no cognizable injury attributable to the Chamber, both because his Complaint and the exhibits attached to it show no involvement by the Chamber in the alleged actions and because Mr. Kimberlin has pleaded little or no personal involvement with the events described.  *Third*, Mr. Kimberlin fails to make plausible allegations sufficient to state the basic elements of his claims.  Accordingly, all of Mr. Kimberlin's claims against the Chamber must be dismissed.

## OVERVIEW OF MR. KIMBERLIN'S ALLEGATIONS

To survive a motion to dismiss, the Complaint must "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).  The Court "may also consider documents attached to the complaint . . . so long as they are integral to the complaint and authentic."  *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  When a complaint's allegations conflict with documents attached or referenced in the complaint, those documents prevail.  *Fare Deals Ltd. v. World Choice Travel.Com, Inc.*, 180 F. Supp. 2d 678, 683 (D. Md. 2001).

Accordingly, for the purpose of this motion, the Chamber provides this overview of Mr. Kimberlin's allegations assuming without admitting they are true,[1] referring when necessary to documents attached to the Complaint, and resolving inconsistencies between the Complaint and attached documents in favor of the documents.

---

[1]  In fact, the Chamber denies or is without knowledge to confirm or deny most of Mr. Kimberlin's allegations.

Mr. Kimberlin's allegations fall into three categories: (1) allegations detailing Mr. Kimberlin's past activism against the Chamber; (2) allegations derived from a set of hacked emails between Defendants Palantir, Berico, and HBGary Federal (collectively, "Team Themis") and Hunton & Williams, describing Team Themis's plan to pitch a reconnaissance product to Hunton & Williams's clients, including the Chamber; and (3) conclusory assertions made "[u]pon information and belief" that "one or more of the defendants," or maybe even "[m]any of the defendants" have actually been using Team Themis's product against Mr. Kimberlin.  [Compl. ¶¶ 44, 52, pages 32, 34.][2]

### A.    Mr. Kimberlin's Claimed Activism Against the Chamber.

Mr. Kimberlin alleges that, for the last eleven years, he has been, and presently is, employed as the director of "Justice Through Music," a Maryland nonprofit.  [Compl. ¶ 1, page 6.]  In 2005, Justice Through Music allegedly started a group called "VelvetRevolution," [*id.*], and in 2009, VelvetRevolution allegedly began a campaign called "Stop the Chamber" ("STC") with the stated mission "to expose unethical activity, excesses and lack of transparency of the Chamber of Commerce."  [*Id.* at 10.]  The complaint lists activities STC ostensibly conducted against the Chamber, and credits STC for activities aimed at corporations that were allegedly members of the Chamber, such as Massey Coal Mine [*id.* at 11] and NewsCorp [*id.* ¶ 59, page 36], but not the Chamber itself.

---

[2]  Mr. Kimberlin also includes some allegations about how defendants William Hoge and Bill Nickless defamed and harassed him on the internet.  [Compl. ¶¶ 53–58, pages 34–36.]  Those allegations are not related in any way to the allegations against the Chamber.  The Chamber therefore does not address the allegations involving Messrs. Hoge and Nickless in this brief, and uses the term "Defendants" to mean all defendants except for Messrs. Hoge, Nickless, and their related organizations.

**B.      Emails Detailing a Pitch that Team Themis and Hunton & Williams
         Planned to Make to Hunton & Williams Clients.**

Relying on attached emails—none of which were addressed to or from the Chamber—the Complaint alleges that Defendants Palantir, Berico, HBGary Federal, and Hunton & Williams planned to pitch to the Chamber a "dirty tricks campaign" against Mr. Kimberlin or the groups in which he allegedly participates.  [Compl. ¶ 12, page 19.]

**1.      Background.**

Specifically, the Complaint alleges that, in late 2010, Palantir, Berico, and HBGary Federal, calling themselves "Team Themis," began work on a proposed "complete intelligence and analysis" package.  [Compl. ¶ 5, page 16; *id.* Ex. D, Email (Oct. 25, 2010, 2:38 p.m.).]  Team Themis labeled their offering a "Corporate Information Reconnaissance Cell" ("CIRC"), and intended to sell it to the law firm Hunton & Williams.  [*Id.* ¶ 5; *id.* Ex. E, Proposal for Corporate Information Reconnaissance Cell (Nov. 3, 2010), pages 2–3.]  As described in Team Themis's written proposal, the CIRC would first collect information about organizations from background checks and internet sources like LinkedIn, LexisNexis, Facebook, and Google; then put that information into one place; and finally organize it all on a software platform developed by Palantir.  [*Id.* at 5–7.]  Using that platform, the data could be reviewed and organized to "gain an understanding of which groups and individuals are working together, what their intentions/plans are, and how best to stop them."  [*Id.* at 7.]  Team Themis allegedly hoped that Hunton & Williams would market the CIRC to its clients, including Bank of America (which was facing data-security breaches by a group called Wikileaks) and the Chamber.  [*Id.* ¶ 5, page 16.]

**2.      Preparation of the Pitch.**

On November 3, 2010, Team Themis presented an overview of their CIRC proposal to John Woods, a partner at Hunton & Williams.  [*Id.* Ex. KK, Email (Nov. 2, 2010, 4:13 p.m.).]  Mr. Woods

then scheduled a meeting to explain the proposal to a more senior partner named Robert Quackenboss. Prior to the meeting between Mr. Woods and Mr. Quackenboss, Aaron Barr, the CEO of HBGary Federal, used Facebook to collect some information about Mr. Quackenboss and sent it to Mr. Woods, apparently for the purpose of demonstrating the kind of data available on the internet and Mr. Barr's aptitude for collecting it.  [*Id.* Ex. J, Email (Nov. 9, 2010, 20:37).]  Mr. Woods wrote back to Mr. Barr that he would not show the information to Mr. Quackenboss, but suggested that Mr. Barr instead demonstrate his abilities by gathering information about the VelvetRevolution's Stop the Chamber campaign and the people who run it.  [*Id.* ¶ 12, page 19; *id.* Ex. H, Email (Nov. 9, 2010, 6:09 a.m.).]

About twenty minutes later, Mr. Barr sent Mr. Quackenboss what he called "preliminary" information about STC.  It consisted primarily of links to the internet home pages and public Facebook profiles for the organization.  [*Id.* Ex. H, Email (Nov. 9, 2010, 6:30).]  Later that day, Mr. Barr sent Mr. Woods more information, identifying the public internet home page of VelvetRevolution, roughly describing the organization, listing its leaders (Brad Friedman and Mr. Kimberlin), and noting that Mr. Kimberlin had been convicted of violent crimes. He also identified the IP address for VelvetRevolution's website and listed other websites associated with that same IP address—all of which are publicly available.  Finally, Mr. Barr gave the public Facebook, Twitter, and LinkedIn profiles for organizations and personalities believed to be associated with the VelvetRevolution.  [*Id.* ¶ 13, page 19; *id.* Ex. G, Email (Nov. 9, 2010, 15:51).]  Later that night, at 11:32 p.m., Mr. Barr sent yet another email saying that he had learned that Change to Win, a group of labor unions, had created a website called fixthechamber.org.  [*Id.* Ex. K, Email (Nov. 9, 2010, 23:32).]  Mr. Barr allegedly learned this from the public websites of SEIU and Change to Win.  [*See id.*]  Mr. Woods emailed Mr. Barr early the next morning and told him to "stand down for now" on further research and that Mr. Woods would "work his

end" by presenting the CIRC proposal to Mr. Quackenboss.   [*Id.* Ex. K, Email (Nov. 10, 2010, 6:05 a.m.).]

A few days later, Team Themis suggested to Mr. Woods that it begin a pilot of the CIRC project, called "Phase One," which would involve "an initial analysis and products, for an initial meeting with a "client."   [*Id.* ¶¶ 19–20, pages 21–22; *id.* Ex. M, Email (Nov. 15, 2010, 7:43 p.m.); *id.* Ex. L, Email (Nov. 16, 2010, 20:42).]   Before authorizing Phase One, however, Hunton & Williams apparently wanted to learn more about what the group would be doing.   [*Id.* ¶ 22, pages 22–23; *id.* Ex. N, Email (Nov. 23, 2010, 9:08).]   To that end, Sam Kremin of Berico emailed Mr. Barr and asked him to put together a "mock report" demonstrating what sort of materials Mr. Barr would be preparing as part of the pilot so that Mr. Quackenboss could get "an idea of what he is pitching to the Chamber."   [*Id.* Ex. O, Email (Nov. 29, 2010, 9:54 a.m.).]   Mr. Kremin advised Mr. Barr not to "put a ton of effort into it."   [*Id.* Ex. O, Email (Nov. 29, 2010, 10:23 a.m.).]

About an hour later, Mr. Barr sent Mr. Kremin a list of "basic thoughts" for mock reports about proposed tactics to employ against two groups: "Chamber Watch," which is affiliated with "Change to Win" (the labor union group), and VelvetRevolution (the entity associated with Mr. Kimberlin).   [*Id.* ¶ 24, pages 23–24; *id.* Ex. O, Email (Nov. 29, 2010, 11:50 a.m.).]   For the VelvetRevolution, he suggested discrediting back-office personnel by associating them with Mr. Kimberlin; characterizing the VelvetRevolution's tactics as "self-serving and childish;" and, as with Change to Win, using insider personas to get them to publish false information and thereby discredit themselves.   [*Id.* ¶ 24, pages 23–24; *id.* Ex. O, Email (Nov. 29, 2010, 11:50 a.m.).]

According to the Complaint, Mr. Kremin used Mr. Barr's tactics to create a mock one-page "operations recommendation" *against Chamber Watch—not VelvetRevolution or Mr. Kimberlin—*to send

to Hunton & Williams for demonstration purposes.  [*Id.* Ex. P, Email (Dec. 1, 2010, 14:13); *id.* Ex. Q, Information Operations Recommendation (Nov. 29, 2010).]

Mr. Kremin also prepared a mock one-page "organizational assessment" discussing the leadership and operations of Chamber Watch  [*id.* Ex. R, Organizational Assessment (Nov. 29, 2010)], a mock one-page "significant activity report" discussing a fictional protest by Chamber Watch and others in front of the Chamber's headquarters [*id.* Ex. S, Significant Activity Report (Oct. 8, 2010)], and a mock slide deck containing basic biographical information about persons affiliated with groups opposed to the Chamber [*id.* Ex. T, Team Themis Slide Deck].  The slide deck included basic biographical information about Brad Friedman, the co-founder of the VelvetRevolution.  [*Id.* at 3.]

### 3.    Demise of the Pitch.

After receiving the mock demonstration materials, Hunton & Williams then delayed several months without authorizing Team Themis to proceed with the Phase One pilot.  [*Id.* Ex. NN, Email (Dec. 10, 2010, 13:25).]  Finally, on January 13, 2011, Mr. Kremin of Berico received a disc from Hunton & Williams, leading him to "assume" that Hunton & Williams had approved Phase One and work on the pitch could begin.  [*Id.* Ex. V, Email (Jan. 13, 2011, 3:16).]

A few weeks later, however, Mr. Ryan of Berico delivered Team Themis some discouraging news.  He had learned that Hunton & Williams would not pay Team Themis for creating the Phase One pilot.  Mr. Quackenboss had apparently been under the impression that Team Themis was willing to "do [that] work at risk and then present jointly with H&W to the Chamber."  [*Id.* Ex. Z, Email (Feb. 3, 2011, 4:59 p.m.).]  Mr. Ryan wrote that Hunton & Williams "won't commit any funds to this project until we've helped them earn buy-in from their Client (the Chamber)."  [*Id.*]  Mr. Ryan proposed that Team Themis create a five to ten minute demonstration to present to the Chamber sometime around February

14, 2011, depending on when Chamber representatives could be available.  [*Id.*]  The team agreed.  [*Id.*, Ex. Z, Email (Feb. 4, 2011, 6:27).]

But before Team Themis could make their planned pitch to the Chamber, the project dramatically imploded.  On February 4, the very day after Mr. Ryan's email suggesting February 14 as the tentative pitch date, the *Financial Times* quoted Mr. Barr boasting that he had "penetrated" the secret hacker group "Anonymous," and that he possessed information about their identities and activities sufficient to justify their arrests.  [*Id.* Ex. AA, *Cyberactivists warned of arrest*, Financial Times (Feb. 4, 2011).] Within days, members of Anonymous hacked into HBGary Federal's website, hijacked its Twitter account, and gained control of tens of thousands of its emails which it published online for all to see.  [*Id.* Ex. BB, *Anonymous hackers attack US security firm HB Gary*, BBC News (Feb. 7, 2011).]  Those emails revealed the mock reports that Mr. Kremin had created with Mr. Barr's suggested tactics against Chamber Watch and the VelvetRevolution.  Those suggestions by Mr. Barr were widely covered in the national press.  [*See id.* Ex. EE, *The leaked campaign to attack WikiLeaks and its supporters*, Salon.com, at page 2 (Feb. 11, 2011).]

In the wake of these revelations, the Complaint alleges that Palantir severed "any and all contacts" with HBGary Federal, [*id.* ¶ 40, page 31], and Berico did the same, [*id.* ¶ 41, page 32.] HBGary Federal allegedly "shuttered its operations."  [*Id.* ¶ 49, page 33.]  Meanwhile, the Chamber issued a statement noting that Mr. Barr's proposal had not been requested by, delivered to, or discussed with the Chamber.  [*See id.* ¶ 50, pages 33–34.]  The Complaint asserts that the Chamber's statement was "false," but provides no factual basis for that assertion.  [*Id.*]

### 4. Mr. Kimberlin's Awareness of the Hacked Emails.

According to the Complaint, Mr. Kimberlin also took notice of the publicly available hacked emails. On February 23, 2011, STC filed complaints with the District of Columbia Bar against Defendants Woods, Wyatt, and Quackenboss, and on March 11, 2011, it sent a "document hold letter" to "Defendant HBGary Federal and most other Defendants in this case" stating "its intent to seek legal remedies in a court of law for the conduct alleged in the instant Complaint." [*Id.* ¶¶ 45–46, page 33.] One of those letters, dated February 28, 2011, went to the Chamber (Exhibit 1 hereto).

On March 16, 2015, Mr. Kimberlin filed this lawsuit. The suit comes four years, one month, and nine days following initial release of the hacked HBGary Federal emails [Compl. ¶ 38, page 28]; four years, one month, and six days after the Chamber publicly denied any involvement in the leaked plans [*id.* ¶ 50, page 33–34]; four years and twenty-one days after Mr. Kimberlin alleges that his "campaign" STC filed a bar complaint against Defendants Woods, Wyatt, and Quackenboss [*id.* ¶ 45, page 33]; and four years and five days after the date of the "document hold letter" Mr. Kimberlin alleges that his "campaign" STC sent to HBGary Federal and most other Defendants [*id.* ¶ 46, page 33].

### C. Mr. Kimberlin's Conclusory Allegations that Team Themis's Aborted Plan Was Nonetheless Carried Out.

Allegations about actions taken after publication of the hacked emails are general and conclusory. In paragraph 44, the Complaint alleges "[u]pon information and belief," that "one or more Defendants, in the spring of 2011, conspired with other actors in an overlapping conspiracy to adopt and implement the central tactics outlined by Team Themis against Plaintiff." In paragraph 52, it alleges that "[m]any of the Defendants conspired to cover up their involvement with Team Themis." These allegations specify no defendant. Separately, in paragraphs 53 through 58, the Complaint alleges that Defendants Pacific Northwest National Laboratory, Bill Nickles, and Hoge "began a covert and then

overt campaign to defame, harass and bully Plaintiff" [Compl. ¶ 53, page 34], purportedly "us[ing] the Team Themis playbook" [*id.* ¶ 57, page 35], and that Hoge "applauded a brutal assault on Plaintiff by a close associate" [*id.* ¶ 58, page 36].  By their own terms, these allegations have nothing to do with the Chamber.[3]

## ARGUMENT

The Complaint asserts five claims for relief against the Chamber.  Claim I alleges "Conspiracy To Violate the Civil Rights Act, 42 USC 1985(2)."  Claim III alleges "Conspiracy To Invade Privacy-Intrusion into Seclusion."  Claim VI alleges "Commission of and Conspiracy To Commit Civil RICO under 18 USC 1962(c) and 1962(d)."  The first Claim VII (pages 58 to 59) alleges "Conspiracy To Interfere with Business Relations and Conspiracy to Interfere with Prospective Economic Advantage."  The second Claim VII (pages 59 to 60) alleges "Intentional Infliction of Emotional Distress."  As a whole, these claims are barred by their respective statutes of limitations (Part I below), and by Mr. Kimberlin's failure to plead sufficient facts regarding his alleged injuries (Part II below).  The individual claims, taken as a whole, fail to provide sufficient factual detail concerning the Chamber's involvement to allow them to proceed against the Chamber, and also fail to make sufficient allegations of the elements required for each claim (Part III below).

## I.     MR. KIMBERLIN'S CLAIMS AGAINST THE CHAMBER ARE UNTIMELY.

On the face of the Complaint, the claims are time-barred.  Courts will not hesitate to dismiss a complaint "when the face of the complaint reveals the existence of a meritorious affirmative defense." *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178 (4th Cir. 1996).  "A complaint showing that the

---

3   Paragraph 59 makes allegations about  "News Corp., a member of the [Chamber]," regarding certain activities in Europe, but does not link those activities to the Chamber, Mr. Kimberlin, or the other allegations in the Complaint.

governing statute of limitations has run on the plaintiff's claim for relief is the most common situation in which the affirmative defense appears on the face of the pleading and provides a basis for a motion to dismiss under Rule 12(b)(6)."   5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 352 (1990).  That is the case here.

Of all Mr. Kimberlin's claims, the RICO claim (Claim VI) carries the most generous limitations period: four years.  The Supreme Court has held that the limitations period from the analogous Clayton Act applies to RICO.  *Agency Holding Corp. v. Malley-Duff Assocs., Inc.*, 483 U.S. 143 (1987). RICO claims accrue and the limitations period begins to run when a plaintiff discovers his alleged injury.  *See Rotella v. Wood*, 528 U.S. 549, 555 (2000).

Mr. Kimberlin filed his RICO claim on March 16, 2015, so it is untimely if it accrued before March 16, 2011.  The Complaint alleges that Mr. Kimberlin knew all the critical facts on which he bases his Complaint by February 2011 at the latest, when the HB Gary emails were published on the internet. Moreover, according to the Complaint, on February 23, 2011, Mr. Kimberlin's campaign, STC, relied on those emails to file a bar complaint against Defendants Woods, Wyatt, and Quackenboss.  On March 11, 2011, STC sent "document hold letters" alluding to a potential law suit to "most" of the Defendants in this case, including the Chamber  [Compl. ¶ 46, page 33; Ex. 1, Hold Request from STC to the Chamber (Feb. 28, 2011).]  Having known about and acted upon the alleged racketeering activity on February 23, 2011 and March 11, 2011, Mr. Kimberlin then waited over four years before filing his lawsuit. It is now too late.

To get around the statute of limitations, Mr. Kimberlin includes some conclusory allegations that "one or more Defendants" followed through with Team Themis's suggested tactics and continued doing so for the past four years.  But Mr. Kimberlin does not allege a single act occurring after February 2011

when HB Gary's emails became public.  These naked assertions are insufficient.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.").

All of Mr. Kimberlin's other claims are based on the same flawed allegations, and all of them carry even shorter limitations periods.  Mr. Kimberlin's civil rights claim (Claim I) carries only a three-year statute of limitations, so it is also untimely.[4]  Mr. Kimberlin's state law claims (Claim III for Invasion of Privacy, the first Claim VII for Interference with Business Relations and Interference with Prospective Economic Advantage, and the second Claim VII for Intentional Infliction of Emotional Distress) are similarly governed by Maryland's three-year general limitations period and are consequently time barred. (*See* n.4.)

## II.     THE COMPLAINT DOES NOT ALLEGE COGNIZABLE LEGAL INJURY.

As noted, the Complaint fails to allege any facts showing that anyone ever implemented Team Themis's rudimentary plans.  More pointedly, the Complaint fails to allege publication of any defamatory statement or any other act that caused injury to Mr. Kimberlin.[5]  If Mr. Kimberlin were

---

[4]  Courts apply the limitations period for the most analogous action in the state where the court is located.  *See Burnett v. Grattan*, 468 U.S. 42, 49 (1984) ("It is now settled that federal courts will turn to state law for statutes of limitations in actions brought under these civil rights statutes [meaning 42 U.S.C. §§ 1981, 1983, and 1985].").  In Maryland, courts use the State's general three-year limitations period found at section 5-101 of the Maryland Code on Courts and Judicial Procedure.  *See Nash v. Duncan*, No. Civ. A. WDQ-05-25, 2005 WL 1383168, at *2 (D. Md. June 8, 2005) (applying Maryland's general three-year limitations period to claim under § 1983); *Hall v. Asher*, 355 F. Supp. 808, 811 (D. Md. 1973) (applying Maryland's general three-year limitations period to claim under § 1985).  As with RICO claims, civil rights claims accrue when the plaintiff "knows or has reason to know of the injury which is the basis of the action."  *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975) (citing *Young v. Clinchfield R.R. Co.*, 288 F.2d 499, 503 (4th Cir. 1961)).

[5]  The Complaint alleges a "brutal assault on Plaintiff" by an unnamed "close associate" of Defendant Hoge.  [Compl. ¶ 58, page 36.]  This allegation is completely unrelated to the allegations involving the Chamber.

defamed, or suffered any other injury, he should be able to specify it.  He pleads no impact on his employment or compensation, and in fact pleads continued employment as "Director of Justice Through Music" as well as "[i]nvolve[ment] with Justice through Music and VelvetRevolution for more than eleven years."  [Compl. ¶ 1, page 6.]  Instead, in his claims against the Chamber, he makes only the most general of allegations about "damages and harm, including physical harm" [*Id.* ¶ 64, page 42 (Claim I)], "substantial damages"  "including physical harm" [*id.* ¶¶ 72–73, page 43 (Claim III)], and "severe emotional distress and mental anguish" [*id.* ¶ 137, page 61 (second Claim VII)].  The claim for conspiracy to interfere with business relations and with prospective economic advantage (first Claim VII) alleges merely that "Plaintiff has been damaged," and an intent "to deliberately harm Plaintiff" warranting "imposition of significant compensatory and punitive damages." [Compl. ¶¶ 128, 130–131, page 59.]  The allegations are plainly insufficient to show a direct injury-in-fact sufficient to allow relief.[6]

---

6  Mr. Kimberlin must plead an injury to himself as a required element of each of his claims.  *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (holding that injury is required element of RICO); *Bediako v. Am. Honda Fin. Corp.*, 850 F. Supp. 2d 574, 581-82 (D. Md. 2012) (holding that Maryland tort law includes "the principle of damnum absque injuria, [under which] a plaintiff cannot recover absent an injury") *aff'd*, 537 F. App'x 183 (4th Cir. 2013); *Glynn v. Impact Science & Tech., Inc.*, 807 F. Supp. 2d 391, 422 (D. Md. 2011) (holding that injury is required element of civil rights claim under § 1985(2)).  And, more fundamentally, he must plead an injury to show that he has a case or controversy addressable by the judicial power of the United States.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (holding that "injury in fact" required for standing under Article III).  Under the federal pleading standard, an allegation of injury—like any other element of a claim—must be pleaded in terms of plausible facts, not stark conclusions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *see also Gallipeau v. Correct Care Solutions*, No. CA 3:10-2017-JFA-JRM, 2011 WL 4502043, at *1 (D.S.C. Sept. 29, 2011) ("It is not enough merely to plead conclusory statements of injury and standing. Instead, the pleading burden set forth by the United States Supreme Court requires that plaintiff plead "enough facts to state a claim to relief that is plausible on its face.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).

With regard to the civil RICO claim (Claim VI), Mr. Kimberlin alleges that he suffered the following: (1) "having his name falsely smeared"; (2) "having his employer defamed based on those smears"; (3) "having to spend untold hours, days, weeks, months and years defending against the criminal actions of Defendants"; (4) "having to spend money defending against the Defendant's actions"; (5) "losing employment and funding opportunities"; (6) "having attempted interference with his business relationships and his contract to remain employed by his employer"; (7) "having interference with prospective business advantage"; (8) "having interference with his business as a musician, composer and manager"; (9) "other pecuniary losses to real or personal property"; (10) "damages to his body, which constitutes property under RICO, when he was assaulted by an person [*sic*] not named in this Complaint who adopted the Team Themis racketeering playbook to harm Plaintiff." [Compl. ¶ 139, pages 57–58.]

These allegations are all deficient. *First*, they are all conclusory. Mr. Kimberlin does not allege any actual facts about the injuries he claims to have suffered, such as whether he sought medical or psychiatric care, missed work, or lost out on an identifiable business opportunity. *Second*, several of Mr. Kimberlin's alleged injuries—numbers (1), (3), (4), (9), and (10) in the list above—are injuries to his person, not injuries to his business or property. Only injuries to business and property are actionable under RICO. 18 U.S.C. § 1964(c); *see also Kimberlin v. Nat'l Bloggers Club*, No. GJH-13-3059, 2015 WL 1242763, at *12 (D. Md. Mar. 17, 2015) (Hazel, J.) (holding that Mr. Kimberlin's claimed reputational injuries were not actionable under RICO because "RICO is not available for the redress of purely personal injuries" (citation omitted)). *Third*, all of Mr. Kimberlin's injury claims are too vague and speculative to show entitlement to relief. *See Kimberlin v. Nat'l Bloggers Club*, 2015 WL 1242763, at *12 (holding that allegations of "lost employment and funding opportunities" and "interefere[nce]

with prospective business [relations]" were "entirely speculative . . . [and] "'not sufficient to confer RICO standing'") (quoting *Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721, 730 (8th Cir. 2004)). Indeed, Mr. Kimberlin's injury number (6) in this case tellingly admits that he suffered no *actual* injury to business or property.  It alleges only that Defendants "attempted" to interfere with his business relationships and employment. Section 1964(c), allows recovery only for *injuries*, however, not *attempts* to interfere with relationships.  *See Bast*, 59 F.3d at 495.  Injury number (2) asserts unspecified injury to Mr. Kimberlin's unnamed "employer," and he lacks standing to allege it.

Since Mr. Kimberlin has pleaded no facts about his injuries, it is unsurprising that he has also not pleaded facts showing causation from any alleged actions by the Chamber to any of the vaguely alleged injuries he says he has suffered.  Consequently, his RICO claim must be dismissed.  *See Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268 (1992) (holding that RICO plaintiff must show that RICO predicate act "not only was a 'but for' cause of his injury, but was the proximate cause as well"); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question is whether the alleged violation led directly to the plaintiff's injuries.").

## III.   NONE OF THE CLAIMS AGAINST THE CHAMBER ARE PROPERLY PLEADED OR SUPPORTED BY THE ALLEGED FACTS.

Even if Mr. Kimberlin's claims against the Chamber were within the limitations period, and if the allegations of injury were sufficient, those claims would still be subject to dismissal because they are either self-defeating or unsupported by meaningful allegations of fact.  Further, for each claim asserted against the Chamber, Mr. Kimberlin draws upon the same allegations.   As set forth below, these allegations are insufficient to support any of the five claims against the Chamber.

### A.      The Allegations are Neither Plausible Nor Particular.

Federal Rule of Civil Procedure 8 "requires a '*showing*,' rather than a blanket assertion, of entitlement to relief" in a plaintiff's pleading.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (emphasis added).  To satisfy that requirement, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "[C]onclusory factual allegations devoid of any reference to actual events" do not count.  *Kimberlin v. Nat'l Bloggers Club*, No. GJH-13-3059, 2015 WL 1242763, at *2 (D. Md. Mar. 17, 2015) (Hazel, J.) (citing *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979)); *see also Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." (citation and quotations omitted)).

Allegations of fraud necessary to support the RICO claims are subject to the higher standard in Rule 9(b), which provides that "a party must state with particularity the circumstances constituting fraud."  To satisfy Rule 9(b), a plaintiff must set forth "the who, what, when, where, and how of the alleged fraud" before gaining access to discovery.  *United States ex rel. Wilson v. Kellogg Brown & Root*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks omitted; emphasis added).  The Complaint's fraud allegations fall even further short of that standard.

The only specific facts pleaded by Mr. Kimberlin in support of his claims are those that he learned from the leaked HBGary Federal emails in February 2011.  Those allegations are insufficient to sustain causes of action against the Chamber for two reasons.  *First*, he does not allege that they were ever carried out by anyone, much less the Chamber.  Mr. Kimberlin alleges that one person (Mr. Barr) *suggested* certain tactics for use against VelvetRevolution, but he does not allege facts showing actual *performance* of those tactics by Mr. Barr or anyone else.  Mr. Kimberlin's allegations about these tactics

rely on an email that Mr. Barr sent to Sam Kremin of Berico on November 29, 2010.  [Compl. ¶ 7, page 17; *id.* ¶ 24, page 23; *id.* Ex. O, Email (Nov. 29, 2010, 11:50 a.m.).]  Mr. Kremin was apparently working to put together some mock reports to show Hunton & Williams some examples of the work product that Team Themis would create.  [*Id.* Ex. O, Email (Nov. 29, 2010, 9:54 a.m.).]  In response, Mr. Barr (in less than one hour) typed out some mock reports about two organizations—Chamber Watch and VelvetRevolution, the latter being an organization of Mr. Kimberlin—which included recommendations like planting fake documents and using fake insider personas to plant misinformation and discredit the organizations.  [*Id.* Ex. O, Email (Nov. 29, 2010, 12:47).]  Mr. Kremin appears to have then copied Mr. Barr's draft mock report about Chamber Watch—but *not* VelvetRevolution—into a mock report to present to Hunton & Williams.  [*Id.* Ex. Q, Information Operations Recommendation (Nov. 29, 2010, 12:47).]  Mr. Kimberlin does not allege that any mock reports using Mr. Barr's suggestions against VelvetRevolution and Mr. Kimberlin were ever created or presented to Hunton & Williams, much less to the Chamber.

Indeed, the Complaint rebuts the notion that the proposals were implemented.  Indeed, it strongly suggests that they were not.  An email from Mr. Ryan of Berico reveals that, as late as February 3, 2011, Hunton & Williams would not commit any funds to Team Themis because they had yet to pitch their proposal to the Chamber and had yet to obtain the Chamber's "buy-in" to proceed with it.  It also reveals that no one had even set a date with the Chamber on which to make their pitch.  [*Id.* Ex. Z, Email (Feb 3, 2011, 4:59 p.m.).]  Only a few days after that February 3 email, Team Themis and its working proposal imploded when HBGary Federal's emails were released.  Palantir and Berico publicly cut all contact with HBGary Federal.  HB Gary Federal allegedly "shutter[ed] its operations."  [*Id.* ¶¶ 40–41, pages 31–32; *id.* Ex. BB, *Anonymous hackers attack US security firm HB* Gary, BBC News (Feb 7, 2011).]

*Second*, Mr. Kimberlin does not allege, and his exhibits do not show, any involvement by the Chamber in any aspect of Team Themis's pitch. Indeed, Mr. Ryan's February 3, 2011, email shows that at the time HBGary Federal's emails were hacked, the Chamber had neither been presented with Team Themis's proposal nor approved of it. [Compl. Ex. Z, Email (Feb 3, 2011, 4:59 p.m.).] In addition, none of the leaked emails were either to or from anyone at the Chamber, and the Complaint does not state otherwise. The Chamber publically disavowed any involvement. [*Id.* ¶ 50, pages 33–34.] Mr. Kimberlin asserts that the Chamber's denial of involvement or knowledge was "false," [Compl. ¶ 50, pages 33–34], but he offers no factual basis for this bare conclusion. It is insufficient under *Iqbal*. 556 U.S. at 678 (rejecting "naked assertions").

## B. Mr. Kimberlin Fails to Plead Facts Supporting a RICO Claim. (Claim VI) [7]

Mr. Kimberlin alleges that the Chamber violated and conspired to violate § 1962(c), which says:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(c). The Supreme Court has held that a RICO plaintiff must plead four elements of liability: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (footnote omitted). In addition, a civil RICO plaintiff must plead two more requirements—injury and causation—to claim relief. *Id.* Mr. Kimberlin's RICO claim against the Chamber does not satisfy any of those six requirements.

---

[7] Count VI alleging RICO violations is not asserted against Defendants Hoge, Pacific Northwest National Laboratory, Nickless, and ManTech.

### 1.   Mr. Kimberlin Does Not Allege Facts Showing that the Chamber Conducted or Participated in an Enterprise.

Mr. Kimberlin has not alleged facts that plausibly show that the Chamber participated in an enterprise.  He makes only the conclusory allegation that all of the Defendants in his lawsuit "associated together for the common purpose of acting to promote [the Chamber's] business interests" specifically by "harming Plaintiff in order to retaliate against him for exposing the [Chamber] and its senior staff." [Compl. ¶ 101, page 48.]

The RICO statute defines an "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."   18 U.S.C. §1961(4).   A nonentity, "association in fact" enterprise, like the one Mr. Kimberlin alleges here, "must have at least three structural features to implicate the RICO statute: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle v. United States*, 556 U.S. 938, 946 (2009). Further, subsection 1962(c) imposes liability only upon those that "conduct or participate" in an enterprise.  In *Reves v. Ernst & Young*, the Supreme Court held that this requirement demands more than mere casual participation; to be liable a defendant must specifically participate in the "operation or management" of the enterprise to be liable.  507 U.S. 170, 179 (1993).

Mr. Kimberlin's allegations against the Chamber do not satisfy these requirements for two reasons.  *First*, as explained above [*see* page17], Mr. Kimberlin's allegations on their face show that the Chamber was not involved in the "operation of management" of the purported enterprise.  Indeed, the Complaint does not allege that the Chamber solicited, received, approved, acted upon, or even knew about the alleged pitch that Team Themis and Hunton & Williams were preparing before Anonymous leaked the emails.  Because Mr. Kimberlin has made at best only conclusory assertions that the Chamber

was involved in those efforts, he has not sufficiently alleged that the Chamber participated in the "operation or management," of a RICO enterprise.  *Reves*, 506 U.S. at 179.  [S*ee* Compl. ¶ 101, page 48].

*Second*, Mr. Kimberlin's complaint shows that the pitch being planned by Team Themis and Hunton & Williams imploded in February 2011 when HBGary Federal's emails were exposed, Palantir and Barico publicly cut all ties with HBGary Federal, and HBGary Federal allegedly "shuttered" its operations.  [*See* pages 15 through 16 above.]  Moreover, the Chamber publicly denied any involvement. [Compl. ¶ 50, page 33–34.]  Consequently, the Complaint fails to allege that the alleged enterprise had "longevity sufficient to permit [the] associates to pursue the enterprise's purpose,"  *Boyle*, 556 U.S. at 946.

> ### 2.    Mr. Kimberlin Has Not Pleaded Facts Showing a Pattern of Racketeering Activity.

Mr. Kimberlin alleges that the Chamber and other defendants committed several predicate acts of racketeering activity, but his allegations are conclusory and contradicted by the rest of his complaint and the documents that he attaches to it.

A "pattern of racketeering activity" is defined in the statute as two acts of racketeering activity within ten years of each other.  18 U.S.C. § 1961(5).  "Racketeering activity" is further defined as any of a number of enumerated federal crimes, including mail fraud, wire fraud, extortion, and money laundering.  18 U.S.C. § 1961(1).  To constitute a "pattern," the Supreme Court has held that the two or more acts of racketeering must show "continuity plus relationship."  *H. J. Inc. v. Nw. Bell Tele. Co.*, 492 U.S. 229, 239 (1989) (quoting S. Rep. No. 91-617).  That means that the acts of racketeering must be "related" and "amount to or pose a threat of continued criminal activity."  *Id.*  Moreover, to state a RICO claim, the plaintiff must allege the commission of two predicate acts within a ten year period by each

defendant.  *See Park v. Jack's Food Sys., Inc.*, 907 F. Supp. 914, 917 (D. Md. 1995) ("[I]t is indisputable that to maintain a section 1962(c) action, at least two predicate acts must be pleaded *against each defendant*.") (emphasis added).[8]   To proceed, these allegations must meet the heightened pleading standard of Rule 9(b), which requires pleading with particularity.

a)        **Mail Fraud, 18 U.S.C. § 1341.**

Mr. Kimberlin alleges that the "named Defendants"—he makes no distinction among them—all committed mail fraud by sending data discs and money through the mail in furtherance of a "fraudulent conspiracy."  [Compl. ¶¶ 111–12, page 52.]

To plead mail fraud, a plaintiff must allege "(1) a scheme disclosing an intent to defraud, and (2) the use of the mails in furtherance of the scheme."  *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996).  Because this predicate act involves fraud, a plaintiff "must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); *see also Bhari Info. Tech. Sys. Private Ltd. v. Sriram*, 984 F. Supp. 2d 498, 505 (D. Md. 2013) ("When mail and wire fraud are asserted as the predicate acts for a civil RICO claim, the standards of Rule 9(b) apply.").  That means that the plaintiff must specifically allege "the who, what, when, where, and how of the alleged fraud."  *Kellogg Brown & Root*, 525 F.3d at 379.   He may not, as Mr. Kimberlin has done here, assert "merely conclusory allegations of fraud against multiple defendants without identifying each individual defendant's participation in the alleged fraud."  *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250 (D. Md. 2000) (citations omitted).

---

8   The Complaint also alleges a "conspiracy" to violate RICO.  Without a substantive violation of RICO, there can be no such conspiracy.  *Kimberlin v. Nat'l Bloggers Club*, 2015 WL 1242763, at *3 n.2 ("Because Kimberlin has failed to state a claim under § 1962(c), his charge of conspiracy to violate RICO pursuant to § 1962(d) is also without merit.").  Moreover, the Complaint contains no meaningful factual allegations that the Chamber entered any agreement to participate in the purported conspiracy.

Mr. Kimberlin has not adequately alleged that the Chamber committed any acts of mail fraud. *First*, Mr. Kimberlin's blanket allegation that all the "named Defendants" committed mail fraud is insufficient under Rule 9(b) because it plainly does not "identify each individual defendant's participation in the alleged fraud," *Adams*, 193 F.R.D. at 250. *Second*, as discussed above [*see* page 17], Mr. Kimberlin has not alleged any involvement by the Chamber in the pitch being prepared by Team Themis and Hunton & Williams, and therefore has not alleged that the Chamber was part of any "scheme disclosing an intent to defraud," *Chisolm*, 95 F.3d at 336, as required to plead mail fraud. *Third*, the only specific reference to a mailing relates to a single *expected* mailing of a data disk from Hunton & Williams to Team Themis. [Comp. ¶ 15, page 20; *id.* ¶ 111, page 52; *id.* Ex. V, Email (Jan. 13, 2011, 3:16).] Even if otherwise sufficient, that allegation does not purport to implicate the Chamber, and is insufficient to plead mail fraud against the Chamber.

For each of these reasons, Mr. Kimberlin has not adequately pleaded that the Chamber committed the predicate act of mail fraud.

### b) Wire Fraud, 18 U.S.C. § 1343.

Mr. Kimberlin also alleges that the "named Defendants"—again, making no distinction— committed wire fraud in the form of "thousands of emails" between the Chamber, Hunton & Williams, and Team Themis in order to further "illicit activity to harm Plaintiff." [Compl. ¶ 115, page 52.]

As with mail fraud, a plaintiff pleading the predicate act of wire fraud must allege "(1) a scheme disclosing intent to defraud; and (2) the use, respectively, of the mails or interstate wires in furtherance of the scheme." *Kimberlin v. Nat'l Bloggers Club*, No. GJH-13-3059, 2015 WL 1242763, at *4 (D. Md. Mar. 17, 2015) (citing *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996)). And, as with mail fraud, Rule 9(b) requires a plaintiff alleging wire fraud to allege specifically the "who, what, when,

where, and how of the alleged fraud," *Kellogg Brown & Rout*, 525 F.3d at 379.  The Plaintiff may not assert "merely conclusory allegations of fraud against multiple defendants without identifying each individual defendant's participation in the alleged fraud."  *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250 (D. Md. 2000) (citations omitted).

Mr. Kimberlin's allegations of wire fraud therefore fail for the same reasons as his allegations of mail fraud: he makes only a blanket allegation against all the Defendants and does not "identify each individual defendant's participation." *Adams*, 193 F.R.D. at 250.  He has not alleged that the Chamber itself had any knowledge or involvement in any "scheme disclosing an intent to defraud." *Chisolm*, 95 F.3d at 336.  Moreover, despite the more than 70,000 hacked emails from HBGary Federal and available to Mr. Kimberlin [*see* Compl. ¶ 38, page 28], the Complaint does not specify, much less attach as an exhibit, a single email to or from anyone at the Chamber.

For these reasons, Mr. Kimberlin's allegation that the Chamber committed wire fraud is insufficiently pleaded.

### c)      Obstruction of Justice, 18 U.S.C. § 1503.

Mr. Kimberlin alleges that the "named Defendants" obstructed justice by using "false and forged documents in order to discredit [him] so he would not be deemed a credible witness" and by "causing threats of injury and death to be directed at [him] in order to intimidate him from cooperating with law enforcement officials."   [Compl. ¶¶ 118–19, page 53.]   The only specific allegation of an act of obstruction relates to an alleged battery on Mr. Kimberlin by some unidentified person who was allegedly a "close associate" Defendant Hoge, but who is not alleged to be affiliated with the Chamber in any way.  [*Id.* ¶ 58, page 36; *id.* ¶  119, pages 53–54.]

Obstruction of justice is prohibited by 18 U.S.C. § 1503.  It says:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). . . .

18 U.S.C. § 1503(a).  The Supreme Court has narrowly construed the catchall provision in this subsection, which prohibits obstruction of the "due administration of justice."  Like the other parts of the subsection, only obstruction of actual *judicial proceedings*—not pre-proceeding investigations—will violate the statute.  *See United States v. Aguilar*, 515 U.S. 593, 599 (1995) ("The action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority."); *see also In re Am. Honda Motor Co, Inc. Dealership Relations Litig.*, 958 F. Supp. 1045, 1055 (D. Md. 1997) ("[B]ecause § 1503 applies only to obstruction of federal judicial proceedings, [defendant's] actions cannot constitute a predicate act under RICO.").

Mr. Kimberlin alleges that Defendants obstructed justice by "intimidating and smearing and physically harming Plaintiff" in order to influence Mr. Kimberlin against "cooperating with the FBI" or testifying in a grand jury proceeding about criminal acts by "senior members of the Chamber."  [Compl. ¶ 117.]  His allegations are insufficient for several reasons.  *First,* as shown above [*see* pages 15 through 16], all of Mr. Kimberlin's allegations about the supposed smear campaign against him derive from a suggestion by Mr. Barr that was never actually fulfilled and that was not developed or even known by

the Chamber.  He alleges no actual use of a "false or forged document[]."  Nor does he allege that any acts of defamation actually occurred, or that he knew about the plan to smear him; without knowledge of the plan or action he could not be intimidated by the plan or acts.  *Second*, at no point in Mr. Kimberlin's complaint does he allege that anyone affiliated with the Chamber caused him actual, physical harm.  *Third*, Mr. Kimberlin has identified no covered judicial proceeding, nor has he alleged that he knew and could knowledgeably testify to facts relevant to that proceeding, much less that he had been "identified as a prospective witness" in such a proceeding.  *Fourth*, Mr. Kimberlin's allegation that the Chamber sought to prevent him from participating in an FBI investigation, apart from its complete lack of factual detail, does not implicate the obstruction statute because it does not allege "an intent to influence judicial or grand jury proceedings." *Aguilar*, 515 U.S. at 599.

### d)   Intimidation and Retaliation against a Witness, 18 U.S.C. §§ 1512, 1513.

Mr. Kimberlin alleges that the "named Defendants" retaliated against him through "the Team Themis campaign to 'discredit' and fracture his credibility"; by " threats of death and injury" and "actual physical injury"; and by "articles and tweets published or planted by Defendants portraying Plaintiff as untrustworthy and not credible."  [Compl. ¶ 121, page 54.]  Defendants allegedly did all this "to retaliate against him for providing information to law enforcement officials regarding federal offenses committed by principles [*sic*] of the Chamber of Commerce."  [*Id.*]  He does not allege publication of any articles, any defamatory statements (other than an incomprehensible tweet having no connection to the Chamber [Compl. ¶ 54, page 34]), or any other acts that discredited him.  Nor does he allege that he *knew* about any such statements, so as to be actually intimidated by them.

Section 1512 of Title 18 prohibits witness tampering and § 1513 prohibits witness retaliation. Section 1512 says:

Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to--

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(D) be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(b).  Section 1513 says:

Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for--

(1) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or

(2) any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation,

supervised release, parole, or release pending judicial proceedings given by a person to a law enforcement officer;

or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

*Id.* § 1513(b). An "official proceeding," for purposes of both § 1512 and § 1513, is "a proceeding before a judge or court of the United States, a United States magistrate, a bankruptcy judge, or a Federal grand jury; . . . a proceeding before Congress; or . . . a proceeding before a Federal Government agency which is authorized by law . . . ." *Id.* § 1515.(a)(1).

Mr. Kimberlin's claims of intimidation and retaliation rely on essentially the same allegations as his obstruction claim [*see* Subpart III.2.c above], and therefore suffer the same defects. *First,* his allegation about efforts to "discredit and fracture his credibility" derive from the same suggestion by Mr. Barr that was never actually fulfilled and was never disclosed to the Chamber [*see* pages 15 through 17]. *Second*, he does not allege that he ever *actually* participated in an "official proceeding" as defined in § 1515(a)(1), that he was ever invited to do so, or that the Chamber prevented him from doing so or retaliated against him because he did. *Third*, while Mr. Kimberlin makes the conclusory allegation that Defendants published false tweets and articles about him, he identifies only one such tweet (Comple. ¶ 54, page 34) by a Defendant (Mr. Nickless) with no alleged relationship to the Chamber, and does not indicate how that incomprehensible tweet was intended to intimidate him. His allegations are therefore too conclusory to state a claim.

### e)   Extortion, 18 U.S.C. § 1951.

Mr. Kimberlin alleges that the "named Defendants" "conspired to engage in extortion by intruding into Plaintiff's legally protected business and First Amendment activities, and personal, family and business relationships, and then conspiring to 'exploit vulnerabilities' to 'pressure' Plaintiff to stop

exposing [the Chamber], cooperating with the FBI and testifying before any grand jury."  [Compl. ¶ 123, pages 54–55.]

Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear or under color of official right."  18 U.S.C. § 1951(b)(2).

Mr. Kimberlin's allegations against the Chamber do not describe "extortion" because he has not alleged that the Chamber or any other defendant "obtain[ed] property," 18 U.S.C. § 1951(b)(2), from him or anyone else.  He has therefore failed to plead the predicate act of extortion.  *See Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003) (upholding dismissal of RICO claim based on extortion where defendants did not "obtain respondents' property" nor receive "'something of value from' respondents that they could exercise, transfer, or sell").

### f)      Money Laundering, 18 U.S.C. § 1957.

Mr. Kimberlin alleges that the "named Defendants" conspired to launder money "by transferring money from [the Chamber] to [Hunton & Williams] disguised as legal fees for payment of the illegal Team Themis black bag cyber spying campaign."  [Compl. ¶ 125, page 55.]

A person commits money laundering when he "knowingly engages or attempts to engage in a monetary transaction in *criminally derived property* of a value greater than $10,000 and is derived from specified unlawful activity . . . ."  18 U.S.C. § 1957(a) (emphasis added).

Mr. Kimberlin's allegations about money laundering fail in two respects.  *First*, his complaint alleges that Team Themis was paid nothing for its work on the planned pitch to the Chamber [*see* pages 6 through 7 above], thereby contradicting his claim that any money actually changed hands.  *Second*, to the extent that Mr. Kimberlin alleges money was  paid to Team Themis, the payment was *for* allegedly

unlawful activity, not "*derived* from specified unlawful activity."  18 U.S.C. § 1957(a) (emphasis added).  The statute requires the latter, not the former.

Mr. Kimberlin therefore fails to plead that the Chamber committed the predicate act of money laundering.

### g)        Written Extortion, Md. Crim. Code § 3-706.

Mr. Kimberlin alleges that the "named Defendants" violated the Maryland extortion statute when they "conspired to and did make written communications under real and fictitious names with the intent to extort things of value, including Plaintiff's livelihood and reputation, by falsely accusing Plaintiff of crimes in order to cause him contempt and disrepute; and inflict emotional distress and economic harm to Plaintiff."  [Compl. ¶ 128, page 55.]

The Maryland Criminal Code says:

> A person, with the intent to unlawfully extort money, property, or anything of value from another, may not knowingly send or deliver, or make for the purpose of being sent or delivered and part with the possession of, a writing threatening to:
>
> (1) accuse any person of a crime or of anything that, if true, would bring the person into contempt or disrepute; or
>
> (2)        (i) cause physical injury to a person;
>
> (ii) inflict emotional distress on a person;
>
> (iii) cause economic damage to a person; or
>
> (iv) cause damage to the property of a person.

Md. Code. Ann., Crim. Law § 3-706.

Mr. Kimberlin's written extortion claim against the Chamber fails in two respects.  *First*, as shown, he fails to allege that Mr. Barr's proposals for using fake personas and fake documents were actually implemented, and *second* he fails to allege any involvement by the Chamber.  [*See* pages 15

-28-

through 17 above.]  Indeed, Mr. Kimberlin identifies no specific "writing" from the Chamber or anyone else that threatened to accuse him or cause him harm.  *Third*, extortion under Maryland law involves the taking of "money, property, or anything of value from another."  Mr. Kimberlin alleges that Defendants took his "livelihood and reputation."  Those are not things that can be "extorted" from one person and "obtained" by another.  A written threat to damage a person's reputation, which is not alleged here against the Chamber, is not the same as a threat to damage a person's reputation *unless* the threatened person pays something of value to the person making the  threat.  The latter is extortion; the former is not.  *Fourth*, Mr. Kimberlin improperly attempts to employ harm to his reputation as *both* the thing extorted *and* the threat: he says the Chamber took his reputation by threatening to destroy his reputation. That makes no sense.

Consequently, Mr. Kimberlin has failed to allege the predicate act of state law extortion against the Chamber.

### C.      Mr. Kimberlin Fails to Plead Facts Supporting a Civil Rights Claim. (Claim I)

For his civil rights claim, Mr. Kimberlin alleges that "all Defendants"—except the four that are affiliated with Messrs. Hoge and Nickless—violated the Civil Rights Act by conspiring to use "the tactics set forth" in the rest of his complaint to deter him from testifying "to any matter pending in a federal court" and to injure him "on account of his having so attended or testified."  [Compl. ¶ 61, page 41.]  Mr. Kimberlin says that Defendants knew that he had provided information to the FBI about "the illegal conduct of [Chamber] board member Donald Blankenship and [Chamber] President Tom Donohue and the illegal conduct of [Chamber] member NewsCorp, and that there were grand juries empaneled to investigate this criminal activity."  [*Id.* ¶ 62, pages 41–42.]

Section 1985 of Title 42 prohibits conspiracies to interfere with civil rights, including conspiracies to intimidate witnesses.  It says, in relevant part:

(2) Obstructing justice; intimidating party, witness, or juror

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

42 U.S.C. § 1985.

Mr. Kimberlin's civil rights claim suffers from the following defects.  *First*, as shown, Mr. Barr's suggested tactics were never implemented and were not disclosed to the Chamber.  *Second*, Mr. Kimberlin has not alleged that he was a "witness" as that term is employed in § 1985.  A "witness" under section 1985(2) "does not encompass all persons who may have knowledge of relevant facts," but instead must be someone "who at least has been clearly identified as a prospective witness in a judicial proceeding."  *Mattison v. Click Corp. of Am.*, No. CIV.A. 97-CV-2736, 1998 WL 325927, at *4 (E.D.Pa. Jan. 27, 1998).  For example, Mr. Kimberlin does not allege that he was involved in any way with the grand jury that indicted Mr. Blankenship in 2014 for the Upper Big Branch mine disaster, or that he had anything to do with the investigation of NewsCorp for alleged spying activities in the United Kingdom (which in any event involved an investigation in the United Kingdom, not in any court in the United States).  Nor has Mr. Kimberlin alleged that *any* grand jury has been empaneled to investigate what he

-30-

amorphously refers to as "illegal conduct" on the part of the Chamber.  *Third*, as shown, Mr. Kimberlin's civil rights claim should also be dismissed for the independent reason that he has not alleged any harm to himself beyond vague references to "damages and harm, including physical harm."  [*See* Compl. ¶ 64, page 42.]

### D.    Mr. Kimberlin Fails to Plead Facts Supporting a Claim for Invasion of Privacy. (Claim III)

Mr. Kimberlin alleges that "all Defendants"—except Mantech—conspired to invade his privacy through "unreasonable intrusion" upon his seclusion.  [Compl. ¶ 70, page 43.]  Mr. Kimberlin includes no factual allegations supporting this claim under the claim heading, but instead refers vaguely to his allegations "as outlined above."  [*Id.*]  He alleges that this intrusion caused him to suffer unspecified injury to his "reputation, business interests, and mental well-being" resulting in "substantial damages." [*Id.* ¶¶ 71–72, page 43.]

To state a claim for invasion of privacy under Maryland law,[9] a plaintiff must allege facts showing "an intentional intrusion upon another person's solitude, seclusion, private affairs or concerns in a manner which would be highly offensive to a reasonable person."  *Trundle v. Homeside Lending, Inc.*, 162 F. Supp. 2d 396, 401 (D. Md. 2001).  A plaintiff must also allege that he had a "reasonable expectation of privacy in the source of the information."  *Id.*

---

[9]   The Chamber applies Maryland law to this and Mr. Kimberlin's other tort claims because that is where Mr. Kimberlin says he lives and works [*see* Compl. ¶ 1, page 6] and, therefore, supposedly where his alleged injuries would have occurred.  *See Lab. Corp. of Am. v. Hood*, 911 A.2d 841, 845 (Md. 2006) ("Unlike most other States . . ., Maryland continues to adhere generally to the *lex loci delicti* principle in tort cases.  Under that approach, where the events giving rise to a tort action occur in more than on State, we apply the law of the State where the injury—the last event required to constitute the tort—occurred."); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that federal courts must apply choice-of-law rules in state where they are located).

Mr. Kimberlin's privacy claim fails for a number of reasons. *First*, his allegations are too vague with respect to the Chamber because he does not say how the Chamber supposedly intruded upon his seclusion. The Complaint does not allege that the Chamber knew about or had anything to do with the efforts by Team Themis to create a proposal about the CIRC. [*See* Compl. ¶ 18, page 21 (alleging that Barr sent an email (Exhibit LL) "which listed information about non-profits, and personal information about principals and staff of STC/VR, including Plaintiff and their friends and family."); *id.*, Ex. LL Email (Nov. 11, 2010, 20:07) (showing email to be between only Mr. Barr of HB/Gary Federal and Mr. Kremin of Berico).] *Second*, Mr. Kimberlin's complaint indicates that all the information that Mr. Barr collected about Mr. Kimberlin (over the course of just one day) was information available to the public on the internet, including user-generated content on the websites and Facebook pages of the VelvetRevolution and Stop the Chamber. [*Id.* ¶ 18, page 21 (alleging that "personal information about principals and staff of STC/VR" was taken from "Facebook pages"); *id.* Exs. H, Email (Nov. 9, 2010, 6:30); G, Email (Nov. 9, 2010, 15:51) (showing sources of "personal information" to be public websites and Facebook pages).] Mr. Kimberlin cannot have a reasonable expectation of privacy in information about him that is already published on the internet, especially information posted on the internet by himself and his own organizations. *See Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136 (S.D. Cal. 2005) (dismissing claim for invasion of privacy under California law because plaintiffs photographed themselves and allowed posting of photographs on internet); *Pearce v. Whitenack*, 440 S.W.3d 392, 400 (Ky. Ct. App. 2014) (dismissing claim for invasion of privacy under Kentucky law because plaintiff has no expectation of privacy in comment posted on Facebook).

For these reasons, Mr. Kimberlin's invasion of privacy claim against the Chamber must be dismissed.

### E.      Mr. Kimberlin Fails to Plead Facts Supporting a Claim for Intentional Interference with Business and Prospective Economic Advantage. (Claim VII)

Mr. Kimberlin alleges that all the Defendants except the four affiliated with Messrs. Hoge and Nickless "attempted" to interfere with his employment at Justice through Music and VelvetRevolution by "conspiring to fracture, undermine and destroy."  (Mr. Kimberlin includes no object in his sentence: he does not say *what* the Defendants allegedly "fractured, undermined, and destroyed.")  [Compl. ¶ 126, page 58.]   Mr. Kimberlin's only specific allegation of purported tortious activity under this claim heading is about an email from Mr. Barr proposing to "Attack kimberlin [*sic*] and after a series of attacks on his person start making ties to the back office folks . . . discrediting them by association. Done in the right way this can cause them to distance themselves and also funders from kimberlin. [*sic*]." [Compl. ¶ 126, page 58–59; *id.* Ex. O, Email (Nov. 29, 2010, 11:50 a.m.).]

To state a claim for tortious interference with business relations, a plaintiff must allege facts showing each of the following elements: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the Defendants (which constitutes malice); and (4) actual damage and loss resulting."  *Kaser v. Fin. Prot. Mktg.*, 831 A.2d 49, 53 (Md. 2003).  For a claim about interference with a *prospective* economic advantage, a plaintiff must also "identify a possible future relationship which is *likely* to occur, absent the interference, *with specificity*."  *Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 546 (D. Md. 2006) (applying Maryland law) (emphasis added).

Mr. Kimberlin's interference claim fails for three reasons.  *First*, the email that Mr. Kimberlin cites as his only support for this claim shows that the alleged tortious acts were only discussed, not actually performed.  The tactics for "discrediting" Mr. Kimberlin were a suggestion by Mr. Barr to prepare a mock report to be presented to Hunton & Williams for purposes of demonstrating the kinds of

things Mr. Barr might prepare for Hunton & Williams's clients, *if* they purchased his services. The Complaint certainly contains no factual allegation of any "attack" to discredit Mr. Kimberlin. *Second,* he does not allege that Mr. Barr's proposal was ever presented to the Chamber, much less carried out at the Chamber's behest. *Third*, Mr. Kimberlin alleges that Defendants attempted to interfere with his employment or "conspired to harass companies associated with" his "employer," not that they actually did so. [Compl. ¶¶126, 127 pages 58-59.] Indeed, Mr. Kimberlin's allegations specifically state that he remains employed as a principal at both Justice Through Music and VelvetRevolution, with no alleged reduction in his pay or responsibilities. [*Id.* ¶ 1, page 6.] His interference claims must therefore be dismissed.

### F.   Mr. Kimberlin Fails to Plead Facts Supporting a Claim for Intentional Infliction of Emotional Distress. (Second Claim VII)

Mr. Kimberlin vaguely alleges that the conduct of all Defendants (except Mantech) "as set forth" in the rest of his complaint "constitutes extreme behavior so far outside the norms of civil society that an ordinary citizen would consider it outrageous conduct." [Compl. ¶ 133, page 59.] He claims that Defendants have stated that they will harm him through "death threats, harm to his family and business, and reputational harm." [*Id.* ¶ 134, page 60.] He claims to have suffered unspecified "severe emotional distress and mental anguish" as a result. [*Id.* ¶ 137, page 60.]

To state a claim for intentional infliction of emotional distress, a plaintiff must plead facts showing the following elements: "(1) The conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must be a causal connection between the wrongful conduct and the emotional distress; (4) [t]he emotional distress must be severe." *Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 113 (Md. 2000).

Mr. Kimberlin has failed to plead those elements in four respects.   *First*, nowhere does the Complaint explain the "emotional distress" that he claims to have suffered.   For this reason the Complaint fails on the last two essential elements for this claim of: emotional distress that is *severe* and that is *caused* by defendant's wrongful conduct.   *Second*, Mr. Kimberlin does not identify what conduct on the part of the Defendants gives rise to his claim; he just vaguely refers to "Defendants' conduct, as set forth above."   [Compl. ¶ 133, page 59.]   Nowhere does the Complaint allege any facts about the "death threats" and "harm to his family and business" that the Chamber was supposedly behind. Without factual detail about these inflammatory allegations, he cannot show the first two elements of his claim: conduct that is *intentional or reckless* and *extreme and outrageous*.   *Third*, even if the work by Team Themis and Hunton & Williams in preparing their aborted pitch to the Chamber rose to the level of "extreme and outrageous," Mr. Kimberlin was not aware of it (and thus could not have been upset by it).   *Finally*, as with his other counts, the Complaint alleges no involvement by the Chamber with the work by Team Themis as explained above [page 17 above].

Accordingly, the intentional infliction of emotional distress claim should be dismissed.

## CONCLUSION

For the foregoing reasons, the Chamber urges the Court to dismiss with prejudice all of Mr. Kimberlin's claims against it.   Moreover, because the Complaint makes clear that his claims are time-barred, and that he is unable to plead cognizable injury and essential elements of each claim, amendment would be futile and dismissal with prejudice is appropriate.

July 20, 2015                                   Respectfully submitted,

                                                   /s/ Bobby R. Burchfield
                                                Bobby Burchfield, Esq. (Bar No. 02325)
                                                bburchfield@kslaw.com
                                                Johnny Walker, Esq. (*pro hac vice*)
                                                jhwalker@kslaw.com
                                                **KING & SPALDING** LLP
                                                1700 Pennsylvania Avenue, NW
                                                Washington, District of Columbia 20006
                                                Telephone: 202 626 5524
                                                Facsimile: 202 626 3737

                                                *Attorneys for the Chamber of Commerce*
                                                *of the United States*