UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
SOUTHERN DIVISION

BRETT KIMBERLIN,
  Plaintiff,

v.  No. 8:15-cv-00723 GJH

HUNTON & WILLIAMS,
  Defendants.

**PLAINTIFF'S RESPONSE TO THE CHAMBER OF COMMERCE'S MOTION TO DISMISS**

Now comes Plaintiff Brett Kimberlin and responds in opposition to Defendant Chamber of Commerce's ("COC") Motion to Dismiss. The motion glosses over the true facts of this case and misapplies the law to those facts. The Complaint does, as much as possible without discovery, state a claim under each and every count. The statute of limitations does not apply because these are continuing torts, set into motion by the Defendants, and the injury to Plaintiff occurred within three years of the filing of the Complaint.

**The Complaint Properly States a Claim for Relief under Fed.R.Civ.P. 12(b)(6)**

A motion filed under Rule 12(b)(6) challenges the legal sufficiency of a complaint, see *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009), and the legal sufficiency is determined by assessing whether the complaint contains sufficient facts, when accepted as true, to "state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility standard requires only that the complaint's factual allegations "be enough to raise a right to relief above the speculative

1

level." *Twombly*, 550 U.S. at 555. Accord, *Summers v. Altarum Inst. Corp.*, 740 F.3d 325, 328 (4th Cir. 2014).

To survive a motion to dismiss, a plaintiff need not demonstrate that the right to relief is probable or that alternative explanations are less likely; rather, he must merely advance his claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. If the explanation is plausible, the complaint survives a motion to dismiss under Rule 12(b)(6), regardless of whether there is a more plausible alternative explanation. *Houck v. Lifestore* ___ F. 3d ___, Case No. 13-2326 (4th Cir. July 1, 2015)

There is no speculation required in this case. As set forth herein, Plaintiff has pleaded a very specific set of facts showing participation on the part of COC and its attorneys in formulating a blueprint of domestic intelligence activities that were used to inflict injury on Plaintiff, all of which satisfy the elements of each Count and meet the standard in *Ashcroft v. Iqbal.* Plaintiff's claims are plausible and supported by many of the Defendants' own emails and documents.

**Short Statement of Facts**

COC portrays this case as a mere unconsummated "pitch" from several Defendant cyber intelligence contractors to lawyers for COC. Because it was unconsummated and not even shared with COC, they assert, Plaintiff has failed to make a valid legal claim against COC. COC also argues that the claims are time barred because the four-year statute of limitations for RICO cases has passed and three-year statute of

limitations for the other claims has passed. These arguments are without merit and belied by the facts and established legal precedent.

This Court must accept the allegations in the Complaint as true instead of accepting the COC's assertions that Plaintiff failed to state a claim. Plaintiff has alleged a very compelling and "plausible" narrative that the COC engaged in racketeering activity through an enterprise and pattern of activity; that it violated 42 USC 1985(2) by deterring him from cooperating with a federal grand jury; that it interfered with his business activities, both current and prospective; that it retaliated against him for cooperating with a federal grand jury and investigation; and that it launched a course of conduct that intended to cause him severe emotional distress. Plaintiff has backed up his narrative with scores of emails and letters written by or about the COC laying out an abhorrent plan to destroy Plaintiff and his employer through the use of illegal and unethical means. Under Fed. R. Civ. P. 10(c), a court can consider for purposes of a Rule 12 motion, documents that are attached to a motion to dismiss if they are referred to in the complaint and are central to the plaintiff's claims. Plaintiff has also shown that the COC was very frustrated after being exposed as engaging in nefarious conduct and that it then resorted to racketeering activity to shut down those who exposed that conduct, such as Plaintiff. Plaintiff has supplemented his Complaint with the instant brief and with his affidavit attached as Exhibit C. *See Albiero v. City of Kankakee,* 122 F.3d 417, 419 (7th Cir. 1997) (plaintiff opposing dismissal may supplement the complaint with factual narration in an affidavit or brief, and if the extra assertions make out a claim, then the complaint stands).

This case should not be dismissed prior to discovery in this case, and to do so would be contrary to the public's interest and would reward the Defendants' outrageous, tortious conduct. This case was filed after Edward Snowden and Wikileaks exposed very highly public cyber abuses that have fundamentally altered the way that courts, legislators, the public and even the Executive Branch view illegal domestic spying, The instant case opens a window into the secretive world of spying on American citizens by private cyber security companies that work hand in hand with law enforcement and military agencies. Moreover, it lays bare how powerful corporations are using such companies not only to spy on opponents and advocacy organizations, but also to undermine and ultimately destroy them through the use of diabolical, illegal and Segretti-type means.

One shudders to think what would have happened had Watergate been swept under the rug like the COC wants to do in this case by having this Court dismiss this case at this stage of the proceedings. History would have altered and criminals would have gone unpunished. Sunlight is a potent disinfectant, and this Court should allow Plaintiff to shine sunlight on the abhorrent abuses of the Defendants named in this case by denying COC's Motion to Dismiss and allowing discovery.

**Plaintiff Has Initiated Discovery To Support His Claims**

This week, all of the represented Defendants will be served with both document requests and interrogatories seeking information to support Plaintiff's claims. This Court should not rule on the Defendants' Motions to Dismiss until that discovery is complete. Plaintiff believes that such discovery will support his claims and show that the statute of limitations does not apply to this case for various reasons. It is

well established that discovery can take place in complex cases such as the instant case prior to a ruling on a motion to dismiss. *Forest River Inc,, v. Heartland Recreational Vehicles*, (ND Il 2012). See, e.g., *Allstate Ins. Co. v. Levy*, No. CV-10-1652 (FB)(VVP), 2011 WL 288511, at *1 (E.D.N.Y. Jan. 27, 2011) (—The pendency of the motion to dismiss does not provide an automatic basis to stay discovery.‖); *Integ. Systems & Power, Inc. v. Honeywell Int'l, Inc.*, No. 09 CV 5874(RPP), 2009 WL 2777076, at *1 (S.D.N.Y. Sept. 1, 2009) (—It is well-settled that the issuance of a stay of discovery pending the outcome of a motion to dismiss is by no means automatic.‘‖); *DSM Desotech Inc. v. 3D Systems Corp.*, No. 08 CV 1531, 2008 WL 4812440, at *2 (N.D. Ill. Oct. 28, 2008) (—[T]he mere filing of the motion [to dismiss] does not automatically stay discovery.‖); *Bocciolone v. Solowsky*, No. 08-20200-CIV, 2008 WL 2906719, at *1 (S.D. Fla. July 24, 2008) (—[C]ourts have consistently rejected any per se requirement to stay discovery pending resolution of a dispositive motion.‖). In *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1368 (11th Cir. 1997), *Koock v. Sugar & Felsenthal*, LLP, No. 8:09-CV-609-T-17EAJ, 2009 WL 2579307, at *2 (M.D. Fla. Aug. 19, 2009) (—The holding in *Chudasama* does not establish the general rule that discovery should not proceed while a motion to dismiss is pending. . . . Instead, *Chudasama* and its progeny ̱stand for the much narrower proposition that courts should not delay ruling on a likely meritorious motion to dismiss while undue discovery costs mount.‘‖). Accord *In re Winn Dixie Stores, Inc. ERISA Litig.*, No. 3:04-cv-194-J-33MCR, 2007 WL 1877887, at *1 (M.D. Fla. June 28, 2007). See also Lori Andrus, *In the Wake of Iqbal*, 46 TRIAL 20, 29

(2010) (noting —the many federal decisions rejecting the pendency of a motion to dismiss as a basis for granting a blanket discovery stay).

**The Four-Year RICO Statute of Limitations**

COC argues that the four-year statute of limitations has expired because Plaintiff did not file his Complaint before the four-year time limit required for RICO cases. COC argues that Plaintiff would have had to file by February 2015 rather than March 2015, and therefor the RICO count is untimely. This is without merit for several reasons.

**Rice v. Paladin Enterprises**

The Fourth Circuit, in *Rice v. Paladin Enterprises Inc*, 128 F.3d 233 (4th Cir. 1997), set forth the principle for continuing liability such as Plaintiff has alleged in this case. In 1983, Paladin Press published a book called, "Hit Man: A Technical Manual for Independent Contractors" which provided detailed instructions on how to commit murder. *Ten years later*, in Montgomery County Maryland, three people were murdered using the techniques outlined in the book. The victims' family sued Paladin Press for aiding and abetting the murder. The trial court held that the First Amendment protected Paladin, but on appeal, the Fourth Circuit, relying on Maryland law, held that Paladin was responsible because it had provided the instructions on how to kill, which had been followed by the actual killer:

> we hold ... that the First Amendment does not pose a bar to a finding that Paladin is civilly liable as an aider and abettor of Perry's triple contract murder. We also hold that the plaintiffs have stated against Paladin a civil aiding and abetting claim under Maryland law sufficient to withstand Paladin's motion for summary judgment. [at 243].

The Court, in making this determination, relied on Maryland law:

Maryland's highest court has held that a defendant may be liable in tort if he "by any means (words, signs, or motions) encourage[s], incite[s], aid[s] or abet[s] the act of the direct perpetrator of the tort." *Alleco Inc. v. Harry & Jeanette Weinberg Foundation,* 340 Md. 176, 665 A.2d 1038, 1049 (1995) (*quoting Duke v. Feldman,* 245 Md. 454, 226 A.2d 345, 347 (1967)). It further appears that generally Maryland defines the tort of aiding and abetting in the same way that it defines the crime of aiding and abetting. The state defines "aider" as one who "assist[s], support[s] or supplement[s] the efforts of another," and defines "abettor" as "one who instigates, advises or encourages the commission of a crime." *Anello v. State,* 201 Md. 164, 93 A.2d 71, 72-73 (Md.1952). The Court of Appeals has explained that in order for a conviction to stand, "it is not essential that there be a prearranged concert of action, although, in the absence of such action, it is essential that [the defendant] should in some way advocate or encourage the commission of the crime." *Id.* And, recently, the court has reiterated that criminal aiding and abetting "may be predicated upon counseling or encouraging" a criminal act, even if there is no agreement between the principal and the aider or abettor, and also that "[i]t is well settled that aiding and abetting does not always require a conspiracy."*Apostoledes v. State,* 323 Md. 456, 593 A.2d 1117, 1121 (1991).

The primary, and possibly only, difference between Maryland's civil and criminal laws of aiding and abetting is the intent requirement. As Judge Learned Hand explained in discussing generally the difference between civil and criminal aiding and abetting laws, the intent standard in the civil tort context requires only that the criminal conduct be the "natural consequence of [one's] original act," whereas criminal intent to aid and abet requires that the defendant have a "purposive attitude" toward the commission of the offense. *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938); *see also Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949) (adopting Judge Hand's view of the criminal intent requirement). We assume that Maryland prescribes a higher intent standard for the imposition of criminal liability than it does for civil liability. [at 251]

In the instant case, the Defendants, including the COC, created various documents, including the "Corporate Information Reconnaissance Cell" blueprint detailing how it would target, track, and neutralize people, organizations, and companies as directed by H&W. These included specific instructions on how to harm these targets, including (1) using illegal surveillance, both overt and covert, to gather harmful information, (2) installing malware on computers, (3) creating false documents with false narratives to ruin the credibility of the targets, (4) attacking friends, families and associates of the targets, (5) using social media software to

automate snooping on targets, (6) undermining the credibility and funding bases of the targets, (7) gathering personal information of family members to use for exploitation and smearing of targets and other means.

In the instant case, these documents, prepared by highly specialized cyber warfare experts employed by the CIA and Department of Defense, using techniques developed to target international terrorist organizations, were circulated amongst the Defendants without objection, and agreed upon. This package of techniques is not something that the average person would engage in or even has the knowledge base to imagine. Yet, after these documents were exposed by Anonymous, they were instituted against Plaintiff by others in the intelligence community, including Defendants Hoge and Nickless, and others acting in concert with them.

For the past three plus years, named and unnamed conspirators and/or aiders and abettors, have taken the blueprint instructions and template created by and for the Defendants in this case and used them to harm Plaintiff. They have (1) illegally scraped social media sites of Plaintiff, his non profits, family and friends to find exploits, (2) created false documents and false narratives about Plaintiff that they have used to undermine his credibility and funding base, (3) engaged in multiple attempts to cyber attack his non profits websites using phishing, malware and denial of services software, (4) generated defamatory information that they placed in the public domain, (5) targeted Plaintiff's family and teenage daughter with predatory conduct, (6) targeted Plaintiff's employer and music business for destruction, and (6) engaged in other illegal and nefarious conduct.

Did these people enter into an express conspiracy agreement with the Defendants exposed by Anonymous, or did they simply take advantage of the instructions and template created by those Defendants? Without discovery, we do not know the answer to that question. However, under *Rice*, the Defendants exposed by Anonymous are liable as aiders and abettors for the continued harm that has occurred to Plaintiff over the past three plus years because the conduct was the "natural consequence of [one's] original act,". *Rice* at 251. Therefore, there is no bar under the statute of limitations to any of the counts in the Complaint.

**SOL Is Tolled**

Moreover, the statute of limitations was equitably tolled. In *Rotella v. Wood*, 528 U.S. 549 (2000), the Supreme Court set a four-year discovery of injury limitation in RICO cases. However, the Court made clear that that limitation is not rigid:

> In rejecting pattern discovery as a rule, we do not unsettle the understanding that federal statutes of limitations are generally subject to equitable principles of tolling. ... and where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer to plaintiff's difficulty. The virtue of relying on equitable tolling lies in the very nature of such tolling as the exception, not the rule. [at 560-61]

As the Supreme Court reaffirmed earlier this year in *United States v. Kwai Fun Wong*, ___U.S.___(2015), "a court usually may pause the running of a limitations statute in private litigation when a party 'has pursued his rights diligently but some extraordinary circumstance' prevents him from meeting a deadline.'" (citation omitted).

In the instant case, there are several reasons to find that the SOL for RICO did not end in February 2015.

1. On or about November 2014, a whistleblower with intimate knowledge of this case contacted Plaintiff and advised him that that the Defendants at Hunton & Williams in the "Wikileaks/USCOC/BofA dirty tricks campaign" were hiding information about the matter. He specifically urged Plaintiff to file suit and seek discovery, and indicated that Defendant Richard Wyatt would be in a position to provide pertinent information that had been taken from the premises of the Hunton & Williams firm in March of 2011 in order to protect it from discovery. He said that these matters caused serious marital discord for Mr. Wyatt that led to the dissolution of that marriage. He said that Plaintiff should seek discovery of these matters.

2. In light of the information provided by the whistleblower, Plaintiff, on December 17, 2014, contacted Defendants Wood, Wyatt and Quackenboss at Hunton & Williams informing them that Plaintiff would be filing this case, and that he was available for pre-suit discussions. On February 9, 2015, Plaintiff followed that up with an email to David Higbee, Managing Partner at H&W in Washington, DC, letting him know that Plaintiff's filing of the suit was imminent. On February 15, 2015, H&W General Counsel Robert Rolf contacted Plaintiff and asked for a meeting at H&W headquarters in Richmond, Virginia on February 19, 2015, which occurred under Federal Rule of Civil Procedure 408. Negotiations continued over the next several weeks regarding resolution, service and wording in the Complaint, which Plaintiff filed on March 16, 2015. The H&W Defendants were very aware during this time about the possibility of a Statute of Limitations defense yet Mr. Rolf stated that if the case was resolved, H&W would waive any SOL.

In short, the H&W Defendants and the COC Defendants (which were represented by H&W counsel) knew, as early as December 17, 2014, that Plaintiff was going to file this suit. Counsel engaged in confidential discussions with Plaintiff from as early as February 15, 2015. They discussed the SOL defense and even about waiving it during the resolution process. Clearly, Plaintiff exercised due diligence in filing the Complaint and acted quickly after learning the information from the whistleblower. *Irwin v. Department of Veterans Affairs*, 498 U. S. 89, 95-6 (1990),

**Plaintiff's Injuries**

Moreover, the statute of limitations was never exceeded when Plaintiff filed his Complaint because the injuries suffered by Plaintiff did not accrue until well after March 2011. In fact, as set forth in the Complaint, it was the harm caused by the adoption of the Team Themis blueprint instructions by Defendants Hoge, Nickless and others beginning in May 2012 that became the starting date for all the statutes of limitations. See also Plaintiff's declaration at Exhibit C. Those instructions were created on behalf of the COC to harm its perceived enemies. Plaintiff was named as a "Tier I" target, and the COC made it clear that it wanted Plaintiff neutralized. As the Supreme Court held in *Rotella*, the SOL for RICO begins to run from the time of the discovery of the injury, which in this case was May 2012.

At this stage of the proceedings, Plaintiff does not know if, as is routine for black operations, the Defendants turned over or contracted their attack campaign to Defendants Hoge, Nickless and others as proxies, or if those Defendants and others simply adopted the instruction manual set forth in the Team Themis documents after they became public. However, it does not matter for purposes of liability or

11

jurisdiction since the injury to Plaintiff flowed from the creation and publication of Team Themis attack documents.

As several of the Defendants admitted in an email exchange on November 10, 2010, they saw themselves as a hybrid of James Bond and mafia gangsters: *"We need to blow these guys away with descriptions of our capabilities, IP, and talent. Make them think that we are Bond, Q, and money penny all packaed [sic] up with a bow. ... Most of all that we are the best money can buy! Dam [sic] if feels good to be a gangsta."* Complaint at 23. Both Bond and gangsters act without regard to the law or rules, yet these Defendants want this Court to accept their argument that their conduct ended on February 4, 2011 when they were exposed by Anonymous, and they quietly went back to their daily routines filled with humiliation. They want this Court to ignore the unprecedented attack campaign launched against Plaintiff in May 2012 using the same techniques set forth in the Team Themis documents. They want to forget that on November 9, 2010, Defendant Aaron Barr referenced one of the instigators of that future attack, Mandy Nagy, in his discussions with Defendant Pat Ryan when he said, "We could do so much with this..." Exhibit A. And yes, he did do much with it according to the Complaint—he turned over the keys to the Team Themis campaign to her and others, so they could continue and institute the attacks on Plaintiff to harm him and his business. Those attacks have continued for the past three plus years and someone, likely associated with Defendants, is funding them. Yet now, the COC and the other Defendants want this Court to let them go on their merry way with no discovery, no accountability and no change in behavior.

## The RICO Claim Meets The Initial Pleading Requirement

The COC makes various claims as to why Plaintiff's RICO claim does not state a claim or meet the requisite pleading standard of particularity. It argues that Plaintiff has pled no enterprise, no pattern of racketeering, and no harm to Plaintiff's business. This is without merit.

In *Rotella,* the Court made clear that RICO cases should be construed with flexibility rather than being dismissed prior to discovery:

*Rotella* has presented no case in which Rule 9(b) has effectively barred a claim like his, and he ignores the flexibility provided by Rule 11(b)(3), allowing pleadings based on evidence reasonably anticipated after further investigation or discovery. See, *e.g., Corley* v. *Rosewood Care Center, Inc. of Peoria,* 142 F. 3d 1041, 1050-1051 (CA7 1998) (relaxing particularity requirements of Rule 9(b) where RICO plaintiff lacks access to all facts necessary to detail claim). [Id at 560]

In *Corley*, the Court found that where the information regarding the particularity of the predicate acts was in the hands of the defendants, the RICO count could not be dismissed for failure to state a claim:

we believe that Rule 9(b)'s particularity requirement must be relaxed if, at the time the complaint was filed, Corley had been denied access in discovery to information that would identity those residents [and therefore the specifics of the fraud]. at 1051

The instant case screams out for the Court's flexibility and for discovery. The Defendants are a mix of black ops intelligence contractors, extremely powerful lawyers and their firm of over 800 lawyers, and the most powerful corporate lobbying entity on earth. These Defendants have secrecy embedded in their DNA. In fact, when Anonymous exposed their nefarious activities, every single Defendant except Palantir CEO Alex Karp engaged in a bunker mentality by battening down the hatches and refusing substantive comment, despite demands from the press and

others for answers. In short, were it not for the Anonymous expose', this RICO activity would have been kept cloaked in the dark depths of top secrecy while law abiding citizens and advocacy organizations would have been subjected to overt and covert attacks funded and directed by the COC and its lawyers, and implemented by other Defendants. The Defendants are now hoping that this Court will dismiss Plaintiff's claim so that their conduct will remain buried in their secret archives. They have stated that they will vigorously oppose any discovery while telling the Court that Plaintiff has not pled his Complaint with particularity. But, as *Rotella* and *Corely* make clear, that would constitute error. And it would be unfair and unjust.

**The Enterprise**

The COC argues that Plaintiff has not shown that there was an enterprise or that COC was a part of that enterprise. To the contrary, the enterprise is defined in the Complaint as:

The association in fact enterprise is a group of people and entities associated together for the common purpose of acting to promote COC's business interests and protecting the COC and its senior staff from any external opposition and criminal and administrative investigations. Complaint at 48.

COC asserts that Plaintiff has not shown with particularity that COC even knew anything about the H&W/Team Themis "pitch", and therefore could not have been part of the enterprise. This is without merit. First, the COC's lawyers at H&W, acting as agents of the COC, were directing the contacts with the Defendant cyber security contractors, and therefore, the COC, which was paying those lawyers, is ultimately responsible for knowing what their attorneys were doing. In fact, because these documented contacts continued over a period of at least six months,

COC was certainly billed by H&W attorneys for the time spent dealing with those contractors.

Second, there are many emails that indicate that H&W was keeping COC in the loop and having direct contact with COC about the Team Themis proposals. These are listed in an article by reporter Scott Keyes at ThinkProgress on February 14, 2011. Exhibit B.

Third, as Exhibit J of Plaintiff's Complaint makes clear, H&W provided a "data disc" to Team Themis loaded with information about Plaintiff and other opponents of the COC, which the COC had compiled over a long period. Defendants Pat Ryan and Aaron Barr said they would incorporate this data into their own database at Palantir. Complaint at 20. It is inconceivable that H&W would be in possession of a data disc of compiled data on people opposed to the COC without COC's knowledge.

Fourth, to accept COC's position without discovery would grant it immunity from suit simply because it used H&W lawyers as a firewall of protection. This Court should not tolerate this common tactic of organized crime bosses.

Fifth, without discovery, there is no way of knowing whether the enterprise was limited to the facts set forth in the Complaint or whether it was really "shuttered" after the Anonymous expose'. The Team Themis plan was breathtaking in its scope, targeting more that a dozen advocacy organizations and their leaders, with a 12 million dollar proposed budget. Included in the discussions were other clients such as Bank of America and Booz Allen, and other targets such as Wikileaks. In short, this was a huge operation involving many of the most powerful entities on earth yet

the COC asks this Court to believe that it was clueless to the rogue operation being run by its 800 lawyer firm, H&W.

**Pattern of Racketeering**

COC asserts that Plaintiff has not shown a pattern of racketeering because he has failed to show with particularity the specifics of charged crimes, such as fraud. As Plaintiff pointed out above, the Defendants are in possession of the documents that Plaintiff needs to show that particularity, and therefore this Court should not rule on their Motion to Dismiss until Plaintiff receives those documents.

Contrary to COC's argument regarding the predicate act of obstruction of justice and intimidation of a witness, Plaintiff has clearly alleged in the Complaint that he (1) was working with whistleblowers who provided information about the Chamber and its senior staff, (2) was in regular communication with the FBI in person about COC illegal activities, (3) had provided information to the FBI about COC board member Donald Blankenship's criminal activities, (4) he had his non profit lawyer lead the call for a criminal investigation of COC member NewsCorp for violating the Foreign Corrupt Practices Act, (5) had offered to testify before any grand jury investigating the matters he provided to the FBI, and (6) had been told that a grand jury was investigating Donald Blankenship's crimes as provided by Plaintiff to the FBI and that he could be called as a witness. See Exhibit C.

The COC did not want Plaintiff to be believed by the FBI or the grand jury. The COC knew that Plaintiff and his organizations were bringing unwanted scrutiny of COC activities, and they wanted it stopped. The COC wanted to ensure that Plaintiff became so toxic that he would either never be called to the grand jury, would not be

believed if called, or would be intimidated and deterred from testifying before the grand jury. The COC cannot now assert that since Plaintiff never testified, that it did not obstruct justice. In fact, just the opposite is true—its tactics worked because Plaintiff was not called before the grand jury, he has been intimidated and deterred from pursuing further exposes' of the COC, and he has been embroiled in a multi-year campaign of personal and professional destruction by persons who have adopted the techniques created by the Defendants.

Moreover, the actions of the Defendants, including COC, involved *intimidating Plaintiff from being a witness and retaliating against him* for providing information to the FBI and grand jury that indicted COC Board Member Donald Blankenship. This violated 18 USC 1512(d) and 1513 (b) and (e).

Without discovery, Plaintiff cannot know if the money spent by the COC on H&W's black operations was derived from unlawful activities to make it qualify for money laundering. Considering the secret nature of the operation, the COC's statements of plausible deniability, and the great lengths COC went through to "see no evil," it is very plausible that it was funding these operations with a black bag account that was kept off the books, making it unlawful proceeds.

**Injury to Business and Property**

The Complaint sets forth a long list of ways in which Plaintiff's business and property interests were harmed by the Defendants' racketeering activity and the adoption of the Team Themis campaign. Complaint at 57-58 and Exhibit C. Because these allegations must be accepted as true, this is all that is necessary at this stage of the proceedings to meet the harm to business element.

Clearly, Plaintiff has alleged an enterprise, pattern of racketeering, and harm to business and property, and this Court should not dismiss this case without first allowing Plaintiff to seek discovery to prove the elements of the RICO charge.

**The 42 USC 1985(2) Count**

The COC makes the same argument regarding the section 1985(2) count as it does regarding some of the predicate acts: that Plaintiff was not deterred from testifying before a federal grand jury because he presented no evidence that he was going to be a witness at a grand jury. This circular chicken and egg argument is without merit as Plaintiff demonstrated above. In this case, unlike *Kimberlin v. National Bloggers Club*, relied on by COC, there *was* a federal grand jury empaneled to investigate matters Plaintiff brought to the attention of the FBI regarding criminal activities of Massey Energy and its COC Board Member, Donald Blankenship. The FBI told Plaintiff to be prepared to testify before the grand jury regarding information he provided to the FBI. See Exhibit C.

Clearly, the COC did not want Plaintiff to testify or expose any of the criminal activities of itself or its senior members. That is precisely why Defendants H&W, Wyatt, Wood and Quackenboss hired the military intelligence contractors to target Plaintiff and others. In fact, the timing is important since it was in April and May 2010, just a few months before H&W hired Team Themis, that Plaintiff first provided the FBI with information about Donald Blankenship's criminal activities as CEO of Massey Energy. Zeese, Kevin, *Criminal Investigations of Massey Energy Go Forward As Citizen Pressure Builds for Prosecution,* Truthout, May 29, 2010. Plaintiff's non-profit had offered a $50,000 reward for information about Massey

18

Energy from whistleblowers that he then hand delivered to the FBI. The non-profit filed complaints with the FEC and IRS regarding the COC's criminal campaign finance violations, and it requested Congressional investigations of the COC. All this resulted in withering criticism and scrutiny of the COC from the press, Members of Congress, and even the White House. See e.g., Eaggen Dan, *Obama Continues Attacks on Chamber of Commerce*, Washington Post, Oct. 11, 2010; Zornick, George, *Chamber of Commerce Story Sparks Wide-Ranging Reaction, Calls for Investigations,* Think Progress, Oct, 7, 2010. Long term members of the COC such as Apple, PG&E, Excelon and Nike all quit the COC because of expose's of the Chamber's positions by Plaintiff's non-profit and others. Korosec, Kristen, *Five and Counting: Apple Quits Chamber of Commerce*, CBS Money Line, Oct. 5, 2009. The COC was hemorrhaging bad news and it wanted it stopped at any price, leading to the hiring of Team Themis and the targeting of Plaintiff so he would or could not testify about what he had uncovered about the COC and its senior members. Clearly, this constitutes a violation of 42 USC 1985(2).

**The Remaining Claims**

The COC makes arguments regarding several other claims, including that they are time barred or fail to state a claim. Plaintiff adopts his arguments above regarding the statute of limitations noting that the SOL starts when the injury is discovered. In Plaintiff's case, the injury from the Team Themis plan was discovered in May 2012, well within Maryland's three year SOL. Moreover, although the COC relies on Maryland SOL statutes, it ignores Article 19 of the Maryland Constitution, which states:

That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land.

In the instant case, the COC, directly and through its co-Defendant agents, created a blueprint on how to "fracture, undermine and destroy" Plaintiff and his employer, and that blueprint was then used by Defendants Hoge, Nickless and others to injure Plaintiff. The COC wants this Court to grant it immunity based on when it and its agents created that blueprint rather than when that blueprint was used to injure Plaintiff. This would deny him "justice and right" under Article 19. Cf. *Jackson v. Dackman*, 30 A.3d 854 (Md. 2011) (statute which granted immunity to lead paint manufacturers after time period violated Article 19).

Wherefore, for all the foregoing reasons, the Court should deny COC's Motion to Dismiss.

Respectfully submitted,

Brett Kimberlin

Certificate of Service

I certify that I emailed a copy of this response to the Defendants this 8th day of September, 2015.

Brett Kimberlin