FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2015 OCT 14  PM 3: 30

CLERK'S OFFICE
AT GREENBELT

BY___BU___DEPUTY

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
SOUTHERN DIVISION

BRETT KIMBERLIN,
    Plaintiff,

v.
                             No. 8:15-cv-00723 GJH

HUNTON & WILLIAMS,
    Defendants.

**PLAINTIFF'S RESPONSE TO MOTIONS TO DISMISS BY THE HUNTON&WILLIAMS DEFENDANTS, BERICO DEFENDANTS, PALANTIR DEFENDANTS, HBGARY DEFENDANTS, MANTECH, HOGLUND, PNNL AND HOGE**

Now comes Plaintiff Brett Kimberlin and responds in opposition to the Motions to Dismiss filed by the Defendants named above.  Plaintiff has already filed a response to the Chamber of Commerce, and is awaiting any motions filed by Defendants Aaron Barr and Patrick Ryan after having served them with the Complaint.  In short, the Defendants' motions are without merit and misapply the law and misrepresent the facts and Plaintiff's claims for relief.  The motions should not be ruled on without allowing Plaintiff discovery because the Defendants are in possession of documents and data that support his claims.

**STATEMENT**

Plaintiff hereby adopts, where applicable, the arguments he made in his response to the Chamber of Commerce ("Chamber"), including the following statement by several of the Defendants admitting in an email exchange on November 10, 2010, that they considered themselves as a hybrid of James Bond and mafia gangsters:

"*We need to blow these guys away with descriptions of our capabilities, IP, and talent.*

1

*Make them think that we are Bond, Q, and money penny all packaed [sic] up with a bow. ... Most of all that we are the best money can buy! Dam [sic] if feels good to be a gangsta."* (Complaint at 51).

This is an eye-opening admission of the state of mind of the Defendants in real time. They saw this operation against Plaintiff and other Chamber opponents as a rogue operation, just like something James Bond and the Mafia would do, with no rules and no boundaries. James Bond and the Mafia eliminate their enemies by any and all means. They use high tech gadgetry or brute force, with total disregard for laws and the rights of their targets. The ends justify the means. And when the Mafia bosses want to get their way, they issue threats to intimidate and obstruct justice, just like those received by Plaintiff after exposing the Chamber, as shown in a letter to the FBI dated on October 17, 2010, just days after Defendant Hunton & Williams had reached an agreement with Team Themis to target Plaintiff and other opponents of the Chamber. See Complaint Exhibit QQ.  Plaintiff, who was receiving the email and mail being sent to StopTheChamber, received all these emails.

- **"Leave the Chamber of Commerce alone, this is your only warning;"**
- **"You WILL be confronted and stopped... I am quite probably a member of the fasting (sic) growing group that is your direct enemy...;"**
- **"The more torture of Islamohitlerite babykilling Fascist pigs, the better. You should be with them;"**
- **"Your (sic) all on borrowed time. The real revolution will come to those soon;"**
- **"You peices (sic) of shit should all be fucking burned at the stake;"**
- **"Be careful what you ask for..;"**
- **"Bounty on your head. Beware;"**
- **"I dont make threats. Only promises. You better back the hell off;"**
- **"I will inform friends and family of your thoughts and movements;"**
- **"Keep this $200,000 'tip' business going for the CEO of the Chamber and you will find yourself as the target.... You will only receive a limited number of warning --- this may be the only one --- before your punishment is delivered."**
- **"Please let the world know who is behind this bounty offer so that they can be 'recognized' for their decision."**

- **"Try yourselves for treason againsst [*sic*] the U.S. and then we can hang you for your crimes against this country." (Complaint 14-15).**

Apparently, Defendants want this Court to believe that they were all just shooting the bull when someone came up with the idea to "pitch" the Chamber with a $12 million hair brained scheme to destroy its opponents with all the cyber tools developed to target international terrorists. According to Defendants, both Hunton & Williams and the Chamber never accepted or acted on the pitch, and, when the scheme was exposed by Anonymous on February 7, 2011, none of the Defendants ever talked about it again but rather all went on their merry way as if it never happened. The Defendants want this Court to ignore the harm to Plaintiff and his employer that directly flowed from the Defendants' plans to destroy Plaintiff, a harm that did not manifest itself for more than a year after Defendants' blueprint for destroying Chamber opponents was posted online. The Defendants hope that this Court will pretend that no federal grand jury was impaneled to investigate the crimes Plaintiff brought to the attention of the FBI, and that he was never told that he could be called to testify before that grand jury.

When ruling on a motion to dismiss, this Court is required to determine if the Complaint is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In the instant case, Plaintiff's allegations as set forth in the Complaint are both plausible and compelling. In contrast, the Defendants' assertions, such as those mentioned above, are so implausible that they require a suspension of reason and rational thought. As the Fourth Circuit stated recently in, *Houck v. Lifestore*, \_\_\_F.3d\_\_\_, Case No. 13-2326 (July 1, 2015), when ruling on a motion to dismiss, the court cannot conduct a balancing test between competing narratives. Instead, if the

plaintiff's "explanation is plausible, [the] complaint survives a motion to dismiss under Rule 12(b)(6), regardless of whether there is a more plausible alternative explanation." Moreover, when reviewing a motion to dismiss, "[t]he court may consider documents attached to the complaint, as well as documents attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed." *Sposato v. First Mariner Bank,* No. CCB-12-1569, 2013 WL 1308582, at *2 (D. Md. Mar. 28, 2013); *see also CACI Int'l v. St. Paul Fire & Marine Ins. Co.,* 566 F.3d 150, 154 (4th Cir. 2009). Therefore, this Court can consider the exhibits attached to this Global Response to show that the Complaint meets the plausibility requirement of Fed. R. Civ. P 8(a).

As this Court ruled in *Malibu Media, LLC v. Doe,* PWG 13-365 (D. Md. Dec. 16, 2014), "to require Malibu to prove that the subscriber more likely than not is the infringer—that is, to meet its ultimate burden of proof—at the pleading stage would turn the civil litigation process on its head; 'there is no requirement that Malibu present at this stage actual evidence to support the merits of its infringement allegations.'" (citations omitted).

### The Defendants Misstate And Misapply Maryland Law With Regard To Their Statute Of Limitations Arguments

The Defendants make various arguments for dismissal on statute of limitations grounds. First, they assert that the four-year statute of limitations on the RICO claim began on or about February 7, 2011, when Anonymous released the HBGary files on the Internet. Second, they argue that the three-year statute of limitations for the remaining counts began on the same date. These arguments are without merit.

As this Court noted in *Fowler v. Wells Fargo Home Mort. Inc,,* No GJH-15-1084 2015 WL 2342377. At 3 (D. Md. 2015), it is the plaintiff's "knowledge of her own injury that controls the running of the [four-year] statute of limitations [period for RICO actions]." Moreover, under Maryland Courts Article § 5-101, the statute of limitations begins to run from the time the action "accrues." Because the term "accrue" is undefined by the legislature, the question of accrual is left to judicial determination. *Poffenberger v. Risser,* 290 Md. 631, 633 (1981). Therefore, when limitations are at issue, it is necessary to judicially determine when accrual occurred to trigger the operation of the statute. This determination may be based solely on law, solely on fact, or on a combination of law and fact. Id. at 634.

In *Hecht v. Resolution Trust*, 635 A. 2d 394, 397 (Md. 1994), the court noted that in Maryland, courts faced with limitations claims are required to apply the discovery rule, "which provides that a cause of action accrues when a plaintiff in fact knows or reasonably should know of the wrong." The *Hecht* court, painstakingly analyzed a host of cases where the discovery rule has been applied, including those involving medical malpractice, negligent construction, professional malpractice, latent disease such as asbestos, and product liability. See also *Rice v. Paladin Enterprises Inc*, 128 F.3d 233 (4th Cir. 1997), where the Court found that the defendant was liable ten years after the publication of a book used as a blueprint for a murder. Moreover, the court found that where there is a "continuation of events," the limitations period does not begin until the end of the series of events. The court also stated that although the determination of when a cause of action accrues under the discovery rule is usually made by the court, "when the viability of statute of limitations

defense hinges on a question of fact, however, the factual question is ordinarily resolved by the jury, rather than by the court." *See also*: the discovery rule is not rigid but rather can be shaped by the court to avoid "possible injustice in these situations outweighed interests in repose and administrative expediency." Id.

In the instant case, as set forth in the Complaint, Plaintiff did not discover the RICO and state law injuries caused to him from the Team Themis blueprint until May 2012 when Defendant Hoge and his associates implemented the Team Themis blueprint. Plaintiff's affidavit, attached as Exhibit 1, states unequivocally that Plaintiff's knowledge of his injury first came in May 2012. For the purposes of Defendants' Motions to Dismiss, this Court must accept this fact as true, and reject Defendants' assertions that the RICO and state law claims are barred by the statute of limitations. Indeed, under the discovery rule, the only issue for this Court at this time is the determination of when Plaintiff realized the injury to Plaintiff occurred. If the Defendants want to dispute Plaintiff's statement that the injury first occurred in May 2012, then the issue becomes one of fact that must be left to a jury.

Moreover, with regard to the claim under 42 U.S.C. 1985(2), the actions of the named Defendants began in the spring of 2010 and continued through the spring of 2015 while the empaneled federal grand jury was meeting in the investigation of Chamber of Commerce board member Donald Blankenship. Mr. Blankenship was indicted by that federal grand jury in November 2014, Exhibit 2, and the grand jury issued a superseding indictment in March 2015. Exhibit 3. Mr. Blankenship's federal trial began on October 1, 2015 in Charleston, West Virginia. Exhibit 4.

Plaintiff and his organization spearheaded the campaign for criminal indictment of Mr. Blankenship, and provided the FBI with information about Mr. Blankenship's criminal conduct, including information provided by whistleblowers who responded to a reward posted by Plaintiff's organization.  Plaintiff personally met with the FBI, had numerous communications with the FBI, and was told that he could be called to testify before the grand jury.  The Defendants, through the Team Themis blueprint, wanted to, conspired to and did deter and intimidate Plaintiff not to appear before the grand jury. Plaintiff has attested to this in his Declaration attached as Exhibit 1. The Defendants' threat in a nutshell was this: "You provide evidence to the FBI that could result in a grand jury indictment and we will harm you personally and professionally, both overtly and covertly. You will pay dearly for cooperating with any federal prosecution of the Chamber or its board members." This is the exact type of threat covered by the statute.

Clearly, the harm in the Section 1985(2) claim was continuous and ran throughout the term of the grand jury empaneled to investigate and indict Mr. Blankenship.  Therefore, there is no statute of limitations bar, and the Defendants' argument that it is three years from February 7, 2011 is wholly misplaced and without merit.

The H&W Defendants spend a great deal of time discussing a March 2011 bar complaint filed by Plaintiff's organization against Hunton & Williams lawyers, as well as publicity surrounding the Anonymous expose', and argue therefore that Plaintiff's knowledge  of the Defendants' nefarious conduct in February 2011 started the limitations clock.  However, that is totally irrelevant to this statute of limitations

argument since the bar complaint alleged unethical conduct by the

Hunton&Williams attorneys, not *harm to Plaintiff* as alleged in the Complaint and as

required under the discovery rule discussed above.  A surgery patient knows of his

surgery when it occurs, but she may not know of the scissors left in her abdomen

until she gets an X ray a decade later to determine why she has abdominal bleeding.

Similarly, in the instant case, Plaintiff knew in February 2011 that the RICO

Defendants engaged in illegal, unethical and nefarious conduct.  However, it was

only in May 2012 that he discovered *the harm* caused by that conduct.  Clearly, there

is no statute of limitations issue here.

**The RICO Claim**

The RICO Defendants argue that Plaintiff failed to allege a RICO violation, and that

he failed to be specific about several of the elements of RICO.  They intimate that

their actions were mere "commercial transactions" that should not be considered

under RICO.  This is without merit.  Initially, Plaintiff adopts his arguments on this

issue in his response to the Chamber of Commerce's Motion to Dismiss, including his

argument that this Court should not rule on the motions to dismiss prior to allowing

discovery.

1.    The Racketeer Influenced and Corrupt Organizations Act ("RICO") was

enacted in 1970 with the goal of eliminating the infiltration of organized crime into

legitimate organizations. *See Benard v. Hoff,* 727 F. Supp. 211, 213 (D.Md.1989); *see

also International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 155 (4th Cir.1987)(stating

that Congress intended "that RICO serve as a weapon against ongoing unlawful

activities whose scope and persistence pose a special threat to social well-being.").

A RICO Enterprise can be an association of individuals and corporations. *Superior Bank, FSB v. Tandem Nat. Mortg. Inc*, 197 F. Supp2d 298, 324 (D. Md. 2000). Moreover, this Court has held that law firms can be held liable under RICO where, as here, "the professional services provided strike at the very core of the enterprise and therefore the lawyer or accountant providing the services is managing or operating the firm." *Thomas v. Ross & Hardies*, 9 F. Supp. 2d 547, 554 (D. Md. 1998).

Edward Snowden demonstrated once and for all that an entire cyber security apparatus and government agency involved with secret spying lied to the public and Congress for years while illegally violating the rights of Americans on a wholesale level. See *ACLU v. Clapper*, ___F.3d___(2d Cir. May 7, 2015) (finding that NSA collection of data on American citizens illegal). Yet now, the RICO Defendants, after getting caught red handed in a patently illegal secret cyber-security operation against law abiding citizens and advocacy groups, are asking this Court to take them on their word that they did not engage in any RICO activity and Plaintiff has not alleged the elements of RICO with particularity. The Hunton & Williams Defendants want this Court to believe, without any discovery, that this was merely a "one-off scenario" rather than a continuing RICO action. The Court should reject this "trust us because we are rich and powerful" argument. Indeed, the Defendants' current sanitized assertions of innocence are at wide odds with statements they made while planning their attacks on Plaintiff et al. *"We need to blow these guys [the Chamber] away with descriptions of our capabilities, IP, and talent. Make them think that we are Bond, Q, and money penny all packaed [sic] up with a bow. … Most of all that we are the best money can buy! Dam [sic] if feels good to be a gangsta."* Complaint at 23. On

9

November 9, 2010, Woods wrote an email to HBGary CEO Aaron Barr ("Barr"),

saying "*If you really want to impress Richard, I would look at the following web-site

and tell him something about the guys behind it:*

*http://velvetrevolution.us/stop_chamber/*" Complaint at 19.  Moreover, Defendant

Barr said in an email that a video Defendant Palantir created to track Iranian ships

carrying illegal weapons was, according to Defendant Quackenboss, what "*sold the

Chamber {to hire Team Themis] in the first place.*"  Complaint at 26.  The "Corporate

Information Reconnaissance Cell" document created by Team Themis for Hunton &

Williams did not simply refer to the Chamber, but to the plural "clients." See, "Team

Themis is poised to apply our knowledge and skills to provide Hunton & Williams

LLP rapid, effective results that *impact the organizations operations and support

clients across the space.*" at page 2. (emphasis added).

   This case is far too important to be dismissed without allowing Plaintiff to

conduct discovery from the Defendants (and proceed to trial).  Over the past four

weeks, Plaintiff has served requests for production of documents and/or

interrogatories on all the Defendants in this case.  Such discovery will assist Plaintiff

and the Court with the truth in this case and provide Plaintiff with more specifics

and particularities to support his claims, including the RICO claim.  Plaintiff believes

that the 50,000 plus HB Gary emails and documents released by Anonymous reveal

only a tip of the iceberg in this case, and that other emails and documents in the

possession of the Chamber, Hunton & Williams and the other Defendants will show

that Defendants engaged in the conduct alleged in the Complaint, including the RICO

conduct.

Plaintiff's Complaint alleges that the Chamber reacted to exposure of its nefarious activities and illegal conduct of its members by ordering its law firm, Defendant Hunton & Williams, to destroy those people and advocacy organizations, including Plaintiff, who were responsible for the exposure.   The Chamber used its law firm as a firewall in order to protect it from being implicated in those unlawful activities. Yet now it wants this Court, without discovery, to enable that strategy of protection and cover up by ruling that Plaintiff has not provided enough evidence to prove his RICO claims.

Such a ruling would be contrary to the admonition in *Rotella v. Wood*, 528 U.S. 549, 560 (2000), that discovery can take place in RICO cases to supplement the particularity requirements, citing *Corley v. Rosewood Care Center*, 142 F.3d 1041, 1050-51 (7th Cir. 1998) (dismissal of RICO count reversed for failure to allow discovery to supplement particularity).   Moreover, it is well established that discovery can take place in complex cases such as the instant case prior to a ruling on a motion to dismiss.   *Forest River Inc,, v. Heartland Recreational Vehicles*, (ND Il 2012). See, e.g., *Allstate Ins. Co. v. Levy*, No. CV-10-1652 (FB)(VVP), 2011 WL 288511, at *1 (E.D.N.Y. Jan. 27, 2011) (—The pendency of the motion to dismiss does not provide an automatic basis to stay discovery.‖); *Integ. Systems & Power, Inc. v. Honeywell Int'l, Inc.,* No. 09 CV 5874(RPP), 2009 WL 2777076, at *1 (S.D.N.Y. Sept. 1, 2009) (—It is well-settled that the issuance of a stay of discovery pending the outcome of a motion to dismiss is by no means automatic.'‖); *DSM Desotech Inc. v. 3D Systems Corp.*, No. 08 CV 1531, 2008 WL 4812440, at *2 (N.D. Ill. Oct. 28, 2008) (—[T]he mere filing of the motion [to dismiss] does not automatically stay

discovery.‖); *Bocciolone v. Solowsky*, No. 08-20200-CIV, 2008 WL 2906719, at *1

(S.D. Fla. July 24, 2008) (―[C]ourts have consistently rejected any per se

requirement to stay discovery pending resolution of a dispositive motion.‖). *See also*

Lori Andrus, *In the Wake of Iqbal*, 46 TRIAL 20, 29 (2010) (noting the many federal

decisions rejecting the pendency of a motion to dismiss as a basis for granting a

blanket discovery stay).

**The Enterprise**

The RICO Defendants assert that Plaintiff has not properly pled a RICO enterprise

because the time frame in which the Defendants conspired was not of sufficient

longevity.  They take solace in the fact that several of the Defendants – Chamber,

Palantir and Berico – issued statements (after they were caught) disavowing their

involvement in the activities laid bare by the Anonymous expose'.  This Nixonian

denial is without merit.

It is well established that an association in fact enterprise can be a legal entity,

such as a corporation, non-profit or political association. Cf. *United States v. Turkette*,

452 U.S. 576, 580 (1981) ("[t]here is no restriction upon the associations embraced

by the definition [of enterprise]"). Furthermore, the requisite continuity of the

enterprise and of the functioning of its associates is not defeated merely because

there is a gap or interruption in the racketeering activities of the enterprise, or the

membership of the enterprise changes over time. *United States v. Church*, 955 F.3d

688, 697-700 (11th Cir. 1992) (ruling that the association-in-fact, drug trafficking

enterprise functioned as a continuing unit from 1973 to 1986, even though there

was a three year gap in the commission of racketeering acts from 1980 to 1983).

On November 3, 2010, Team Themis presented a 12-page document to Defendant Hunton & Williams that is so incredible and mind boggling that it has to be read in order to be believed.  Exhibit F of the Complaint. It is called the "Corporate Information Reconnaissance Cell" and presents a detailed overview of the capabilities and activities of Team Themis, written in military speak, and brags how its clients "span the Intelligence, Defense, Oversight and Law Enforcement Communities." Page 3. See also, "Palantir is recognized as the market-leading analytical platform for counter-intelligence (CI), counter-terrorism (CT), counter-narcotics, (CN) and counter proliferation (CP, currently deployed across elements of the intelligence, defense and law enforcement counties that include SOCOM, DIA, CIA and JIEDDO." Id at 6.  It says that Team Themis will "provide Hunton & Williams LLP with a full spectrum capability set to collect, analyze, and affect adversarial entitles and networks of interest." Page 4.  It planned to use models "developed and employed by the Joint Special Operations  [Military] Command…." Id.  The report says that Team Themis will "conduct rapid, interactive intelligence/targeting cycles in order to understand and affect identified adversaries.  [This] will deliver a comprehensive capability allowing Hunton & Williams LLP to truly understand and *eliminate emerging threats* that could cause harm to their clients."  Id. emphasis added.

As stated in Plaintiff's response to the Chamber's Motion to Dismiss, the RICO enterprise was breathtaking in its scope.  It targeted dozens of advocacy organizations and their leaders, had an initial 12 million dollar proposed budget, involved the most secretive and powerful military cyber security companies in the

world, one of the biggest law firms in the world, and the most powerful lobbying
organization in the United States.  The Enterprise was formed in order to use illegal
means to "eliminate" people and legal advocacy organizations using techniques
developed to track and destroy international terrorists, drug traffickers and military
threats.  The RICO Defendants discussed broadening their activities to include
targeting opponents of the Bank of America and assisting Booz Allen with its clients'
opponents.  It is not plausible to think that these all-powerful Defendants who have
success embedded in their DNA and have faced the toughest adversaries on earth
were suddenly deterred by a cyber attack from Anonymous, and simply shelved
their plans.  Clearly, this RICO Enterprise did not cease or plan to cease operations.
Instead, as alleged in the Complaint, it merely shifted its plans by contracting out the
attacks on Plaintiff to proxies such as Defendant Hoge and his associates to
implement the Team Themis blueprint.  With discovery, Plaintiff can demonstrate
the full scope of the Enterprise.

## Pattern of Racketeering

### Fraud

Defendants assert that Plaintiff has not pleaded with particularity the crimes that
form the pattern of racketeering, including the wire and mail fraud allegations.
Incredibly, the Hunton & Williams Defendants even argue that Plaintiff has not
alleged what is on the data disc *they* sent through the mail to Defendant Barr. (H&W
15). Clearly, since the RICO Defendants are the ones who possess the specifics of
who, what when, where and how, it would be patently unfair to make a ruling on
particularity without first allowing Plaintiff to get discovery.

14

**Obstruction and Retaliation**

As far as the other racketeering crimes, Plaintiff has, as noted above, shown that a major goal of the Defendants was to deter, intimidate, retaliate against and obstruct him from cooperating in federal criminal investigations that included a federal grand jury investigating Chamber board member Donald Blankenship, who was twice indicted by that federal grand jury. The Defendants intended to punish, fracture and destroy Plaintiff and his employer for exposing Chamber and Blankenship criminal activities. The Chamber and its lawyers at Hunton & Williams made a deal with Team Themis to employ the same tactics used against international terrorists in their campaign against Plaintiff and his employer. Those covert and overt tactics were meant to deter, eliminate and neutralize terrorist organizations, so the RICO Defendants surely believed that they would deter and intimidate Plaintiff. In fact, one of the RICO Defendants' main goals was to "retaliate against" Plaintiff for being a witness against the Chamber and Blankenship and providing truthful information to law enforcement agents regarding federal crimes committed by Chamber member Blankenship and the Chamber.    Moreover, as alleged in the Complaint at page 14, and reiterated above, the Chamber launched a ruthless campaign of threats of injury and death to Plaintiff, which Defendant Hoge and his associations repeated a year and a half later. See 5 for several of these later threats, many of which threatened Plaintiff by name, including one that told him not to show up in court or he was dead, and one that threatened him to stop calling the police.

In their Motion to Dismiss, the Hunton & Williams Defendants assert that they did not even know that the Chamber or its members were under criminal investigation. This is misleading since they knew that the StopTheChamber online campaign was dedicated to exposing criminal activities at the Chamber and published copies of letters written to the FBI and other federal agencies requesting criminal prosecution. See Exhibit 6. They used Breitbart.com to attack Plaintiff on October 11, 2010, Exhibit 7, and to debunk and provide cover for Team Themis within days of being exposed by Anonymous. http://www.breitbart.com/big-journalism/2011/02/14/as-hacked-chamberleaks-emails-break-left-scrambles-to-hide-ties-to-domestic-terrorist/ Clearly, the RICO Defendants wanted to make Plaintiff pay for cooperating with federal law enforcement officials. Plaintiff has pled a violation of 18 U.S.C. 1503 and 1512-13 by alleging that the Defendants intended to and conspired to intimidate and retaliate against him, and that must be accepted as true.

**Extortion and Conspiracy To Extort Under Federal And State Law**

The RICO Defendants assert that Plaintiff has not demonstrated that they engaged in any extortionate conduct that would rise to a predicate act under RICO.  To the contrary, the Team Themis plan called for "exploit[ing] vulnerabilities" in order to "pressure" Plaintiff from exposing the Chamber and cooperating with the FBI. Team Themis promised to "eliminate" organizations and people who were threats to the Chamber.  Incredibly, Team Themis planned to release false documents to StopTheChamber, which would publish them as true, and then, ala Dan Rather, prove that they are false in order to undermine its credibility.  Team Themis plans to

16

destroy Plaintiff's reputation and livelihood by creating disinformation and false narratives are precisely what Defendant Hoge and his associates did beginning in May of 2012. This disinformation campaign included creating false written documents that be used to destroy the credibility of Plaintiff by falsely accusing him of crimes such as swatting.

Moreover, as alleged in the Complaint, the Chamber caused more than 100 threats of death and injury to Plaintiff, Complaint at 14-16, and Defendant Hoge and his associates caused even more death threats to be leveled at Plaintiff. See Exhibit 5. All of this clearly amounts to extortion under federal and state law.

**Money Laundering Under 18 U.S.C 1956-1957**

The RICO Defendants assert that Plaintiff has not shown that the funds used or attempted to be used by the Chamber and Hunton & Williams Defendants to pay the Team Themis cyber security contractors were derived from criminal activities. To be sure, *without discovery*, Plaintiff cannot prove that the Chamber was using funds derived from unlawful activities. However, as President Obama, numerous Senators, advocacy organizations and even a Chamber whistleblower have alleged, the Chamber was deriving funds unlawfully and using those funds for unlawful purposes. See e.g., Exhibit 8, "Obama Continues Attacks On Chamber of Commerce" (Chamber refused to open its books to prove that it was not illegally receiving funds from foreign donors to support GOP candidates). Plaintiff's organization, StopTheChamber, listed on its front page many instances of illegal and fraudulent conduct by the Chamber that resulted in unlawfully derived funds. Exhibit 6.

Moreover, Plaintiff has also alleged that the transactions between the Chamber

and Hunton & Williams were disguised as legal fees and laundered through Hunton

& Williams, thereby violating 18 U.S.C. 1956(3), which provides:

> **(3)**Whoever, with the intent—
>
> **(A)**
>
> to promote the carrying on of specified unlawful activity;
>
> **(B)**
>
> to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
>
> **(C)**
>
> to avoid a transaction reporting requirement under State or Federal law, conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph and paragraph (2), the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

Plaintiff has alleged that the funds intended for Team Themis were to be used to

engage in unlawful activities as alleged in the Complaint.  Therefore, he has properly

alleged money laundering as a predicate act.  This will also be fleshed out with

discovery.

**Pattern**

The RICO Defendants assert that Plaintiff has shown no "pattern" because his

predicate acts fail and he has not demonstrated long term criminal activity.  This is

without merit.

Accepting this argument would reward the Defendants for getting caught and

would preclude RICO actions where the pattern of racketeering is interrupted.  In

the instant case, it was only because the RICO Defendants were caught that the

covert enterprise and the pattern did not continue past February 7, 2011. But it was intended to continue for at least six months based on the contract, and Team Themis wrote the contract to give them "exclusivity related to any other corporate campaign projects," which implies longevity. Complaint at 22. Moreover, Plaintiff has alleged that the RICO enterprise continued through the Hoge Defendant proxies.

Finally, something that is glossed over in the RICO Defendants' discussions is that Plaintiff not only alleged a RICO violation but also a *conspiracy to commit RICO*. In a conspiracy, a person is liable for "actions of the conspiracy that were reasonable foreseeable." *United States v. Hodge*, 594 F.3d 614, 619 (8th Cir. 2010). Clearly, the Complaint alleges that conspiracy included a pattern of racketeering acts, and the acts of Defendant Hoge and his associates were foreseeable are attributable to the RICO Defendants.

**Conspiracy Under RICO**

A RICO conspiracy claim is broader than a simple RICO claim. Anyone who agrees of conspires to pursue the same criminal objective can be held liable for a RICO violation. *Salinas v. United Sates*, 522 U.S. 52, 63-4 (1997) ("If conspirators have a plan which calls for some to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.") A conspirator must simply intend to further an endeavor, which, if completed, would satisfy all elements of a civil RICO claim. Id. at 64. See also *CGC Holding Co. v. Broad and Cassell*, 773 F.3d 1076, 1088 (10th Cir. 2014) (one conspires to violate RICO by adopting the goal of furthering the enterprise, "even if the conspirator does not commit a predicate act").

In the instant case, none of the Defendants took any affirmative action to withdraw from the RICO enterprise or conspiracy once it was exposed by Anonymous.  Therefore, they are liable for the actions of Defendant Hoge and his uncharged associates.  It is well established that withdrawal from a RICO conspiracy requires a clean break and confessing to law enforcement officials.  See, e.g., *United States v. Zimmer*, 299 F.3d 710, 718 (8th Cir. 2002) ("'[I]t is not easy  to withdraw from a criminal conspiracy.' . . . . Zimmer must do more than demonstrate that he undertook no conspiratorial activity after the cut-off date; he must demonstrate that he took affirmative action to withdraw from the conspiracy either by making a clean breast to the authorities or by communicating his withdrawal in a manner reasonably calculated to reach his coconspirators . . . .To make a clean breast of a conspiracy, the conspirator must 'sever all ties to the conspiracy and its fruits, and act affirmatively to defeat the conspiracy by confessing to and cooperating with the authorities").  In the instant case, other than a few faux outrage statements to the press, none of the RICO Defendants affirmatively severed all ties with the conspiracy or confessed to any law enforcement official.  Instead, they engaged in a bunker mentality complete with cover-ups and lies.  And after the heat died down, they then resurrected the conspiracy in May 2012 through Defendant Hoge and his associates.

**RICO Injury**

The RICO Defendants assert that Plaintiff has not sufficiently alleged any injury cognizable under RICO, which only allows an injury to business or property.   The Berico Defendants also make a bizarre claim that Plaintiff "lacks standing" to even file the suit because he has no injuries.  This is without merit.

The RICO Defendants are all highly educated or staffed by highly educated and skilled people.  They knew that Plaintiff was involved as a principal with StopTheChamber, Velvet Revolution and Justice Through Music. In fact, these organizations were listed as top tier targets with Plaintiff listed right underneath as a "Tier 1" target.  The RICO Defendants knew that if they harmed Plaintiff, they would also harm his business and property interests.   In an email on November 9, 2010, Defendant Woods wrote to Defendant Barr,  *"If you really want to impress Richard, I would look at the following web-site and tell him something about the guys behind it: http://velvetrevolution.us/stop_chamber/"* Complaint at 19. Moreover, the Chamber wrote letters to StopTheChamber's PR agent attacking Plaintiff's reputation and to PR Newswire, which had a contract with StopTheChamber to issue press releases.  See Complaint at 13-14. As a result, PR Newswire refused to issue any more press releases.   Also, Defendant Hoge and his associates have spent the past three years attacking Plaintiff in order to destroy his ability to earn a living and shutter his employer. This has caused organizations and people to cease funding and doing business with the employer, which caused a loss in his earnings. The RICO Defendants admitted in their emails that their goal was to harm Plaintiff and his employer. As stated in the Complaint:

> In a PowerPoint presentation Team Themis prepared for H&W, it promised to "mitigate effect of adversarial groups" and discussed the youthful criminal record of Plaintiff, and said that its goal was to 'discredit, confuse, shame, combat, infiltrate and fracture' COC opponents." at 26.

Loss of job, earnings, or reputation, is sufficient to state claim under 1962(d). See *Mruz v. Caring, Inc,* 991 F. Supp. 701, 721 (D. NJ 1998):

> As to the first question, the parties do not appear to dispute that a loss of one's job — the injury alleged by Plaintiffs — is injury to one's business or property. Nor could they, as courts have generally viewed the loss of one's job as an injury to one's business or property. *See, e.g., Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1170 (3d Cir.1989) (loss of earnings, benefits, and reputation were sufficient injuries to state claim under section 1962(d)); 2 Arthur F. Mathews, Andrew B. Weissman & John H. Sturc, *Civil RICO Litigation* § 8.04[C][3][a] at 8-75 to 8-76 (2d ed.1992).

In *Wang Laboratories v. Burt*, 612 F.Supp. 441 (D. Md. 1984), this Court found that "Wang's allegations of injury to its business reputation and customer goodwill in addition to its loss of revenues satisfied the injury requirement of 18 U.S.C. 1964(c). '*See Kimmel v. Peterson,* 565 F.Supp. 476, 495 (E.D.PA 1983) (Plaintiff's allegations of monetary losses as a result of defendant's fraud sufficiently allege "injury" under 18 U.S.C.§1964(c)). *Hellenic Lines, Ltd. v. O'Hearn,* 523 F.Supp. 244, 248 (S.D.N.Y. 1981) (the corporation was injured for purposes of RICO if, as alleged, it sustained monetary damages).'"

Moreover, the Ninth Circuit, in an *en banc* decision, analyzed the RICO statute and found that where a Plaintiff alleges "any property interest valid under state law," he meets the business and property requirement of RICO. *Diaz v. Gates*, 420 F3d 897 (en banc) (9th Cir. 2005). Plaintiff's Complaint in Claim VII, includes two state law claims alleging harm to Plaintiff's business relations and prospective economic advantage. The tort of interference with contract is well established under Maryland law and it includes "maliciously or wrongfully infring[ing] upon an economic relationship." *Macklin v. Logan*, 639 A.2d 112 (Md. 1994) *See also K&K Management Inc. v Lee*, 557 A.2d 965 (Md. 1989) (there are two general types of actions for interference with business relationships including "inducing the breach of an existing contract and, more broadly, maliciously or

wrongfully interfering with economic relationships in the absence of a breach of contract.").

In short, these highly intelligent Defendants did and do not distinguish between harming Plaintiff and harming Plaintiff's employer, property and business interests because they know they are intertwined and interrelated. Michael Jordan spends millions each year protecting his reputation because he knows that any attacks on him personally would automatically harm his business. The same applies to the instant case—the RICO Defendants attack and attacked Plaintiff in order to harm his ability to conduct business. This clearly meets the RICO business and property injury standards. *See also, Potomac Electric Power v. Electric Motor and Supply*, 262 F3d 260 (4th Cir. 2001) (even nominal amount of damages sufficient to support liability in civil RICO case).

**State Tort Claims**

The Defendants assert that Plaintiff has not pleaded Conspiracy to Invade Privacy, Conspiracy to Interfere with Business Relations and Conspiracy to Interfere With Prospective Economic Advantage because he has not shown any damage or privacy violation. In making these arguments, the Defendants ignore the word "conspiracy" and instead argue that because there was no consummated act, the claims must fail. This is without merit.

As noted above, the Defendants did engage in a *conspiracy* to commit the alleged torts. With regard to the conspiracy to invade Plaintiff's privacy, the Defendants conspired to insert malware on Plaintiff's computers and dig up information that they could use to "exploit vulnerabilities" to "pressure" Plaintiff. Contrary to

Defendants' assertions, finding vulnerabilities about Plaintiff would require them to invade his privacy. Moreover, Defendant Hoge, Nickless and their associates have spent years invading Plaintiff's privacy by attacking him with false narratives, falsely accusing him of crimes, probing and interfering with private aspects of his personal life and business relationships, calling his neighbors with false accusations, contacting and harassing his wife and daughter, and showing up at his home and business to take photos to post on the Internet. See Plaintiff's Declaration at Exhibit 1.

With respect to conspiracy to interfere with business relations and prospective economic relations, the Complaint alleges that the main goal of Defendants was to "discredit, confuse, shame, combat, infiltrate and fracture" Plaintiff and his advocacy organizations so they would not expose the nefarious activities of the Chamber. As Defendant Barr stated in an email on November 29, 2010: *"Attack [one of the VR principals] and after a series of attacks on his person start making ties to the back office folks ... discrediting them by association. Done in the right way this can cause them to distance themselves and also funders from [the principal]."* Complaint at 58-59. Plaintiff is that VR [Velvet Revolution] principal, and the Defendants conspired to harm Plaintiff's funding base in order to interfere with his business relations and prospective economic relations. In fact, Defendant Hoge and his associates followed this Team Themis script precisely by attacking Plaintiff with false narratives and false accusations of crimes, and then contacting people and foundations that funded Plaintiff's employer repeating those false narratives, which caused the funders to

stop funding the employer.  This harmed Plaintiff's business relations and interfered with any future funding by those people.  Exhibit 1.

At this stage of the proceedings, this Court has to accept Plaintiff's allegations as true with regard to harm to him from the Defendants' conduct.  At trial, Plaintiff will present evidence in various forms to show that he was harmed and suffered economic loss from the Defendants' conduct.

**Conspiracy To Invade Privacy and Intrusion Into Seclusion**

Defendants assert that Plaintiff has failed to state a claim of conspiracy to invade privacy and intrusion into seclusion under Maryland law.  This is without merit.

Plaintiff alleges in his Complaint that the named Defendants conspired with one another to use covert means to harm, pressure, exploit, neutralize and eliminate him.  Team Themis portrayed itself as the king of malware, which is a covert software program that can infect a computer with a virus in order to extract private data.  The reason Hunton & Williams hired Team Themis was most likely that it possessed a skill set that normal private detectives do not, including being able to use powerful and covert software programs to discover incriminating evidence that can be used to extort Chamber opponents.

Moreover, the Complaint alleges that these Defendants conspired with Defendant Hoge and other uncharged conspirators to invade Plaintiff's privacy and intrude on his seclusion by coming to his private home and private office, taking surreptitious photos of him and his children, engaging in surveillance of him both online and in person for months and years, calling his neighbors and business associates with derogatory information, and stalking his wife and child on and offline.  Mr. Hoge is a

cyber security operative who has testified that he has probed every aspect of

Plaintiff's private and business life, and in doing so has falsely accused Plaintiff of

crime after crime and tried to have him charged and imprisoned for these false

crimes that he allegedly discovered through his covert investigations of Plaintiff.

In *Nader v. General Motors*, 25 NY.2d 560 (NY 1970), a case eerily similar to the

instant case, General Motors hired private investigators to dig up dirt on consumer

advocate Ralph Nader because he had exposed wrongdoing by General Motors.  Mr.

Nader sued for invasion of privacy and emotional distress, and set forth a list of

actions taken by the investigators:

> Specifically, the plaintiff alleges that the appellant's agents (1) conducted a
> series of interviews with acquaintances of the plaintiff, "questioning them about,
> and casting aspersions upon [his] political, social * * * racial and religious views
> * * *; his integrity; his sexual proclivities and inclinations; and his personal
> habits" (Complaint, par. 9 [b]); (2) kept him under surveillance in public places
> for an unreasonable length of time (par. 9 [c]); (3) caused him to be accosted by
> girls for the purpose of entrapping him into illicit relationships (par. 9[d]); (4)
> made threatening, harassing and obnoxious telephone calls to him (par. 9[e]);
> (5) tapped his telephone and eavesdropped, by means of mechanical and
> electronic equipment, on his private conversations with others (par. 9[f]); and
> (6) conducted a "continuing" and harassing investigation of him. [at 565-6].

General Motors filed a motion to dismiss for failure to state a claim, but the court

found that keeping him under surveillance and eavesdropping on him violated his

privacy.  Mr. Nader prevailed in the case.

Similarly, in the instant case, Plaintiff has alleged both covert and overt violations

of his privacy from Defendants who either conspired to or actually invaded

Plaintiff's privacy through surveillance and use of malware.  These must be accepted

as true.

**Infliction of Emotional Distress**

Defendants assert that Plaintiff has failed to allege sufficient facts to support his claim for Intentional Infliction of Emotional Distress because he failed to show how and why.  This is without merit.

The director of a small non-profit becomes the target of the most powerful, wealthy and ruthless lobbying organization in the world in order to shut him up.  To keep its hands clean, the lobbying organization tells its 600-person law firm to secretly hire the top military cyber security contractors in the country to overtly and covertly target the "Tier 1" non-profit director with malware, disinformation, deceit, combat tactics and infiltration in order to fracture, neutralize and "eliminate" him and his employer.  The contractors need $12 million from the lobbying organization to succeed in their mission.  When they get caught and exposed, they lay low for a few months and then farm out their attacks to proxies who will be difficult to trace back to them.

This is not a plot for the NBC hit series, "The Blacklist," but rather the real life drama that Plaintiff has been dealing with for the past four years, as alleged in the Complaint.  He was targeted by the Defendants for exposing corruption and malfeasance at the Chamber, and, for four years, has been under siege by the Defendants, with Defendant Hoge and his associates creating false narratives about him, falsely accusing him of crimes, calling his neighbors and supporters, contacting his wife and child, stalking him, taking photos of his children, and investigating every aspect of his personal and business activities, even after repeatedly being told to leave him alone.  Plaintiff, unable to live a normal life, has had to surround his

home with 24/7 security and cameras, console his daughter after she was bullied out of two schools because of the Defendants' false narratives, repeatedly call 911 because of unknown people showing up at his home, file for peace orders to protect his family and him from Defendant Hoge and his associates, and be subjected to the most vile online bullying campaigns imaginable. This conduct was intentional, continuous, extreme and outrageous, and it caused severe emotional distress to Plaintiff.

Plaintiff is a human being who has been targeted for years by some of the most powerful, secretive and dangerous groups, companies and people on the planet. No mere mortal could be subjected to such a brutal and sustained attack without suffering severe emotional distress. Students that are bullied in school for a few days over a Facebook post suffer severe emotional distress and even commit suicide. Plaintiff has suffered so much more yet the Defendants have the gall to assert that he has *not suffered enough* to meet the legal standards for intentional infliction of emotional distress.

The Restatement (Second) of Torts, 46 at 71, provides: {"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." In comment (i) to the Restatement it is expressly stated that this rule also covers a situation where the actor knows that distress is certain, or substantially certain, to result from his conduct. In order to satisfy the element of extreme and outrageous conduct, the conduct "must be `so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized society.'" *Batson v. Shiflett*, 325 Md. 684, 733 (Md. 1992).

Illustrative of the cases which hold that a cause of action will lie for intentional infliction of emotional distress, unaccompanied by physical injury, is *Womack v. Eldridge*, 215 Va. 338 (1974). There, the defendant was engaged in the business of investigating cases for attorneys. She deceitfully obtained the plaintiff's photograph for the purpose of permitting a criminal defense lawyer to show it to the victims in several child molesting cases in an effort to have them identify the plaintiff as the perpetrator of the offenses, even though he was in no way involved in the crimes. While the victims did not identify the plaintiff, he was nevertheless questioned by the police, called repeatedly as a witness and required to explain the circumstances under which the defendant had obtained his photograph. As a result, plaintiff suffered shock, mental depression, nervousness and great anxiety as to what people would think of him and he feared that he would be accused of molesting the boys. The court, in concluding that a cause of action had been made out, said: "Most of the courts which have been presented with the question in recent years have held that there may be a recovery against one who by his extreme and outrageous conduct intentionally or recklessly causes another severe emotional distress...."

In the instant case, the emotional distress of Plaintiff is much greater than that found sufficient in *Womack*. Indeed, the conduct of the Defendants is grossly outrageous and goes beyond all possible bounds of decency and is utterly intolerable in a civilized society. Clearly, this Court should find that he has met the

standard for Intentional Infliction of Emotional Distress, and a jury should be allowed to decide this factual issue.

**The Connection Between The Team Themis Defendants And Defendant Hoge**

Defendants assert that Plaintiff has not shown any direct connection between the Team Themis Defendants (Chamber, Hunton & Williams, Palantir, Berico and HB Gary Defendants) and the Hoge Defendants (Hoge, Nickless and associates of Hoge who have worked with him to attack Plaintiff beginning in May 2012). Therefore, they assert, Plaintiff has shown no conspiracy or continuing tort for statute of limitations purposes. This is without merit.

First, in cases such as this, circumstantial evidence is just as compelling and relevant as is direct evidence. And the circumstantial evidence of coordination between the Chamber and Defendant Hoge and associates is overwhelming. On October 8, 2010, Team Themis, on behalf of Defendants Chamber and Hunton & Williams, created a report on protesters at the Chamber and a target list of people and organizations the Chamber wanted neutralized. See S and T of Complaint Exhibits. Plaintiff is listed as a "Tier I" target and three of his advocacy organizations are listed in the very top tier—StopTheChamber, Velvet Revolution and Justice Through Music. Two days later on October 10, 2010, the conservative blog Breibart.com published an article titled, "Unrepentant Domestic Terrorist Behind Anti Chamber of Commerce Campaign." http://www.breitbart.com/big-government/2010/10/15/unrepentant-domestic-terrorist-behind-anti-chamber-of-commerce-internet-campaign/ attached as Exhibit 7. The very next day, one of Breitbart's reporters, Mandy Nagy, writing under the name Liberty Chick, published

another article on Breitbart.com titled, "Progressives Embrace Convicted Terrorist." http://www.breitbart.com/national-security/2010/10/11/progressives-embrace-convicted-terrorist/ Defendant Barr, in a November 9, 2010 email to Defendant Ryan, referenced the October 11, 2010 Nagy article saying, "We could do so much with this..." Exhibit 9.

Breitbart.com wrote again about Plaintiff on May 25, 2012, when it published two stories, "Kimberlin Funders Stunned To Discover The Fund Kimberlin." http://www.breitbart.com/big-government/2012/05/25/kimberlin-funders-stunned-to-discover-they-fund-kimberlin/ and "The Conservative Blogosphere Introduces Kimberlin 2012." http://www.breitbart.com/big-government/2012/05/25/kimberlin-2012/ These articles were part of a campaign called "Everybody Blog About Brett Kimberlin," which was spearheaded by Defendant Hoge and his associates. In fact, on the same day that Breitbart.com published its two articles, Defendant Hoge published articles attacking Plaintiff http://hogewash.com/2012/05/25/who-is-brett-kimberlin/ and listed other conservative blogs that also attacked Plaintiff, including Breitbart.com. http://hogewash.com/2012/05/25/everybody-blog-about-brett-kimberlin-day/

Second, shortly after Plaintiff filed the instant Complaint, one of Defendant Hoge's close associates, Aaron Walker, filed a depraved, defamatory and malicious suit against Plaintiff and his wife in Montgomery County Circuit Court. The judge in the case struck or dismissed three iterations of the suit.

On October 5, 2015, Plaintiff received an email from Mr. Walker in which he made extortionate demands that Plaintiff drop the instant lawsuit. Exhibit 10. Mr. Walker

is not a party to this suit yet he demanded $50K from Plaintiff, a dismissal of this suit, and a promise that Plaintiff take no discovery from him.  It appears that someone on the Defendants' side of this case has coordinated with Mr. Walker, apparently to file the malicious suit in the first place and second, shortly before the instant response was due, to send Plaintiff a frightening, harassing and unwanted demand to drop the "case involving Hunton and Williams."

It is highly unlikely that Mr. Walker has acted on his own in making the extortionate demand since he is not even a defendant in this case.  Apparently, someone on Hunton & Williams side is using him in an attempt to extort the dismissal.  Obviously, that person also does not want any discovery taken from Mr. Walker.  This demonstrates, at least circumstantially, that there is a direct relationship between Hunton & Williams and Defendant Hoge's friend and associate Aaron Walker, and that Hunton & Williams is using Mr. Walker as a proxy to secure its goals of committing torts against Plaintiff *and* extorting Plaintiff to drop this lawsuit.

Third, the actions of Defendant Hoge and his associates with regard to Plaintiff closely mirror the plans of Team Themis:

- Hoge works for NASA and portrays himself a cyber security expert, and has testified that he has digitally "probed" every aspect of Plaintiff's business and personal life; Team Themis's expertise involved digitally probing targets to find vulnerabilities to be able to pressure them.

- Hoge has created false narratives about Plaintiff and used them for disinformation in order to harm the reputation of Plaintiff; Team Themis

32

stated that they would create false documents and disinformation to destroy the credibility and reputation of the targets, including Plaintiff.

- Hoge has attacked anyone who supports Plaintiff with defamation, malicious suits, and harassment and he wrote letters to some of them; Team Themis and the Chamber created graphs of associates of Plaintiff and then put them on target lists or wrote them letters to them defaming Plaintiff or threatened them with lawsuits.

- Hoge and his associates have targeted the funders of Plaintiff's non-profit employer in order to destroy his livelihood: Team Themis plan was to target Plaintiff with a smear campaign and then notify Plaintiff's funders.

- Hoge has targeted Plaintiff's family and child with stalking, bullying and harassment; Defendant Barr scraped that same child's social media sites and identified the school she was attending, while bragging to Defendant Woods that he had hacked into Defendant Wyatt's home account and identified his wife and children as an example of how he could target the families of Chamber opponents.

- Hoge uses social media as his weapon of choice against Plaintiff and brags that he has used social media to harm Plaintiff; Team Themis bragged that it was unsurpassed in social media expertise and could use it to exploit, effect and "eliminate" any Chamber opponent.

Clearly, Plaintiff has alleged in his Complaint that the actions of Defendant Hoge and his associates were continuations of the Team Themis playbook, and that the Team Themis Defendants laid low after being exposed by Anonymous, and then

reappeared through the proxy of Defendant Hoge and his associates who carried out

that original playbook.  Plaintiff has made a "plausible" case that there is a strong

connection and conspiracy between the Team Themis Defendants and Defendant

Hoge and his associates, which this Court must accept as true.

### The Ku Klux Klan Act Violation under 42 U.S.C. 1985(2)

The pertinent section of 42 U.S.C. 1985 alleged by Plaintiff is as follows:

**(2)OBSTRUCTING JUSTICE; INTIMIDATING PARTY, WITNESS, OR JUROR**
If two or more persons in any State or Territory conspire to deter, by force,
intimidation, or threat, any party or witness in any court of the United States from
attending such court, or from testifying to any matter pending therein, freely, fully,
and truthfully, or to injure such party or witness in his person or property on
account of his having so attended or testified,

The Defendants assert that they never intended to deter Plaintiff from testifying

before the grand jury investigating the Chamber and one of its top members, Massey

Energy CEO Donald Blankenship.  This is without merit.

In *Kush v. Rutledge*, 460 U.S. 719 (1983), the Supreme Court held that Section

1985(2) applies to a lawsuit where the defendants "engaged in a conspiracy to

intimidate and threaten various *potential material witnesses* in order to prevent

them from testifying 'freely, fully and truthfully' in the action.'" (emphasis added).

In *Haddle v. Garrison,* 525 U.S. 121, 126 (1998), the unanimous Supreme Court

stated: "Petitioner Michael A. Haddle, an at-will employee, alleges that respondents

conspired to *have him fired from his job in retaliation* for obeying a federal grand

jury subpoena and to deter him from testifying at a federal criminal trial. We hold

that such interference with at-will employment may give rise to a claim for damages

under the Civil Rights Act of 1871, Rev. Stat §1980, 42 U. S. C. §1985(2). (emphasis

added).  In the instant case, Plaintiff has alleged that he was a *potential witness* in a

grand jury investigating the Chamber and Donald Blankenship, and that the named

Defendants *conspired* to retaliate against him through intimidation, deterrence and

threats to keep him from testifying.  He alleged that the Defendants conspired to

retaliate against him by destroying his reputation and livelihood, and that

Defendant Hoge and his associates conspired to have him fired from his job.  He

alleged and provided proof that there was a direct causal relationship between the

Defendants' attacks on Plaintiff and hundreds of threats of death and injury he

received.

StopTheChamber was dedicated to exposing criminal activity of the Chamber of

Commerce and its members.  Its campaign to expose criminal wrongdoing reached

all the way to the White House with President Obama calling out the Chamber for

illegally using foreign money to target Democrats in campaign ads. When

StopTheChamber exposed top Chamber member Donald Blankenship for engaging

in criminal activity that led to the April 5, 2010 death of 29 coal miners, the

Chamber realized that any unfettered investigation into Massey Energy's activities

could open it and its members up to criminal prosecution on the scale of Watergate.

That is why it told its law firm, Hunton & Williams, to shut down the investigations

and those behind them. That's why Hunton & Williams went for broke and called on

the most effective military intelligence contractors on earth to "eliminate" the

Chamber's opponents, including "Tier I" activist Brett Kimberlin. Yet now these

Defendants tell this Court, with a straight face no less, that they did not engage in

any conspiracy to deter Plaintiff from testifying before any grand jury and did not

even know there was a grand jury investigation underway. They also shamelessly assert that because no money exchanged hands between the Chamber, Hunton & Williams and Team Themis, there was no *conspiracy.* And Hunton & Williams portrays its actions as "political speech," rather than intimidation.

For one of the top law firms on the planet to come before this Court and argue that it did not know that a federal grand jury was investigating 29 deaths at the Big Branch Mine, after StopTheChamber published its letters to the Department of Justice and had its attorney appear on national television and write articles in national publications demanding the indictment of Donald Blankenship, is jaw dropping.   It is so implausible and devoid of common sense that it needs to be rejected out of hand.

Rather, it is Plaintiff's allegations in the Complaint that are plausible and must be accepted as true.   There was a federal grand jury empaneled to investigate the Big Branch Coal Mine disaster, and StopTheChamber posted rewards from whistleblowers to provide evidence against Donald Blankenship.   Plaintiff met with the FBI at the Washington DC Field Office on several occasions and had many additional communications with FBI agents after that.   He was considered a potential witness in the case because StopTheChamber led the call for indictment of Donald Blankenship.   Plaintiff was the person who received the tips from the whistleblowers that said that Donald Blankenship altered records and lied to federal agents.

The Chamber did not want Plaintiff to be able to gather evidence against it from whistleblowers or others.  That is why it told its law firm, Hunton & Williams, to attack Plaintiff using military contractors who work for the CIA targeting terrorists and enemies of the United States.  The Chamber considered Plaintiff and others its enemies who had to be eliminated, and chose Team Themis to completely "shock and awe" Plaintiff into running for the hills.

The Defendants assert that they never consummated the deal between themselves and point to this or that email to indicate that the $12 million plan did not occur.  However, the Defendants can point to no email or other communication that says that the plans were dead because there are no such documents.   None of the Defendants ever "withdrew" from the conspiracy and none bee-lined it down to the FBI or United States Attorneys Office to confess as is required to gain immunity from involvement in an illegal conspiracy.  In fact, the emails relied on by Hunton & Williams only show that it did what every good advocate would do by attempting to negotiate a better deal with Team Themis.  As stated in the Complaint, on February 3, 2011, just days before the Anonymous expose', Defendant Barr wrote that the deal was still on after talking to Defendant Quackenboss:

> "*ref our H&W support to the Chamber*...." He said that H&W wanted Themis to create a Phase 1 demo "*and then present jointly with H&W to the Chamber*...." Specifically, Barr suggested creating a "*5-10 min demo (along the lines of the Iranian shipping demo – which is what Bob Q said sold the Chamber in the first place....)... Bob apologized for the confusion/misunderstanding and said he thinks there is a high likelihood of selling the Chamber on this, but asked that we be willing to share the risk with H&W up-front. .... Please let me know where you ... stand on this so I can get back to Bob ASAP and coordinate the next steps. ...*" [Complaint at 26]

As noted above, Plaintiff's 1985(2) claim involves *a conspiracy*, not a completed

act. He has pled that there was a federal grand jury investigating the Chamber and

Donald Blankenship and that he was a potential witness. He has pled that the

Defendants wanted to "eliminate" him and his advocacy organization to neutralize

Plaintiff's ability to cause and/or cooperate in criminal investigations of their illegal

conduct. He has pled that the Chamber and its law firm conspired to hire Team

Themis to neutralize Plaintiff using illegal and unorthodox means, and that those

means were intended to deter and intimidate him from cooperating with the federal

government and testifying before any grand jury investigating the Chamber and its

members. He has pled that he was intimidated upon learning that he was a "Tier 1"

target of the most secretive and powerful cyber security firms on earth. This clearly

states a claim under section 1985(2). Cf. *Kush v. Rutledge*, 460 U.S. 719 (1983).

**Defendant Hoge's Motion To Dismiss**

Defendant Hoge, in his Motion to Dismiss, asserts that Plaintiff has failed to state a

claim because he never committed any tort, and that res judicata bars the claims.

These assertions are without merit.

There is no res judicata in this matter with regard to Defendant Hoge. First, the

case Defendant Hoge relies on in state court, *Kimberlin v. Walker* is distinct from the

instant case, and Defendant Hoge has made no showing that the issues raised in that

case and the issues raised in this case are the same. In fact, in that case, there were

two issues, defamation and false light, neither of which are raised in the instant case

with regard to Defendant Hoge.. Moreover, the claims in the instant case that are

charged against Defendant Hoge continued long past the date of the complaint and trial in that case, and are still continuing.

Defendant Hoge is charged in the instant Complaint with (1) Conspiracy to Invade Privacy/Intrusion Into Seclusion, (2) Invasion of Privacy, Appropriation of Name, Intrusion Into Seclusion, and Unreasonably Publicity, and (3) Intentional Infliction Of Emotional Distress.  Plaintiff has set forth above how Defendant Hoge conspired with the other Defendants to invade Plaintiff's privacy and intrude into his seclusion. See pp. 25-26. Defendant Hoge has engaged in a continuing course of conduct to actively spy on Plaintiff and his business.  He has used software programs to inspect, probe and analyze Plaintiff's activities in ways that are not available to the general public.  This includes deep forensic investigations of Plaintiff's business, social media and online presence, including collecting data and meta data on every aspect thereof, including photos, videos, websites, and contacts, and then drawing sinister conclusion to those and leading to false allegations of criminal activity.   He regularly publishes and shares that information with other people to harm Plaintiff.

Defendant Hoge admits in his Motion to Dismiss that he includes Plaintiff's name every single day for years, including this month, in the titles of his website posts, which drives traffic to the website where he can ask for donations and raise his search engine rankings.  Many of these posts are derogatory, libelous or depraved. This gives unreasonable and unwanted publicity to Plaintiff, and amounts to appropriation of his name for commercial purposes.

Plaintiff's name has commercial value to Defendant Hoge. When he writes about Plaintiff, or publishes his photo/likeness, he gets more traffic, more money, and more comments on his blog. Defendant Hoge's use of Plaintiff's name is not "incidental" but rather deliberate, ongoing and an integral part of his blog. See *Lawrence v. AS Abell Co*, 475 A.2d 448 (Md. 1984) (if name or photo has commercial value, and its use not fleeting or incidental, plaintiff states claim for invasion of privacy and appropriation of his name). Therefore, Plaintiff has properly pled invasion of privacy, intrusion into seclusion, and appropriation of his name.

Plaintiff has already demonstrated that he has suffered Intentional Infliction of Emotional Distress from the now five year smear campaign launched by the Defendants. See pp 28-30. He notes that Defendant Hoge, in his Motion to Dismiss, brags about his obsession over Plaintiff while making derogatory and snide remarks about Plaintiff. (Hoge M2D pp 4-5) Defendant Hoge has created a cottage industry of making inflammatory and defamatory statements in his pleadings so he can publish them online using Plaintiff's name in order to provide red meat to his readers and get more funds from them. Plaintiff has alleged that Defendant Hoge engages in his uncivilized conduct toward Plaintiff in order, inter alia, to intentionally inflict emotional distress on him on a daily basis. Who, other than a Silence of the Lambs sadist, would spend every single day of the past three and a half years investigating, harassing, stalking, abusing, ambushing, defaming and harming Plaintiff, his family, and his employer? Plaintiff cannot lead a normal life because of Defendant Hoge's outrageous conduct toward him and his family. Clearly, this amounts to outrageous intentional infliction of emotional distress.

Plaintiff has demonstrated that he has properly stated claims against Defendant Hoge.

### Defendant PNNL's Motion To Dismiss

Defendant PNNL first states that Plaintiff's Complaint does not put PNNL on notice of the allegations against it. Second, it states that it cannot be held liable for the actions of its employee, Bill Nickless. Third, it states that it should not lumped in with the other Defendants who have been charged with intentional infliction of emotional distress because nothing it did was outrageous. These arguments are without merit and belied by the facts of this case.

Initially, Plaintiff moves this Court to strike the affidavit of Defendant Nickless. He has intentionally avoided service in this case but he has sworn out an affidavit that is attached to Defendant PNNL's Motion to Dismiss. This suit is not a game of "gotcha" where a Defendant can pick and choose how and what he wants the Court to consider. The Court should disregard the affidavit until such time as Defendant Nickless avails himself to the jurisdiction of this Court.

First, PNNL knows what it is facing in this case. It has responded adequately to the issues set forth in the Complaint, and done so point by point. Second, Defendant PNNL is responsible for the actions of Defendant Nickless because he was acting on PNNL's behalf, knowledge and authority. Defendant Nickless is a member of a secretive group called "Watching The Felon," and this covert group was launched by Defendant Hoge to target Plaintiff with smears, disinformation and harassment. This group has a private "Google Group" which plans actions against Plaintiff. The only information on that group's "circle" about Defendant Nickless is the words, "Pacific

Northwest National Laboratories," leaving the impression that he acts on behalf of
PNNL. Exhibit 11.

Defendant Nickless also uses his Twitter account to discuss his employment and
lead his readers to believe that *he does* tweet under the authority and approval of
PNNL. When a reporter contacted him to ask about his attacks on Plaintiff, he said
that he was "not authorized" to speak to journalists so the reporter should "Go to
pnnl.gov/contacts/ to learn how to contact an official media spokesperson." Exhibit
12. In response to another follower on Twitter discussing his tweets involving
Plaintiff, Defendant Nickless said, "guess I'll get out of bed and go to the lab. Will my
managers/sponsors accept my work? Hope so...." Exhibit 13. The work he was
referring to was his attacks on Plaintiff.

Moreover, on February 2, 2015, when Plaintiff contacted PNNL's general counsel
to complain about Defendant Nickless' conduct, counsel said that he would
investigate the matter and provide Plaintiff "with a response upon completion of our
examination." Exhibit 14. However, PNNL never provided Plaintiff with any
response, but rather circled the wagons to cover-up and protect Defendant Nickless.

For the purposes of PNNL's motion, this Court has to accept Plaintiff's allegations
as true. Those allegations, defamation, false light, conspiracy to invade privacy, and
intentional infliction of emotional distress, state that Defendant Nickless, an
employee of PNNL and close associate of Defendant Hoge, engaged in these
intentional torts conceived by Team Themis to destroy Plaintiff's name, business
and reputation. Defendant Nickless has attacked Plaintiff repeatedly on Twitter
with defamatory tweets that portray him in a false light, including false allegations

of murder and sexual abuse of minors.  This constitutes per se defamation under

Maryland law. *Shapiro v. Massengill*, 105 Md. App. 743 (Md. 1995) (false statements

that plaintiff engaged in criminal activity per se defamation). Defendant Nickless did

this with the knowledge of Defendants PNNL and Hoge, and this intentional

campaign, coming once again from those involved with the military industrial

complex, caused Plaintiff fear, anxiety and emotional upset.  See Plaintiff's

Declaration at Exhibit 1.

Defendant Nickless portrays himself as an expert in cyber matters with a focus on

adversarial relations. Plaintiff became anxious and concerned when he learned that

Defendant Nickless, a cyber threat expert, and Defendant PNNL, a partner of the

Department of Defense, were targeting him.  He read the following from the PNNL

website and feared that he was going to be hacked, attacked online, and suffer

covert cyber hits.

**Bill Nickless**

> Bill Nickless is a senior research scientist at Pacific Northwest National
> Laboratory, with over 20 years of experience in experimental systems
> engineering and cyber security research. He has extensive experience in
> system administration, virtual reality, high performance networking,
> network sensor development and cyber security. Given this broad range of
> experience, his research interests are oriented towards collaborating with
> others to develop a deep understanding of cyber security issues—
> particularly those that revolve around managing the adversarial
> relationships endemic to cyberspace. Based on that solid foundation of
> understanding, he enjoys developing unique and innovative approaches and
> technologies to support cyber defenders for the private, public, and critical
> infrastructure communities.

*PNNL*

> Technologies to counter acts of terrorism have progressed at PNNL in this decade with the expansion of radiation portal monitoring technology developed at the Laboratory. This technology is used at ports of entry around the country to scan for and detect the presence of nuclear and radiological materials. In 2004, The U.S. Department of Homeland Security established the National Visualization and Analytics Center (NVAC) to advance visualization research using computer technology to enable humans to visually synthesize and derive insight from massive amounts of information to help the nation predict and respond to manmade and natural disasters and terrorist incidents.

There is a thread throughout this case that is disconcerting, outrageous and frightening—all of the Defendants have some direct or integral connection to the military industrial complex, including Defendants Hoge, Nickless and PNNL. These people and companies that work for the military are targeting Plaintiff, a civilian American citizen who merely engages in protected and legal activities. This is outrageous under every possible analysis. Concern about the ease and seamless way in which these Defendants shift from using their military tactics against "advanced persistent threats" of foes in China, Russia and Iran to legitimate U.S. advocacy organizations provides a powerful reason to allow this case to be heard by a jury. A civilian jury should consider the facts and evidence, and decide whether Plaintiff suffered emotional distress by being targeted by those in the military industrial complex for a smear and elimination campaign. Considering the Complaint and the exhibits noted above, it is clear that there is a genuine issue of material fact regarding whether PNNL was directing or aware of the actions of Defendant Nickless to defame, portray Plaintiff in a false light, invade his privacy and cause him emotional distress. At this stage of the proceedings, this Court must accept Plaintiff's allegations as true and allow this case to proceed.

**Defendants HB Gary, Hoglund and Mantech**

Defendants HB Gary, Greg Hoglund and Mantech adopt the arguments of other Defendants with regard to the statute of limitations, legal injury and failure to state a claim. Plaintiff has addressed those above and in his Response to the Chamber's Motion to Dismiss and hereby adopts them. These Defendants also make the additional argument that Plaintiff has not alleged a valid claim that the Defendants engaged in a fraudulent conveyance by selling HBGary to Mantech shortly after the HB Gary was humiliated and virtually bankrupted by the Anonymous hack into its servers. This is without merit.

First of all, Defendants assert that HB Gary and HB Gary Federal are two separate entities and that it was HB Gary, not HB Gary Federal that was sold to Mantech. For the purposes of this Complaint, it does not matter which is which since Plaintiff made clear that he is suing both entities as one, since they were both under the same roof, in the same office and owned by the same people, including Defendant Hoglund. HB Gary was the department that dealt with corporate clients and HB Gary Federal was the department that dealt with federal clients.

Second, Plaintiff alleges in his Complaint that the sale of Defendant HB Gary to Defendant Mantech was fraudulent in order to cleanse it of its potential liabilities, including liabilities from the Team Themis conspiracy, and to provide a sham windfall to HB Gary. This must be accepted as true for the purposes of this motion.

Third, there are genuine issues of material fact that should be determined by a jury.

- Plaintiff alleges and HB Gary emails exposed by Anonymous show that HB Gary was in dire financial straits in late 2010, so much so that Defendant Hoglund told his employee, Defendant Barr, that if he did not come up with some contracts, HB Gary would have to fold.

- If that wasn't enough to show the financial instability of HB Gary, the fallout from the Anonymous hack and expose', including massivepublicity and Congressional hearings caused HB Gary to lose whatever business and contracts it had since no one would hire a cyber security firm that could not even protect its own data.

- Defendant HB Gary asserts that it is common to only buy assets and not liabilities, and that does not prove fraud with regard to the purchase of HB Gary. . However, in looking at Exhibit 1 of Defendants' Motion to Dismiss, when one compares the purchase of HB Gary with two other Mantech purchases of TranTech and Worldwide Information Network Systems ("WINS"), it is clear that HB Gary was very different.  The HB Gary purchase was an "asset purchase agreement," of $23.8 million, id at 27, while the purchase of TranTech a few months earlier was an "asset and liabilities" purchase-- $21.5 million in assets vs. $2.3 million in liabilities.  Id. at 11. Similarly, the purchase of WINS included a $9 million escrow placement "to satisfy potential indemnification liabilities of WINS." Id. at 11.

- One of Hunton & Williams' clients, Bank of America ("BOA"), also discussed hiring Team Themis to conduct attacks on its opponents, and it was BOA that later provided the cash to Mantech to purchase HB Gary, using its $50 million

line of credit.  Id. Plaintiff will seek discovery to determine if there was any
quid pro quo with regard to the sale, such as having Team Themis do work
for BOA after the Anonymous expose' while hiding payments through the
fraudulent sale of HB Gary.

- Counsel for StopTheChamber, on March 14, 2011, sent a document hold
  letter to HB Gary advising that it was considering potential litigation.  This
  placed HB Gary on notice that it could be sued for the Team Themis actions.
  As a result, HB Gary quickly began negotiations with Defendant Mantech to
  sell its assets in order to keep them out of reach of Plaintiff and other
  potential plaintiffs.

- Upon receipt of the Document Hold letter, Plaintiff became a "creditor,"
  defined by the Maryland Uniform Fraudulent Conveyances Act as someone
  who has "any claim...."

- The sale of HB Gary assets was done to shield those assets, however much,
  from potential creditors.

- Plaintiff alleges that the sale of HB Gary to Mantech for $23.8 million was a
  sham because HB Gary was insolvent, under investigation by the federal
  government and the House Armed Services Committee, mortally wounded
  under every business rubric, and humiliated both professionally and publicly
  by Anonymous hackers.  The price paid was not fair consideration for the
  shell left of HB Gary.

- Without discovery Plaintiff cannot add more particularity because the necessary documents, including emails, letters, notes and financial reports are in the possession of the Defendants.

The Defendants' reliance on *Christian v. Minn. Mining & Mfg. Co.*, 126 F. Supp. 951 (D. Md. 2001), is misplaced because in that case 3M's divestiture did not absolve itself from liability.  The other cases cited by the Defendants do not support their arguments.

Clearly, Plaintiff has stated a claim and supported it with documents alleging that the sale of HB Gary to Mantech was a sham that constituted a fraudulent conveyance.  Therefore, the Motion to Dismiss should be denied.

## CONCLUSION

For all the foregoing reasons, Plaintiff moves this Court to deny the Defendants' Motions to Dismiss.

Respectfully submitted,

Brett Kimberlin

Certificate of Service

I certify that I mailed a copy of this motion to Defendant Hoge, and emailed it to counsel for the other Defendants this 15th day of October, 2015.

Brett Kimberlin

## EXHIBITS

1.  Plaintiff's Declaration

2.  Article re Donald Blankenship Indictment

3.  Article re Donald Blankenship Superseding Indictment

4.  Article re Donald Blankenship Trial

5.  Threats to Plaintiff from Hoge-led attacks

6.  StopTheChamber Front Page

7.  Article by Breitbart.com re Plaintiff Leading Anti Chamber Campaign

8.  Article re Obama's Calling Out the Chamber's Criminal Activity

9.  Aaron Barr Email Re Nagy's Breitbart Article

10. Aaron Walker Extortion Email of October 5, 2015

11. Watching The Felon Google Group Circle Document

12. Tweet from Defendant Nickless re Contacting PNNL

13. Tweet from Defendant Nickless re Approval from PNNL

14. PNNL Email to Plaintiff