Exhibit B

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

```
-------------------------------X
                               :
BRETT KIMBERLIN,               :
                               :
        Plaintiff,             :
                               :
           v.                  :        Civil No. 403868
                               :
NATIONAL BLOGGERS CLUB, et al.:
                               :
      Defendants.              :
                               :
-------------------------------X
```

HEARING

Rockville, Maryland                          September 3, 2015

DEPOSITION SERVICES, INC.
12321 Middlebrook Road, Suite 210
Germantown, Maryland 20874
(301) 881-3344

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

```
------------------------------X
                              :
BRETT KIMBERLIN,              :
                              :
         Plaintiff,           :
                              :
              v.              :        Civil No. 403868
                              :
NATIONAL BLOGGERS CLUB, et al.:
                              :
         Defendant.           :
                              :
------------------------------X
```

Rockville, Maryland

September 3, 2015

WHEREUPON, the proceedings in the above-entitled

matter commenced

BEFORE:    THE HONORABLE MICHAEL D. MASON, JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

KIMBERLIN BRETT, Pro se
8100 Beech Tree Road
Bethesda, Maryland  20817

FOR DEFENDANT BREITBART.COM:

MARK I. BAILEN, Esq.
Baker & Hostetler, LLP
1050 Connecticut Avenue, Suite 1100
Washington, D.C.  20036

FOR DEFENDANT WILLIAN HOGE:

PATRICK OSTRONIC, Esq.
932 Hungerford Drive, Suite 28A
Rockville, Maryland  20850

DEPOSITION SERVICES, INC.

APPEARANCES (Continued):

FOR DEFENDANTS MICHELLE MALKIN AND TWITCHY:


MICHAEL F. SMITH, Esq.
Smith Appellate Law Firm
7566 Main Street, Suite 307
Sykesville, Maryland  21784

FOR DEFENDANT AARON WALKER:

AARON WALKER, Pro se
P.O. Box 3075
Manassas, Virginia  20108

FOR DEFENDANTS DEBLASE INC., MERCURY RADIO ARTS,
AND GLENN BECK:

SCOTT J. SHOULDER, Esq.
Cowan, Debaiet, Abrahams & Sheppard, LLP
41 Madison Avenue, 34th Floor
New York, New York  10010

FOR DEFENDANT MANDY NAGY:

T. BRUCE GODFREY, Esq.
Jezic, Krum & Moyse, LLC
2730 University Blvd, Suite 604
Silver Spring, Maryland  20902

FOR DEFENDANTS DAN BACKER AND DB CAPITOL STRATEGIES:

CHRISTINA PAULINE SIROIS, Esq.
DB Capitol Strategies, PLLC
203 South Union Street, Suite 300
Alexandria, Virginia  22314

<u>I N D E X</u>

<u>Page</u>

Judge's Rulings                                    86

1                          P R O C E E D I N G S

2          THE COURT:  Good morning, you may be seated.

3          THE CLERK:  Civil 403868, Brett Kimberlin versus

4   National Bloggers Club, et al.

5          THE COURT:  Let's do this.  Let Defense stay back

6   there for a second because I'm probably going to take you in

7   waves, okay.  So where is Mr. Kimberlin?

8          MR. KIMBERLIN:  Yes, sir.

9          THE COURT:  You take that desk there, okay.  So go

10  ahead and identify yourself for the record.

11         MR. KIMBERLIN:  My name is Brett Kimberlin.  I'm the

12  plaintiff in this case.

13         THE COURT:  Okay, have a seat for a second --

14         MR. KIMBERLIN:  Yes.

15         THE COURT:  -- Mr. Kimberlin.  Mr. Walker, come

16  forward for a second, identify yourself for the record.  Just

17  leave all of your briefcases there for a second.

18         MR. WALKER:  Sorry, sir.

19         THE COURT:  Okay, with respect to your motion to

20  dismiss which was the first that was filed which is docketed at

21  tab 6 --

22         MR. WALKER:  Uh-huh.

23         THE COURT:  Unfortunately I issued an order two days

24  ago.  When I took a look at this thing it's 44 pages long.

25         MR. WALKER:  It was too long?

```
1              THE COURT:  There's a 15 page limitation on motions
2   that are filed unless you get leave of Court --
3              MR. WALKER:  Oh --
4              THE COURT:  -- to file longer motion.
5              MR. WALKER:  I apologize.
6              THE COURT:  So I struck this.  I'm not going to
7   consider it.  It was with leave to you to file an amended
8   petition that conforms with the rule.  Okay, so I'm not taking
9   this one up this morning, okay.
10             MR. WALKER:  Okay.
11             THE COURT:  So you can step back for a second.  So
12  that's 6 is denied without prejudice to refiling.
13             MR. WALKER:  I believe that was 7, Your Honor.
14             THE COURT:  6 is the way it's docketed, but we can go
15  back and look at that later.  It's a motion to dismiss so --
16             THE CLERK:  Yes, I have it 6.
17             THE COURT:  Okay, then next we have Mr. Hoge
18  represented by Patrick Ostronic.
19             MR. OSTRONIC:  Yes, Your Honor.  Good morning, Your
20  Honor, Patrick Ostronic on behalf of Mr. Hoge.
21             THE COURT:  Okay, so now this is a motion at Docket
22  Entry 14 and it is entitled motion to dismiss for improper
23  venue and a request for a hearing.  So it suggests by its title
24  that really you're only raising venue issues.  And yet in the
25  body of the motion it seems also to talk about it's a little
```

1    unclear to me but suggests that he's failed to plead a claim

2    for conspiracy.  But I guess you're saying only insofar as it

3    relates to venue issues?

4           MR. OSTRONIC:  Your Honor, my point on that issue

5    is --

6           THE COURT:  Go ahead I'll hear you on your motion.

7           MR. OSTRONIC:  Okay, Your Honor, Mr. Kimberlin's

8    motion complaint lists out several charges including his last

9    one is conspiracy.  And the only thing he says about conspiracy

10   is conspiracy.  He lists nothing else in there besides just the

11   word conspiracy.

12          THE COURT:  Yes.

13          MR. OSTRONIC:  So if we just look at that first of

14   all it's not a tort here in Maryland.  And second of all

15   there's not --

16          THE COURT:  Not a standalone tort.

17          MR. OSTRONIC:  A standalone --

18          THE COURT:  A tort, but not a standalone.

19          MR. OSTRONIC:  Not a standalone.  It can be an

20   element of one, but conspiracy to do this, conspiracy to do

21   that, there's got to be an underlying tort.

22          THE COURT:  Correct, can't stand by itself.

23          MR. OSTRONIC:  That's what my client's saying.

24          THE COURT:  Yes.

25          MR. OSTRONIC:  Since he doesn't allege conspiratorial

1  element in any of the complaint the word conspiracy to me is

2  just there to allow him to file in this court and bring us all

3  in here.

4           THE COURT:  Okay, but I think he brings claims

5  against you in Counts 2, 3, 5, 7, and 8, right?

6           MR. OSTRONIC:  He brings claims against us, but he

7  doesn't allege how there was any conspiracy among the co-

8  defendants such that defamation.  If I say something bad about

9  you and somebody else is saying something bad it doesn't mean

10  they conspire to do that.  It just means we may have been

11  talking the same language, may have been talking about the same

12  subject.  It's not a conspiracy per se unless there's something

13  alleged in there that we can respond to.

14           THE COURT:  Well what's that got to do with the

15  venue?

16           MR. OSTRONIC:  Well if he doesn't have conspiracy

17  then this is not the courtroom, because Mr. Hoge doesn't live

18  in Montgomery County.  Mr. Hoge doesn't work in Montgomery

19  County.  Therefore, he would have to go elsewhere to sue Mr.

20  Hoge's on his own.  He has particular counts there.

21           THE COURT:  Because there are no other defendants

22  you're saying.

23           MR. OSTRONIC:  There's no conspiracy then Mr. Hoge's

24  a standalone defendant and Mr. Hoge then would have to be sued

25  either in his workplace or his home place, neither one of which

1  is Montgomery County.  And in fact the only defendant amongst,

2  the only person in the entire courtroom right now among us here

3  that lives in Montgomery County and that would be proper venue

4  would be Mr. Kimberlin.  It's the only one it's convenient to.

5  Otherwise it's bringing people in from New York, bringing

6  people in from Virginia, bringing people in from Carroll County

7  a place just to suit Mr. Kimberlin here.  And that's why when I

8  look at conspiracy there's no conspiracy there.  There's

9  nothing alleged.  It just seems to me like a magic word to say

10  conspiracy, okay, now we get to file in my courtroom.

11          THE COURT:  Okay, so Mr. Kimberlin.

12          MR. KIMBERLIN:  With regard to conspiracy --

13          THE COURT:  You can have a seat, Mr. Ostronic.

14          MR. KIMBERLIN:  With regard to conspiracy, throughout

15  the complaint I alleged that the defendants engaged in a

16  conspiracy to ruin my business and portray me in a false light,

17  invade my privacy, and that's the entire gist of the complaint.

18  That this was a group decision and a conspiracy to do this.

19  And venue is definitely proper under Rule 6-201(b) which states

20  if there is more than one defendant and there is no single

21  venue applicable to all defendants under subsection (a) of this

22  section all may be sued in a county in which any one of them --

23          THE COURT:  Yes, I understand that theory.

24          MR. KIMBERLIN:  Okay.

25          THE COURT:  But the problem I have is you can't just

1   sort of a conclusion.  Conspiracy ultimately is a question of

2   law, arguably may even be a question of fact if you're using it

3   in an everyday sense, although I don't think people talk

4   everyday about conspiracy generally without there being some

5   legal connotation to it.  So you really have to allege the

6   facts but underlie the existence of the conclusion that a

7   conspiracy existed.  And I've looked through your 52-page

8   complaint a couple of times and again just this morning before

9   coming out on the bench because I wanted to make sure that I

10  understood precisely what was being alleged here.  And

11  specifically as it relates to Mr. Hoge, what I noticed is

12  beginning on page 4 carrying over to page 5 and into page 6

13  where you describe each of the parties --

14          MR. KIMBERLIN:  Right.

15          THE COURT:  -- he's not even mentioned, unless I've

16  missed something okay, and I've looked at it two or three

17  times, but I could have missed it.  In looking through your

18  complaint and reading it I think four times looking for Mr.

19  Hoge's name I only found it on pages 21 where you describe Mr.

20  Hoge along with Mr. Walker having stalked you, but that's in

21  the context of they show up in court.  Mr. Walker comes with

22  Mr. Hoge to court, of course everybody has the right to come to

23  a public proceeding.  That wouldn't be stalking, even if they

24  showed up at all cases.  And then you say he constantly, Walker

25  and Hoge constantly write blog posts stating they're armed and

1   dangerous and will not hesitate to use their weapons.  Walker,

2   Akbar, Frey, and Hoge attack anyone online who questions their

3   conduct.  And then you say Hoge and Walker continue to defame

4   you.  But, again, that's a conclusion that doesn't really say

5   specifically how, other than falsely calling plaintiff a

6   swatter and stated that he caused defendant Walker's

7   termination.  But there's no allegation there specifically as

8   to what did Mr. Hoge did as opposed to Mr. Walker or any of the

9   others.

10          And then on page 22, you say Walker, Hoge, Frey, and

11   Stranahan condemned Judge Veahy, which relates to Judge Veahy

12   not so much you.  But I understand Judge Veahy was somehow

13   involved in some case involving you.  Walker and Hoge contact

14   their followers to contact the Montgomery County State's

15   Attorney's Office and demand your arrest and prosecution, which

16   they have a right to do.  That's protected.  Defendants Hoge,

17   Walker, Strahan launched everyone blog about Howard County and

18   Maryland State's Attorney's Day.  And so that's 21 and 22.

19   Then he disappears and does reappear as I can find it until

20   page 41 when you say Hoge who lives in Maryland wrote a letter

21   to a congressman that imputed again, that's a conclusion.  What

22   is it that he wrote?  What is it that he said?  That the

23   plaintiff was involved with swattings and should be

24   investigated and sent by the FBI to prison.  Well again there's

25   a privilege in Maryland if somebody's making a complaint to a

1  government official for somebody to be investigated it's not

2  actionable.  And since filing of the complaint on page 42 you

3  say defendant Hoge has published hundreds of blogs defaming you

4  and accusing you of crime and after crime.  Well we all know,

5  without beating it to death, that at least by admission you in

6  your past committed crimes after crimes.  So it's a recitation

7  of those.  You know, that certainly wouldn't be defamatory.

8  And you say his blog is dedicated to attacking, cyber stalking,

9  harassing, but again it doesn't say specifically what it is

10 that he said that would constitute any of those acts.

11       And then finally the last time I find him is on page

12 43 where you say Hoge, Walker, Frey, Stranahan, and Hoge,

13 Capitol Strategies and Akbar raised money on their websites

14 based on the false narrative about swattings and used the

15 plaintiff's name and reputation.

16       So those are the only occasions where I find there's

17 even any mention of Mr. Hoge.

18       MR. KIMBERLIN:  Well, again, if the Court is saying

19 that I haven't alleged enough about Mr. Hoge or been specific

20 enough about how Mr. Hoge conspired or acted in a tortious way

21 against me, I would like to ask leave to amend my complaint.

22       THE COURT:  Was he part of the federal suit?  Was he

23 part of the federal suit?

24       MR. KIMBERLIN:  Yes, he was.

25       THE COURT:  Was your complaint up there dismissed

1   with leave to amend for failure to state --

2          MR. KIMBERLIN:  No, no --

3          THE COURT:  -- with particulars what the defendants

4   did?

5          MR. KIMBERLIN:  No, it was in the federal case there

6   were several federal questions under RICO and Section 1985 and

7   1983.  They were all related to the swatting issue and the

8   judge accepted one of the 1985 counts for a particular

9   defendant.  He dismissed the RICO count and he dismissed the

10  1985 count, because of that he decided not to accept

11  supplemental jurisdiction over the state law claims.  And so he

12  gave me leave to file those claims in this court within 30 days

13  in order to protect me under the statute of limitations and so

14  that's why I did.  And, basically, this is just a rehash of

15  what was filed in the federal case.  So if --

16         THE COURT:  Well that's what I'm asking, because if

17  this same motion basically that you hadn't alleged access to

18  Hoge specifically it was made in federal court, then you were

19  on notice when you filed this to be able to.

20         MR. KIMBERLIN:  This motion was never filed in

21  federal court as far as venue.  This is a new motion that

22  they've come up with in this case.

23         THE COURT:  Okay, but as we've already discussed you

24  could not base a claim for stalking upon him appearing in court

25  even if he came to every court appearance.

1          MR. KIMBERLIN:  Right.

2          THE COURT:  He has a right.  It's public record.  Any

3    member of the public, whether you like him or not, can come to

4    a public hearing.  And with respect to complaints to officials

5    to ask them to conduct investigation, that as I recall under

6    Maryland law is protected and cannot be the basis of any claim

7    of defamation, which is basically what you're alleging here,

8    whether called false light and/or anything else.  So if that's

9    protected --

10         MR. KIMBERLIN:  Well --

11         THE COURT:  -- it wouldn't do any good to amend it.

12         MR. KIMBERLIN:  No --

13         THE COURT:  To re-allege that.

14         MR. KIMBERLIN:  I mean there are, like I stated in

15   the complaint I thought it was specific enough, but obviously

16   you're saying no.  Mr. Hoge's blog is dedicated to attacking me

17   on a daily basis every single day of the year for three years.

18   Every day he writes something negative about me.  I wanted to

19   limit this case to the swatting, that's what I've done.  If I

20   have to refile against Mr. Hoge in Carroll County or in this

21   County, you know, it would be another massive lawsuit.  I would

22   like to, you know, keep him in this case whether do an

23   amendment or whatever and let a jury decide you know what he's

24   done with regard to swatting.  You know part of the whole

25   everybody blog about Brett Kimberlin Day was to portray me as a

1  criminal swatter to silence conservative bloggers, you know,

2  which was not the case.  I had nothing at all to do with any

3  swattings at all.

4          THE COURT:  But you have to understand there's a real

5  distinction to be drawn in these cases between them reporting,

6  blogging, publishing whatever statements that suggest the

7  people, obviously there's a huge argument going on here between

8  two camps.

9          MR. KIMBERLIN:  Right.

10         THE COURT:  And for them to publish an article in any

11 form that suggests that after people attack you as you describe

12 it that they have been the victims of swatting and that

13 possibly therefore you or somebody associated with you may be

14 involved in that is very, very different than them saying you

15 are responsible for the swatting.

16         MR. KIMBERLIN:  Well --

17         THE COURT:  And you have to be very careful about

18 what it is that you're alleging, because if all you're alleging

19 is that they have reported that people at odds with you after

20 basically portraying you in a negative light in the internet or

21 wherever have found themselves soon thereafter the victims of

22 swatting and that, therefore, one has to question whether you

23 or somebody supporting you is behind that, that's not

24 actionable.

25         MR. KIMBERLIN:  Of course it's not actionable.

1   That's not what they did.  They've stated specifically

2   Kimberlin is swatting me.

3              THE COURT:  Okay, so --

4              MR. KIMBERLIN:  Kimberlin paid his associates to swat

5   me, you know, something like that.  This is very specific

6   directed at me.

7              THE COURT:  Okay, so what I will do is I'm not going

8   to rule or decide your motion one way or the other, because as

9   it's currently pled I think it's insufficient for me to decide

10  whether he's got a claim against Hoge or not.  So I'm going to

11  allow him to amend as to Mr. Hoge to see if he can allege

12  something specifically that he has done without and actually I

13  won't decide this one way or the other.  So we'll just wait

14  until he files his amended complaint and then I'll take up well

15  actually I guess you have to refile it as to the amended

16  complaint.  But I'll leave this for the time being sitting here

17  because if I dismiss the complaint as you then everything else

18  goes automatically and we might as well dispose of some of

19  these other things that we have this morning.

20             MR. OSTRONIC:  Do you have a time, Your Honor?

21             THE COURT:  Fifteen days ought to be -- I mean, this

22  has been kicking around for years.

23             MR. KIMBERLIN:  Yeah, that's fine.

24             THE COURT:  Okay, so you've got 15 days.

25             MR. KIMBERLIN:   That's perfect.

1              THE COURT:  But keep in mind it can't be complaints
2    to officials requesting investigation.
3              MR. KIMBERLIN:  Right.
4              THE COURT:  It can't be coming to court.
5              MR. KIMBERLIN:  Right.
6              THE COURT:  It has to be something specific that he
7    said --
8              MR. KIMBERLIN:  All right.
9              THE COURT:  -- that accuses you of committing crime,
10   not past crimes you've been convicted of --
11             MR. KIMBERLIN:  Right.
12             THE COURT:  -- but some --
13             MR. KIMBERLIN:  Some new crime.
14             THE COURT:  And it has to be, you know, not a
15   suggestion.  His opinion that maybe you or people with you
16   might be behind this.  If it's couched like that it's not going
17   to be enough so --
18             MR. KIMBERLIN:  Right.
19             MR. OSTRONIC:  Your Honor, will it also have to be
20   conspiratorial?
21             THE COURT:  Pardon me?
22             MR. OSTRONIC:  It has to be conspiracy too, correct,
23   he has to allege the elements of conspiracy?
24             THE COURT:  If he wants to bring the other people in
25   with it.  But if he alleges your client defamed to him --

```
 1              MR. OSTRONIC:  Then this wouldn't be the proper
 2    venue.
 3              THE COURT:  Well, if he has anybody else that he can
 4    tie to that.  I mean, if there's more than one defendant he can
 5    make that argument, okay.
 6              MR. OSTRONIC:  Thank you, Your Honor.
 7              THE COURT:  Yes, I mean if all you're left with is
 8    Mr. Hoge, he's right, then you've got to go to Carroll County.
 9              MR. KIMBERLIN:  Right.
10              THE COURT:  Okay.
11              MR. OSTRONIC:  Thank you, Your Honor.
12              THE COURT:  Okay, so let me just think for a second
13    as to --
14              MR. KIMBERLIN:  Your Honor, can I make one
15    preliminary matter, just it might speed things up.
16              THE COURT:  Give me one second.  So as to Docket
17    Entry 14 just put will defer pending receipt of amended
18    complaint.  Okay, you want to speed things up, go ahead.
19              MR. KIMBERLIN:  Yes, I think I would really like
20    that.  Yesterday at late in the afternoon I filed two motions,
21    dismissals.
22              THE COURT:  Okay, who are you dismissing?
23              MR. KIMBERLIN:  For three defendants --
24              THE COURT:  Yes.
25              MR. KIMBERLIN:  And they were agreed to by the Mark
```

1  Bailen, who is right here who is representing those defendants.

2          THE COURT:  Which ones?

3          MR. KIMBERLIN:  Defendant Ace of Spades stipulated

4  dismissal here and --

5          THE COURT:  Ace of Spades the blog Ace of Spades, the

6  blogger?

7          MR. KIMBERLIN:  Yes, both of them are gone.

8          THE COURT:  Okay.

9          MR. KIMBERLIN:  And also defendants Erik Erickson and

10  Red State.

11          THE COURT:  Defendants Erik Erickson and Red State.

12          MR. KIMBERLIN:  And I have the stipulated dismissals

13  for your --

14          THE COURT:  You can give those to the clerk.

15          MR. KIMBERLIN:  And I filed these yesterday with

16  Dorothy with a letter to you.

17          THE COURT:  You filed them with what?

18          MR. KIMBERLIN:  With the clerk yesterday.

19          THE COURT:  Okay.  I don't need those.

20          MR. KIMBERLIN:  So those cases have been resolved

21  through settlement.

22          THE COURT:  So let me just make sure then, in light

23  of the fact that they've been voluntarily dismissed then

24  counsel is not pursuing on behalf of -- well Ace of Spades was

25  never served so that's not really an issue.

1          MR. KIMBERLIN:  Right.

2          THE COURT:  Okay, as to Erik Erickson and Red State

3   that motion to dismiss is being withdrawn and later voluntary

4   dismissal?

5          COUNSEL:  That's correct, Your Honor.

6          THE COURT:  Okay, great.

7          MR. KIMBERLIN:  With regard to Ace of Spades there's

8   a motion for discovery to learn his identity.

9          THE COURT:  I got that.

10         MR. KIMBERLIN:  Which I'm pulling.

11         THE COURT:  Okay.

12         MR. KIMBERLIN:  And Mr. Walker filed motion regarding

13  that which I'm pulling.

14         THE COURT:  Yes, you can't pull his motion, but I

15  understand his motion becomes moot.

16         MR. KIMBERLIN:  Well, whatever, his attorney's fees

17  too.

18         THE COURT:  So the motion that he is indicates

19  pulling is the motion at Docket Entry 31, motion to compel pre-

20  junction disclosure.

21         MR. KIMBERLIN:  Right.

22         THE COURT:  That is being withdrawn.

23         MR. KIMBERLIN:  Okay.

24         THE COURT:  And the other was entitled opposition

25  response.  31 was the motion, that's opposition so you don't

1   have to deny an opposition.  You just have to deal with the

2   motion.

3        Okay, so and just for the record the defendants Blaze

4   Inc. Mercury Radio, Glenn Beck filed a motion to exceed page

5   limits which I granted since they are representing multiple

6   defendants.

7        So then that gets us to the motion at Docket Entry 45

8   is the motion by Erik Erickson and Red State.  That is

9   withdrawn as well as 47, the motion to dismiss pursuant to the

10  slap, that's being withdrawn as well.  That's at 47 is

11  withdrawn in light of voluntary dismissal, okay.  So then --

12       MR. KIMBERLIN:  And there's one more regarding he

13  filed a motion for attorney's fees and that's withdrawn also.

14       THE COURT:  Separate motion for attorney's fees?

15  That was part of the other motions and they were withdrawn so

16  that's gone.

17       MR. KIMBERLIN:  Okay, I didn't know if it was

18  separate.

19       THE COURT:  No, not listed separately that I see.

20       Okay, so then we have defendant Michelle Malkin and

21  Twitchy's motion to dismiss, your opposition, and what I think

22  we're going to do here is, since his opposition is sort of

23  omnibus as to a series of motions, we'll probably take those

24  motions first and then I'll hear your response to those --

25       MR. KIMBERLIN:  Okay.

1              THE COURT:  -- motions collectively --

2              MR. KIMBERLIN:  All right.

3              THE COURT:  -- after I hear from counsel on those

4    motions, okay.  Give me one second.  Okay, Counsel, could you

5    identify yourself for the record.

6              MR. SMITH:  Good morning, Your Honor, Michael F.

7    Smith on behalf of defendants Michelle Malkin and Twitchy.

8    These are our motions to dismiss.  And I'm not going to belabor

9    the points that we've made in the brief, and I know Your Honor

10   has read them and I would just like to reiterate that for all

11   those reasons, and there are many reasons, we feel that the

12   complaint should be dismissed as to both Mrs. Malkin and

13   Twitchy, both failure to state a claim grounds, personal

14   jurisdiction grounds, constitutional grounds, and then the

15   anti-statute.

16             THE COURT:  Well since he's sitting here, okay, and

17   representing, why don't we just briefly, you don't have to beat

18   them to death, but you can go through them so that then his

19   memory at least is jogged and he can respond to them.

20             MR. SMITH:  Understood, Your Honor.  We are arguing

21   with regard to the false light claim, which is the second claim

22   of the complaint, that the complaint fails to state a claim for

23   numerous reasons.  It doesn't meet the elements of the tort as

24   established under Maryland law.  It fails to allege actual

25   malice.  There are no statements that would be highly offensive

1  to a reasonable person identified as being made by either of

2  these two defendants and any statements are protected by the

3  fair plan and privilege.

4       As to the next claim against these two defendants

5  which is the fifth claim, the inference with prospective

6  economic advantages again it fails to plead the elements of the

7  tort as set forth in the case.  There's no privation alleged.

8  There's no wrongful or unlawful interference which is a

9  requirement.  And there's also no unlawful purpose identified.

10      THE COURT:  Let me ask you a couple questions.

11  Returning to the false light --

12      MR. SMITH:  Yes --

13      THE COURT:  Do you allege in your motion, because

14  there's so many of them I can't really remember who alleges

15  specifically that he's a public figure?

16      MR. SMITH:  We do make that assertion, Your Honor.

17      THE COURT:  But can I really decide that on a motion

18  to dismiss?  Because part of the way that you allege he's a

19  public figure is you go outside the complaint and allege

20  certain things that he hasn't pled in the complaint.  So then

21  to the extent I consider things outside of the complaint it

22  really converts it into a motion for summary judgment.  How can

23  I decide that issue on a motion to dismiss?

24      MR. SMITH:  Well, Your Honor, if we had attached

25  things I think that made that assertion then I think the

1    Court's correct and we would be going outside the pleading.

2    Our assertions are based merely on the case law that is

3    reported in the federal reporters and I don't believe that

4    that --

5              THE COURT:  But one or more of you attaches quotes or

6    puts quotes in your motion having to do with, he claims to be

7    an advocate for progressive causes or he's been recognized by

8    others as an advocate for progressive causes, whether that's in

9    this specific one or others I forget.

10             MR. SMITH:  That was not in our motion, Your Honor.

11   Our motion makes the arguments that he's a public figure

12   strictly based on the case law and the various opinions

13   relating to Mr. Kimberlin that recount his various felony

14   convictions.

15             THE COURT:  Let me ask you with respect to the fact

16   of the felony convictions.  What's the most recent felony

17   conviction dated?

18             MR. KIMBERLIN:  1980.

19             THE COURT:  I'm not asking you, okay.

20             MR. SMITH:  Your Honor, that I don't know.  I could

21   look back at our briefs.  I know some of them were some time

22   ago.  But there's also the notion of not just the convictions,

23   but his own self-description in his complaint as being someone

24   who is in the arena.  He's in the arena politically.  He's the

25   head of --

1            THE COURT:  I don't think he makes that.  I mean,

2     when I read it in the reply I do think you do make mention of

3     that.  But his claims in the complaint I think are that his

4     nonprofit organization works with, I forget exactly what it

5     was, but it didn't sound that terrible anyway.  It's work for

6     somebody --

7            MR. SMITH:  Okay.

8            THE COURT:  And then the other was that he works with

9     whistleblowers.

10           MR. SMITH:  That's correct, Your Honor.  His

11    nonprofit, as he describes it, contracts with the State

12    Department or contracted with the State Department to work with

13    activists, individuals in various companies.

14           THE COURT:  Right, activist was one.

15           MR. SMITH:  And then also has this whistle blowing

16    function.  And I think, frankly, the letter is probably more

17    pertinent to the public figure point than even the State

18    Department contract, although I would submit that that plays

19    into it as well.  But the very purpose of the nonprofit is to

20    blow whistles that --

21           THE COURT:  Yes, but he didn't say that.

22           MR. SMITH:  Well, the way I read the complaint, Your

23    Honor, is that the nonprofit is dedicated to assisting the

24    cause of whistleblowing and other things.  And I think in the

25    totality of circumstances between that, between the contracting

1   with the State Department, between the past record when my

2   client's saying why is the State Department contracting with

3   this man, I think that's to me squarely in the ambit of public

4   figure.  Now I think certainly the motion can be decided

5   without saying that he's a public figure.  I think there's --

6        THE COURT:  So, that was the next question.  So,

7   assume that I decide that that's a matter that can't be decided

8   on a motion to dismiss, how does that affect your claims

9   otherwise?

10        MR. SMITH:  I think there's certainly enough other

11   arguments against the false light claim and against the other

12   claims that the Court can grant dismissal.  Your Honor touched

13   on it with regard I think to Mr. Hoge's motion.  I think what

14   we have here really is a defamation claim that Mr. Kimberlin

15   can't bring because he's beyond the one year limitations

16   period.  So we have with some of these other torts we have

17   false light claims, intentional infliction claims and the like.

18        THE COURT:  That's the other question I wanted to ask

19   you about is on the false light you do have the Court of

20   Special Appeals opinion sitting out there that specifically

21   rejected that argument and said it's a three year statute of

22   limitations.  And I know the Court of Appeals you argued

23   subsequently decided Parea (phonetic sp.) was it or --

24        MR. SMITH:  And we actually, Your Honor, we do not

25   raise in our motion a limitations defense.

1             THE COURT:  Okay.

2             MR. SMITH:  But you're right there is that --

3             THE COURT:  Because the Court of Appeals didn't

4    specifically reverse the Court of Special Appeals.

5             MR. SMITH:  Correct, that's correct.  And so we

6    didn't raise the limitations issue.  There are enough other

7    issues we have raised and I think the defamation the sort of

8    disguised defamation nature of these claims really drives home

9    the constitutional defenses as well that we have because the

10   case law is clear that in a false light claim, in these other

11   tort claims the plaintiff has to meet the same pleading

12   standards as in a defamation claim.  So that's where we get to

13   the various constitutional issues that we've asserted in our

14   motion.

15            But to answer your original question separate and

16   apart from public figure there are still sufficient grounds

17   where that claim and the other claims fail to state a claim.

18            THE COURT:  And you raised personal jurisdiction

19   claims as well?

20            MR. SMITH:  That's correct, Your Honor.

21            THE COURT:  And she's in --

22            MR. SMITH:  Mrs. Malkin is in Colorado.  At the time

23   Twitchy is run by an LLC that she owns was also in Colorado.

24   It has since been purchased by a California corporation.  But

25   clearly they're both clear across the country from Maryland.

1  And they don't meet, neither of them meets the standard for

2  asserting Maryland personal jurisdiction.  They're just not

3  sufficient contacts with Maryland and there can be no showing

4  of purposeful availment the way that the case law has defined

5  it in the case of internet websites.

6          THE COURT:  As I understand in your reply you say

7  with respect to the argument relating to the communications

8  decency act that to the extent because he argues in his

9  opposition that you've created original content and therefore

10 you aren't protected.  You say that original content isn't the

11 subject of his complaint, it's nowhere set forth in the

12 complaint therefore it doesn't do him any good.  And the only

13 statements he sets forth in the complaint are statements that

14 you basically republished or you hosted that you did not

15 generate.

16          MR. SMITH:  That's true with regard to Twitchy.  I

17 think at least I tried to make that point clear in the reply.

18 I think Twitchy clearly is an interactive computer service as

19 the CAD defines that and by reposting other people's tweets is

20 covered, is exempt, is privileged.

21          As for Mrs. Malkin to the extent that I read the

22 complaint as leaving aside anything that she wrote which I

23 don't think is covered.  To the extent the complaint takes

24 issue with things that commenters have posted to her articles,

25 so other words she'll write an article Mr. Kimberlin such and

1   such.  And then others have written comments and those have

2   found their way into the complaint.  Those also are things that

3   she can't be held responsible for those.  I don't believe that

4   the communications decency act covers the statements she has

5   written herself because I don't think they fall within the

6   definition but obviously we have other defenses and other

7   assertions as to those.

8          THE COURT:  Okay, thank you.  Do you want to address

9   his arguments now or do you want to do them all at one time.

10  It switches easier.

11         MR. KIMBERLIN:  I think compartmentalizing --

12         THE COURT:  Is better for you?

13         MR. KIMBERLIN:  I'll address.

14         THE COURT:  Go ahead.

15         MR. KIMBERLIN:  First of all the argument and I won't

16  belabor it, the argument about public figure you know I've been

17  involved in a lot of cases over the last few years with some of

18  these defendants and others and they made that argument in

19  front of every judge.  No judge has bought into it.  You know

20  Judge Quirk in this court actually you know had a hearing on it

21  and had motions and he decided against it.  I mean he actually

22  issued an order denying that I was a public figure.

23         THE COURT:  But that would have no binding effect on

24  me.

25         MR. KIMBERLIN:  No I'm not saying that but they've

cgg

1   made this argument over and over and it's never fallen into.

2   But leaving that aside with regard to personal jurisdiction and

3   you know one thing I want to point out is these defendants made

4   all these arguments before Judge Hazel in federal court.  Every

5   one of these arguments were made before Judge Hazel.

6           THE COURT:  Judge Hazel what would he care, he

7   wouldn't need personal jurisdiction.

8           MR. KIMBERLIN:  Okay.

9           THE COURT:  He has nationwide jurisdiction.

10          MR. KIMBERLIN:  All right.

11          THE COURT:  So I don't know why they would make that

12  argument in federal court.

13          MR. KIMBERLIN:  But I'm getting to the other

14  arguments that they're making, anti-slap, failure to state a

15  claim, all these issues.  And Judge Hazel had that case for 16

16  months and they made these arguments in their motion to

17  dismiss.  Judge Hazel could have had he accepted those

18  arguments as valid or strong or whatever he could have said oh

19  yeah, you're right so let's just get rid of this case

20  altogether.  He didn't do that.  He dismissed it without

21  prejudice, leave to refile in this court.  He dismissed other

22  counts and he upheld other counts in my favor.  So my point is

23  that they're making the same argument, many of the same

24  arguments.

25          THE COURT:  Sorry he upheld federal claims in your

1   favor?

2          MR. KIMBERLIN:  Yeah --

3          THE COURT:  So did you pursue it in federal court?

4          MR. KIMBERLIN:  It's being pursued in federal court

5   right now.  It's not against any of the defendants here today.

6   It's against one of the defendants in this case that's not here

7   today.

8          THE COURT:  But as to these defendants he didn't

9   allow any claims to survive in federal court, not federal

10  claims --

11         MR. KIMBERLIN:  Not the particular defense in this

12  court today, but Mr. Frey who is in this complaint who has not

13  file a motion to dismiss he upheld the federal claim.  And it's

14  a 1983 claim.  And that claim is going forward.

15         THE COURT:  But he threw out the RICO claims.

16         MR. KIMBERLIN:  He threw out the RICO and a 1985

17  claim 42 USC 1985, but he upheld the 1983 claim.

18         THE COURT:  But isn't RICO a basically a federal

19  conspiracy claim?

20         MR. KIMBERLIN:  Yeah, but he, the reason he threw out

21  the RICO was RICO's very difficult to plead and he found that

22  there wasn't an enterprise, you know there were certain

23  elements of the offense that weren't met.  But my point is that

24  that judge had the opportunity if he bought into any of the

25  arguments that they're raising today about failure to say claim

1  and all these other issues on these state claims.  He could

2  have done it.  He didn't do it, you know.  He said that this is

3  not a frivolous case.  And he was dismissing it without

4  prejudice only because he thought that the state courts were

5  better equipped to handle state claims and he didn't want to

6  accept supplemental jurisdiction because he had only one

7  defendant left on one count which was a 1983 --

8         THE COURT:  But as a practical matter the fact that

9  he didn't, would mean nothing to me because I happen  to know

10 Judge Hazel was just appointed, I'm surprised he's had this for

11 16 months because I think it was only about 16 months ago he

12 was appointed.

13        MR. KIMBERLIN:  Well, it started with Judge Grimm.

14        THE COURT:  Okay, and very frequently judges,

15 particularly new judges are very hesitant to decide things they

16 don't have to decide.

17        MR. KIMBERLIN:  Right, right, yeah.

18        THE COURT:  So if they can decide one thing that

19 takes the matter off their plate, there's nothing wrong with

20 doing it that way and a lot of judges do it that way and I have

21 no doubt --

22        MR. KIMBERLIN:  No I'm not --

23        THE COURT:  -- that's particularly what Judge Hazel

24 did.

25        MR. KIMBERLIN:  -- arguing res judicata or anything

1   like that as far as that case.  I'm just saying that you know

2   he could have --

3        THE COURT:  Yes, but --

4        MR. KIMBERLIN:  -- if he thought it was frivolous he

5   probably could --

6        THE COURT:  Yes, except I'm trying to explain to you

7   I don't attach much significance to the fact that he didn't.

8        MR. KIMBERLIN:  All right, okay, all right.  With

9   regard to the anti-slap I mean this is a, I have a good faith,

10  this is a good faith complaint.  Judge Hazel actually found

11  that this is a good faith complaint.  And some of these

12  defendants asked for attorney fees in that case.  The judge

13  said no.  Why?  He said it wasn't a frivolous case.  He wrote a

14  31-page decision in that case.  So anti slap it doesn't apply

15  here.  You know this is a good faith case and I'm not trying to

16  silence anybody at all.  I'm not trying --

17       THE COURT:  But I mean --

18       MR. KIMBERLIN:  That's what anti-slap is about.

19       THE COURT:  -- realistically you are.

20       MR. KIMBERLIN:  No.

21       THE COURT:  I mean you want them to stop doing what

22  they're doing which is basically publishing information about

23  you, right?

24       MR. KIMBERLIN:  No, I don't want that at all.  I

25  don't care if they publish anything about me.  I care if they

1   publish lies about me, if they portray me in a false light, if

2   they accuse me of criminal swatting when I had nothing to do

3   with it, that's when I want them to stop.  That's simple.  They

4   can write about something that happened 40 years ago, I don't

5   care.

6           THE COURT:  Okay.

7           MR. KIMBERLIN:  It's not news worthy.  Who cares

8   about it, you know.  Nobody except them, you know.  I don't

9   mind that.  I just don't want them to accuse, falsely accuse me

10  of crimes.

11          THE COURT:  Yes.

12          MR. KIMBERLIN:  Try to get me arrested, that's why

13  Judge Hazel upheld the 1983 claim against the prosecutor in LA

14  County.  He said that he used his office in the LA County's

15  Prosecutor's Office to violate my civil rights by trying to

16  have me arrested for a crime swat --

17          THE COURT:  So the action against Frey is the one

18  that's proceeding then in federal court.

19          MR. KIMBERLIN:  Yeah, exactly.

20          THE COURT:  Okay.

21          MR. KIMBERLIN:  And so that case is moving forward.

22  But as far as swatting, this case is basically about swatting.

23          THE COURT:  Okay.

24          MR. KIMBERLIN:  And trying to use swatting to destroy

25  my reputation as the director of a nonprofit and to destroy my

1   funding base and to get me fired from my job as a director.

2   And that's what this is all about.

3           THE COURT:  Let me ask you this --

4           MR. KIMBERLIN:  Yes.

5           THE COURT:  Under your theory of personal

6   jurisdiction --

7           MR. KIMBERLIN:  Uh-huh.

8           THE COURT:  We here in Maryland would have personal

9   jurisdiction over everybody who goes on the internet and who

10  blogs about you knowing that you live here in Maryland.  So we

11  would have, actually we would have international jurisdiction.

12          MR. KIMBERLIN:  Well I don't agree with that.

13          THE COURT:  Well certainly we would have national

14  jurisdiction.

15          MR. KIMBERLIN:  If, you know, if obviously you know

16  these people got hundreds of bloggers to blog their nonsense on

17  everybody blog about Brett Kimberlin Day, I mean I have you

18  know 20,000 tweets and blogs and stuff from all over the

19  country from people.  I didn't see 20,000 people.  I see 20.

20          THE COURT:  Yes, but your theory of personal

21  jurisdiction was that they basically directed your activity at

22  Maryland because I live in Maryland.  They knew I lived in

23  Maryland and so they knew the impact would come to rest here in

24  Maryland and so while you've chosen not to sue the other 20,000

25  that same theory would apply to every one of those 20,000

1  people.

2          MR. KIMBERLIN:  Well not really because these people

3  directed their actions at Maryland.  They directed it at me.

4  They directed it at my nonprofit which is located in Maryland.

5          THE COURT:  That's the distinction I'm trying to draw

6  here.

7          MR. KIMBERLIN:  Okay, and you know --

8          THE COURT:  Let me ask.

9          MR. KIMBERLIN:  Go ahead.

10          THE COURT:  I understand that you say they direct it

11  at you because they published about you.  So okay, it's

12  directed to you.  But as many of them make note these are

13  national, international organizations.  They directed

14  nationwide if not worldwide.  Yes, it goes to Maryland but it

15  goes to every other state too.  So it's not really directed at

16  Maryland.

17          MR. KIMBERLIN:  Well --

18          THE COURT:  And you say they directed it at Maryland.

19  So that's sort of a big jump.

20          MR. KIMBERLIN:  Well when I say they, you know, if

21  you read the case law that I cited Calder v. Jones that was a

22  Supreme Court case and in that case the court found personal

23  jurisdiction over Florida reporters who wrote defamatory

24  articles about a California actress because "California was the

25  focal point of the story and the harm suffered."  The actions

1   were expressly aimed at California and they knew that het brunt

2   of the injury would be felt by the actress in the state in

3   which she resides and works.  That's the point here.

4        I live and work in Maryland.  They tried to destroy

5   my nonprofit here in Maryland.  And in the Fourth Circuit in

6   ALS Scan v. Digital Service Consultants you know that had to do

7   with an electronic internet activity and they said basically

8   the same thing.  A court can exercise jurisdiction over a

9   person out of state when the person 1) directs electronic

10  activity into the state which they did and with the manifested

11  intent of engaging in business or other interactions within the

12  state they came after me.  They came after my business.  They

13  had everybody blog about Howard County prosecutors who Howard

14  County's in Maryland.  They did that because Howard County

15  wouldn't buy into their frivolous complaints.

16        THE COURT:  Well you keep saying they, so all of a

17  sudden you're lumping every one of the defendants --

18        MR. KIMBERLIN:  I'm not saying they, I'm saying --

19        THE COURT:  You said they.

20        MR. KIMBERLIN:  -- you know let's talk about these

21  defendants.  And so in ALS Scan the court held that this

22  internet blogging or internet activity that talked about a

23  specific party gives the court jurisdiction over the case.  And

24  you know there was another case Hair v. Ritchie which was in

25  the federal court and the court said the same thing but in that

1   case they made a very interesting distinction or point.  And

2   they said well not only do they direct it to the state but they

3   also ask for comments and they generate comments.  That's what

4   these defendants do or did.  They post these articles, they

5   generate comments and many of those comments come from people

6   in Maryland.  And so that's --

7            THE COURT:  Let me, the argument that he makes to the

8   extent that all they're doing is posting comments then why

9   aren't they protected under the federal statute?

10           MR. KIMBERLIN:  I'm not saying, that's a CDA argument

11  which I haven't even gotten to yet you know.  But my point is

12  you're asking about directing it to Maryland.  I'm saying if

13  there are commenters in Maryland it's being directed to

14  Maryland and you know in Mackie v. Compass Marketing the

15  Maryland Court of Appeals you know said that you know where

16  there's a conspiracy which I've alleged the court has personal

17  jurisdiction over over conspirators.  Now if you want me to

18  amend my complaint to make the conspiracy count stronger, you

19  know, to grant personal jurisdiction over all these defendants

20  then I have to do that.  You know, but you know, I mean there's

21  just so many articles that Michelle Malkin and Twitchy wrote

22  about Brett Kimberlin, about my nonprofit justice through

23  music, about going after funding for my nonprofit.  That's

24  directed to Maryland because that nonprofit is in Maryland.

25  I'm the director of that nonprofit.  I mean if they're

1  attacking my funding, if they're attacking my contracts with

2  the State Department you know to help activists overseas that's

3  directed towards Maryland.  It's not directed towards you know

4  something else.

5          THE COURT:  Well, but where is the contract entered

6  into because if the contract is entered into in D.C. it may be

7  that it's really directed toward D.C. and the federal

8  government.

9          MR. KIMBERLIN:  Or it may have been, the point is the

10 contract affects my employer and my business and my activities.

11 And I think that's where the court has jurisdiction.  You know

12 if I'm doing legal, legitimate employment activities in

13 Maryland and the defendants are saying you know, destroy those

14 activities, you know get this guy fired, throw him in prison,

15 don't let him be an activist, don't let him you know work with

16 the State Department, don't let him do any of these things that

17 he does for 10 or 12 years that's directed to Maryland.  It's

18 not directed to anybody else.  It's not directed to Nebraska.

19 It's directed to me.  It's all about Brett Kimberlin.  Brett

20 Kimberlin lives in Bethesda, Maryland.

21         THE COURT:  Right but that argument that you just

22 made to me also assumes because you said it's directed at the

23 activities I engage in in Maryland it assumes two things.  One

24 is that the activities you engage in in your organization

25 justice through music I think it is --

1          MR. KIMBERLIN:  Yes.

2          THE COURT:  -- that those activities occur in

3   Maryland and that's not at all clear from the complaint that I

4   read.  As far as I know those activities could be provided

5   anywhere around the world.  I don't know if you go to them,

6   they come to you or they come to Maryland or wherever, but your

7   argument assumes that your activities occur here in Maryland

8   and that they know or reasonably should know that the

9   activities occur here in Maryland.

10          MR. KIMBERLIN:  Well I think I as far as the

11   activities in Maryland, some of these defendants posted

12   pictures of activists at my office in Maryland from the State

13   Department brought to my office in Maryland.  I mean it's

14   pretty clear that they were attacking the activities that we

15   were doing in Maryland with these activists.  So I just think

16   it's you know it's a stretch to say this court doesn't have

17   personal jurisdiction when --

18          THE COURT:  Okay.

19          MR. KIMBERLIN:  -- you know when all these defendants

20   were targeting me right here in Maryland.

21          THE COURT:  Okay.

22          MR. KIMBERLIN:  And as far as the CDA you know Mr.

23   Smith is a little disingenuous.  In his briefs he argued that

24   the CDA applied both, Michelle Malkin and Twitchy.  I mean it

25   sounded like a minute ago that he backed off of that and said

1  it doesn't apply to Malkin.  But --

2          THE COURT:  Well what I think what he said is to the

3  extent that there are reposting that it doesn't, sorry --

4          MR. KIMBERLIN:  Right.

5          THE COURT:  -- it does apply to the extent that

6  there's content.  It wouldn't apply --

7          MR. KIMBERLIN:  Right.

8          THE COURT:  -- but there's no specific content

9  alleged in the complaint.

10          MR. KIMBERLIN:  All right, so --

11          THE COURT:  Content created by them that is which is

12  the basis of the complaint.

13          MR. KIMBERLIN:  I mean in the complaint and maybe I

14  should have you know posted the blog.  I mean a lot of time

15  they just posted the link and I apologize, maybe that wasn't

16  the right thing to do.  But you know Twitchy works like this.

17  The Twitchy staff writes a blog post and then they say these

18  tweets posted by other people have to do with this particular

19  issue.  So blog post starts the thing and then the tweets

20  follow them.  And so you know obviously the tweets could

21  possibly fall under the CDA.  But the content that's before the

22  tweets you know would be content wouldn't fall under the CDA.

23          THE COURT:  So the headline?

24          MR. KIMBERLIN:  Not the headline the, there's the

25  headline and then there's text.  It's created by the Twitchy

1  staff.

2          THE COURT:  Okay.

3          MR. KIMBERLIN:  And that is not protected by the CDA.

4  The tweets that are created by somebody else or the comments to

5  that post by other people you know would be protected.  And I'm

6  not out there arguing that some you know Joe Blow from Nebraska

7  can't comment about something that Twitchy does.  That's not

8  this case.  I'm saying when Michelle Malkin or Twitchy you know

9  goes out there and says you know Kimberlin swatted another

10 person or another conservative blogger or something like that,

11 that's you know that's the issue because I didn't swat anybody.

12 I had nothing to do with the swatting and you know in fact, you

13 know, somebody's been arrested for it.  So I mean it has

14 nothing to do with me and that's my point.

15         THE COURT:  Okay.

16         MR. KIMBERLIN:  And so the CDA doesn't apply there.

17 And I you know I think several of these defendants and maybe

18 some others have argued about the personal jurisdiction.

19         THE COURT:  Well we'll get to them in a few minutes.

20         MR. KIMBERLIN:  You know but the argument is

21 basically the same you know that they've directed this at me.

22         THE COURT:  Okay.

23         MR. KIMBERLIN:  If this court doesn't have

24 jurisdiction who does?

25         THE COURT:  Okay, anything you want to say in

1   response to his argument that you really did direct the

2   activity to Maryland well I guess one he's saying that Twitchy

3   creates the headline and sort of gets the ball rolling but puts

4   the narrative out there and that that is what this is aimed at.

5             MR. SMITH:  Well, and --

6             THE COURT:  So CDA wouldn't apply to that.

7             MR. SMITH:  Correct, and that I think goes far beyond

8   the bounds of his complaint.  I didn't gather that kind of

9   explanation from reading the bounds of the complaint.  But

10  accepting that as true for purposes of this argument, the re-

11  tweets clearly are protected.

12            THE COURT:  He agrees.

13            MR. SMITH:  Yes, and any original content likely

14  would not be.  I'd have to sit down and look at the terms of

15  the statute as applied to what he's now alleging.

16            THE COURT:  Well what about his argument, well he

17  argued about the activity toward Maryland because he lives in

18  Maryland, his business is in Maryland and --

19            MR. SMITH:  That case is Young, Your Honor.  Young

20  direct controls that.  That's the same argument that the

21  prisoner warden, the Virginia prison warden and Young made

22  saying the newspaper in Connecticut is writing about me running

23  this prison down here.  It's directed at Virginia where I live,

24  where I work and the Fourth Circuit explained in detail how

25  that sort of argument doesn't suffice to meet the minimum

1   context test.  Because otherwise as Your Honor points out

2   people who are out there blogging are going to be getting

3   called in to 50 different courts on a routine basis.

4        THE COURT:  But in Young wasn't that the story in

5   Connecticut was about prisons in general and Virginia was just

6   one that they mentioned a number of prisons and so it really

7   wasn't the primary subject of the article.

8        MR. SMITH:  No actually, Your Honor, Connecticut had,

9   as I understand it, had privatized its prison function so the

10  prisoners were being sent, Connecticut prisoners were being

11  sent to this prison in Virginia.  And the Connecticut newspaper

12  wrote an article saying this prison in Virginia is mistreating

13  our prisoners that we send there.  So in that sense you know

14  clearly it wasn't an article just based on prison conditions in

15  general or you know a slice of prison life in southeastern U.S.

16  It was the Connecticut paper specifically pointing out that

17  this Virginia prison, this Virginia prison warden is

18  mistreating the prisoners that we send them.  And the Fourth

19  Circuit held that under the appropriate minimum context test

20  you can't take that to extend jurisdiction over that website

21  because it's non-sufficient.

22        THE COURT:  And what about the cases he cites to?

23        MR. SMITH:  Well I think the Supreme Court case that

24  he cites we discussed briefly in our reply and I think it also

25  predates the website analysis that you see in some of these

1   cases now, Zip O Manufacturing, ALS Scan, Young, our Court of

2   Appeals decision and CSR Limited, I think all these cases

3   demonstrate how in this era of new technology we're going to

4   apply the personal jurisdiction rules and it can't be as simple

5   as just saying well I'm in Maryland.  I was hurt in Maryland.

6   And as Your Honor points out and we have pointed out in our

7   reply some of the alleged injury even under the complaint's own

8   terms would have been in D.C. because there's this matter of

9   the nonprofit contracting with the State Department.  And if

10  you accept the theory that the malicious intent was to sour the

11  nonprofit's contract with the State Department then that would

12  have been a harm directed toward D.C.

13          But I think his theory as he's pleaded it and as he's

14  articulated it here in court today is really under the four

15  corners of Young.

16          THE COURT:  Okay, thank you.

17          MR. SMITH:  And that's all that I have, Your Honor.

18          THE COURT:  Okay, so next we have Breitbart.

19          MR. BAILEN:  Good morning, Your Honor, Mark Bailen on

20  behalf of Breitbart.com.

21          THE COURT:  Mr. Bailen.

22          MR. BAILEN:  Your Honor, as you know we filed two

23  motions, one to dismiss failure to state a claim and for lack

24  of personal jurisdiction and a second motion on the Maryland

25  anti slap issue.

1            Just briefly, the Breitbart.com is a news and

2    analysis and opinion website.  It covers national and political

3    events.  And in this complaint we identified I think there were

4    four articles that were published on Breitbart.com.  Other than

5    those four articles there are no other allegations about

6    Breitbart.com specifically.  There's a mention --

7            THE COURT:  Mr. Kimberlin, you can have a seat.

8            MR. KIMBERLIN:  Okay.

9            THE COURT:  Go ahead.

10           MR. BAILEN:  There's a mention of Andrew Breitbart

11   who was the founder of Breitbart.com and is not a defendant

12   here.  He passed away actually in 2012, nor his personal

13   representative or anything like that.  So it's just a company

14   and the only allegations again were or is that there were four

15   articles that were published by Breitbart.com that Mr.

16   Kimberlin claims caused the four causes of action.  And one is

17   false light, interference with economic advantage and potential

18   motion to stress and conspiracy.

19           I'd just like to talk briefly about the articles.  In

20   the first article that he identified which is on page 9 of the

21   complaint is an October 11, 2010 publication and under any

22   interpretation of the statute of limitations as to false light

23   or the other torts that's beyond the three year period.  The

24   federal complaint is filed October 15th, 2013.  So any way you

25   cut it that article is out.  One other point about that article

1   based on what Mr. Kimberlin was saying this morning I think it

2   sounds from his argument is that he's actually withdrawing the

3   claim relating to that article anyway.  He specifically said

4   earlier in response to argument that his claim is really about

5   the allegations of swatting that he's being accused of being a

6   swatter.  And that article was in 2010.  It talked about Mr.

7   Kimberlin's background, about the convictions and so forth but

8   there's no mention of any swatting in that article because

9   frankly it happened was in 2010.  And swattings I believe were

10  in early 2011, but certainly the ones that relate to the

11  Breitbart publications didn't occur until 2012.  So that

12  article right off the bat has problems because of the statute

13  of limitations but also based on Mr. Kimberlin's own

14  concessions during argument.

15         The next one is on page 24 which is a June 8, 2012

16  article that commented and reported on an incident involving

17  Erik Erickson who was the editor-in-chief of Red State.com and

18  the fact that he had gotten swatted.  The article, I do not

19  believe even mentions Kimberlin at all and there's no

20  allegation direct or otherwise that Mr. Kimberlin was a

21  swatter.

22         The next article is on page 30, the complaint June

23  25, 2012 article that related to swatting event incident

24  involving Mr. Walker.  Again he reported on the incident and it

25  was about how, it mentioned Mr. Kimberlin there but nothing to

1  do with the idea that he was a swatter or anything.  It

2  mentioned that Mr. Walker had won a court victory that day or

3  around that time against Mr. Kimberlin, that's all.  And it

4  just reported that.

5          The last one is on page 35 of the complaint.  That

6  was a November 8th, 2012 article and that was a report

7  basically reporting that LA Weekly a news magazine in Los

8  Angeles had reported about Patrick Frey the Los Angeles County

9  District Attorney and how he had gotten swatted.  Again no

10  allegation that Mr. Kimberlin was a swatter or anything like

11  that.

12          So that's the universe here with respect to

13  Breitbart.com.  So when it comes to false light you know one of

14  the key issues with false light or defamation is that you need

15  to have a false statement whether direct or implied, implicit

16  or explicit and there's nothing here that can satisfy that.  It

17  also fails under the other elements of false light.  It's not

18  highly what they wrote, those articles are not highly offensive

19  to a reasonable person.  There's no way you can make that

20  conclusion especially the ones that don't even mention Mr.

21  Kimberlin's name at all.  And finally the issue and there's no

22  allegation of actual malice.  False light unlike, and there was

23  reference to this earlier, and I just want to be clear

24  defamation in order for the actual malice test to come into

25  play that's where the public figure doctrine that the Supreme

1    Court in <u>New York Times v. Sullivan</u> created the public official

2    and then later the public figure doctrine to address the

3    situations for actual malice.

4            As the laws developed with respect to false light

5    however, the element of actual malice is in the statute, rather

6    is in the law, in the common law is one of the elements false

7    light in the case <u>Bagwell v. Harvey</u>, <u>Bagwell v. Regional</u>

8    <u>Medical Center</u>, Maryland Special Court of Appeals case in 1995

9    specifically lays that out.  And there's no requirement that

10   there be a showing that the person involved be a public figure

11   or public official.  And that in turn requires the plaintiff to

12   allege facts that there's actual malice to satisfy this claim.

13   And he doesn't allege any facts that Breitbart.com knowingly

14   published anything false or even acted in such disregard or had

15   substantial doubts about anything that it published.  There's

16   actually a complete dark of any evidence with respect to actual

17   malice.  There's some conclusory allegations that they acted

18   with malice and that they didn't do due diligence.  But the

19   Supreme Court specifically found <u>Harkins v. Nine</u> for instance

20   that the failure to investigate or do due diligence alone is

21   not sufficient for actual malice.  So based on the allegations

22   of this complaint that actual malice element can't be met

23   either.

24           We also addressed in our papers the issue that you

25   discussed earlier and was very cogently argued by Mr. Smith the

1   issue of the statute of limitations and while we don't believe

2   the Court necessarily needs to reach that issue and I can

3   understand why with the Court of Special Appeals decision out

4   there the Court may not want to, but nonetheless we do believe

5   that the Viscutelli ruling has sort of emphasized what the

6   courts across the country have come to the conclusion which is

7   that false light and defamation really are one and the same

8   animal and it would be not only unfair but unreasonable to

9   treat them differently with respect to any of the elements or

10  the statute of limitations.

11          So again I don't think the Court needs to reach that

12  based on all the other arguments as to with respect to

13  Breitbart.com why you can't make that a false light claim.  But

14  we believe that the statute should be a one year statute.  And

15  that's clearly what Mr. Kimberlin tried to do here.  He first

16  in the federal case he did allege the one year and I mean he

17  alleged defamation and then once he saw that he had the statute

18  of limitations problem he fell back on the false light and took

19  out his defamation claims.

20          And speaking of the federal case there's just one

21  thing I wanted to point out.  You asked Your Honor earlier

22  about the issue with respect to the Court dismissing claim and

23  so forth.  The way it worked in the federal case is Mr.

24  Kimberlin filed his initial complaint on October 15th, 2013.

25  Two days later he voluntarily as he has the right to do filed

1   an amended complaint.  And then eventually got around to

2   serving people and defendants in this case with the amended

3   complaint.  On behalf of a number of defendants I moved to

4   dismiss that complaint in or around January or February of

5   2014.  At the same time Mr. Kimberlin was trying to serve a

6   number of other defendants.  There were 24 in total and the

7   whole case kind of got very messy.  This was before Judge Grimm

8   at the time before Judge Hazel was appointed to the case.  And

9   there were allegations about service and fraudulent summons

10  being issued, things like that so it got very messy.  And the

11  court basically said that he was going to allow Mr. Kimberlin

12  to amend his complaint but that was it.

13          THE COURT:  For the second time.

14          MR. BAILEN:  For a second time, correct.  So he had

15  already amended it once voluntarily but then you have to have

16  leave of court to amend it again.  The court gave him leave to

17  amend it a second time.  He had already seen, our motions were

18  already on file so these arguments it's particularly concern I

19  would say the conspiracy claim because in my view the same

20  arguments that we raised in defense of the RICO are the ones

21  that would be applicable here too about the conspiracy.  And

22  Mr. Kimberlin was on notice of those claims based on our

23  motions that were file in again early 2014.  Mr. Kimberlin was

24  given the opportunity to amend the complaint, which he did in I

25  believe probably April or May of 2014.  We then filed a new set

1    of motions to dismiss over the summer and it was in the fall

2    that Judge Hazel then dismissed for my clients and for all of

3    the defendants except for one all of the federal claims and

4    then he decided that he wasn't going to exercise jurisdiction

5    over the state laws.  So that's sort of the procedural history

6    with respect to the federal case.

7            As to the other claims against Breitbart.com

8    interference with respect to business advantage, I mean we lay

9    this out --

10           THE COURT:  Well let me ask this.  Was there any

11   claim other than the RICO claim which basically is an

12   enterprise/conspiracy of conspiracy among the defendants under

13   federal claim?

14           MR. BAILEN:  Now there's the violation of the civil

15   rights act.  There was a state or another civil conspiracy

16   claim that was dismissed without prejudice similar to the one

17   that he's alleged here.  But that was again for state law

18   claims.  And federal no, there were only three claims if I

19   recall correctly against the defendants that were federal.  One

20   was the RICO.  One was the 1983 and again that was only against

21   the government officials or people who were acting under color

22   of state law and then a civil rights 1985 claim.  So those were

23   the three federal claims, then there were a number of state law

24   claims, probably another seven or eight state law claims on top

25   of that.

1        THE COURT:  Did Judge Hazel in dismissing the RICO
2  claim explain the reason that he dismissed the RICO claim?
3        MR. BAILEN:  He did.  He went into great detail --
4        THE COURT:  Which was --
5        MR. BAILEN:  -- which was that he was afraid it
6  didn't meet really any of the elements of the RICO claim
7  whether it be establishing the enterprise, establishing
8  conspiracy to commit the underlying predicate acts.  As Mr.
9  Kimberlin pointed out there's a 31-page decision.  And frankly
10  if you look at one of the footnotes at the end of the decision
11  where he granted leave to Mr. Kimberlin to file the state law
12  claims he did note that if I remember correctly there was a
13  reference to the fact to the extent that res judicata or
14  collateral estoppel doesn't prevent them.  So I don't know --
15        THE COURT:  But he makes specific reference in
16  dismissing the claim to there being no evidence of a conspiracy
17  among the defendants?
18        MR. BAILEN:  I believe so, Your Honor.  Again, I've
19  not read the decision recently, but I believe the basis, my
20  recollection was that he found that all of the elements of the
21  RICO claim were not adequately alleged.
22        MR. KIMBERLIN:  Your Honor, I have a copy of the
23  decision if you'd like that.
24        THE COURT:  That's okay, you can give it to counsel.
25        MR. BAILEN:  The other claims against Breitbart.com

1  are the interference with respect to business or economic

2  advantage and the intentional emotional stress.  Again, there's

3  just really no allegations with respect to Breitbart.com about

4  how they in any way interfered with any of his business other

5  than publishing articles, again some of them don't even mention

6  him.  So he's relying solely on the publication of those.  He's

7  also the intentional emotional stress again it's the

8  publication and the Supreme Court case basically said you can't

9  do the Enron around the First Amendment by alleging these non

10  "publication torts."  Here First Amendment he clearly can't

11  establish the actual malice element for instance; can't

12  establish his false light claim, his intentional emotional

13  stress has to fail on that ground as well as the fact that he

14  simply has not alleged the kind of behavior by Breitbart.com by

15  publishing four articles that would suffice.

16         Finally with respect to personal jurisdiction you

17  know I think again Mr. Smith, you know cogently argued the

18  point about Young.  I actually worked on that case and the

19  trial judge in that case had a lot of the same reservations

20  that anyone would have which is you know this was targeted to

21  this, about your story about the warden, this was down in

22  Beachstone Gap way down in southwest Virginia.  It's like he

23  wrote a story about the warden in our prison.  How could you

24  not be targeted?  And he denied our motion to dismiss.  We

25  brought it to the Fourth, he though, he certified it though for

1   us and we brought it to the Fourth Circuit.  And just as Mr.

2   Smith described Fourth Circuit overturned the trial court

3   ruling and found that even though the article was about the

4   warden and it was about Virginia prisons which were based down

5   there and it was really targeted and somewhat about Virginia

6   because again these are Connecticut prisoners that were being

7   sent down there.  So Connecticut residents are being sent down

8   to Virginia to the prison.  You would think that their

9   jurisdiction the court said no.  It was one of the first

10  personal jurisdiction cases to deal with the internet and the

11  court said just as Mr. Smith said.  I won't repeat everything.

12  But that's not sufficient to establish jurisdiction.

13          The case called Calder v. Jones, I'll just briefly

14  talk about that.  The Supreme Court, that was the National

15  Enquirer case suing California and you know they pointed out

16  that the National Enquirer's largest circulation subscribers

17  were based on California.  This is before the internet.  The

18  courts looked very carefully how you know where the newspaper

19  is distributed in that state.  That issue came up actually in

20  the Connecticut case, in the Young v. Advocate too because

21  there were some actual hard copies of the paper distributed

22  especially in Northern Virginia, that paper but not very many.

23  Whereas in the National Enquirer case Calder v. Jones I think

24  as I said the largest part of their circulation was in

25  California.  And before the internet that was really where the

cgg                                                                      56

1   court's focus was on where were the subscribers of the paper

2   who were actually reading it in addition to these other factors

3   that they talked about.

4              THE COURT:  And was the subscription for pay case?

5              MR. BAILEN:  Subscription for pay, exactly.  And here

6   Breitbart.com is not a subscription service.  It's a website

7   just like any other you can access it as Your Honor pointed out

8   anywhere in the world in Australia, Europe, anywhere or here in

9   the United States.  Maybe not some places like China where they

10  might block it, but it's basically available to anyone who is

11  on the internet.  They do not target anyone in particular,

12  region or anything like that in particular or at least with

13  respect to Maryland.  They do actually have a Texas website.

14  Part of their website is dedicated to Texas and so forth, but

15  not Maryland.  So there's nothing that they do that targets

16  Maryland in any way.  And frankly there's no allegation in the

17  complaint that they knew nor did they know really anything

18  about Mr. Kimberlin other than what they were reporting on.

19  And again two of the articles they published didn't even

20  mention him.  So it simply can't suffice to be the personal

21  jurisdiction.

22             The last thing is the motion for the anti-slap.  I

23  think you know, my client there's some exasperation here.  You

24  know this has been going on for a long time.  All they did was

25  publish four publications of which they did not make any direct

1   accusations about Mr. Kimberlin.  They reported about his --

2           THE COURT:  But let me ask you, as I understand, he

3   says that Judge Hazel in the federal courts denied a petition

4   for attorney's fees finding that it was not brought in bad

5   faith and basically didn't necessarily invite him, but said he

6   could pursue the state court claims in state court if he

7   wanted.  So since I'm required to find that he acted in bad

8   faith, how on a motion could I find that he acted in bad faith?

9           MR. BAILEN:  Right, well addressing Judge Hazel's

10  point he was responding to a specific motion by a specific

11  party.  It's not my party's.  I did not file that motion.  He

12  was not considering the evidence as it related to the

13  allegations against my client, Breitbart.com.  He was

14  considering it with respect to the party that filed the motion.

15  At least I think his order doesn't say that it's directed to

16  the other defendants.  And I think the allegations in the

17  complaint varied significantly between different parties.  As I

18  pointed out there's four articles that mention Breitbart.com,

19  that reference Breitbart.com.  And so from my clients

20  perspective and my perspective this case is about my client

21  Breitbart.com which is being sued to be hauled into two courts

22  now and just had to file the third time that we had to file a

23  motion to dismiss.  And it's based upon the fact that we

24  published four articles, two of which didn't mention Mr.

25  Kimberlin; talked about events of public interest.  The fact

1   that you know a SWAT team, police are being sent to people's

2   homes under fraudulent circumstances.  That's definitely public

3   interest, something of public concern.  And instead they got

4   hauled into as I said a Maryland court, first federal court and

5   now into state court and they're a California corporation.  And

6   their offices and business is operated out of California.

7           And they, and if you'll look at the allegations, the

8   claim against my client I think Your Honor can make a finding

9   that that's bad faith to sue Breitbart.com.  This doesn't have

10  to do with any of the other defendants.  It has to do with this

11  specific defendant, was this defendant included in the

12  complaint, were there sufficient grounds to include in the

13  complaint?  In my view absolutely not.  And then to do it after

14  one motion to dismiss is filed.  Second motion to dismiss is

15  filed and now a third motion to dismiss is filed.  And I think

16  at some point there's got to be an end to all of this.  And if

17  that's not bad faith frankly you know they find it as vexatious

18  litigation.  From my client's view this is vexatious

19  litigation.

20          THE COURT:  Was there argument in federal court about

21  the first article being beyond the statute of limitations and

22  not actionable in any event or he didn't bring that defamation

23  claim in federal court or no claim where the statute of

24  limitations was an issue as to that first article in federal

25  court?  I mean basically was the argument that the first

cgg                                                                          59

1  article was beyond the statute, well I guess in federal court

2  that would have been different.

3       MR. BAILEN:  Actually, the first complaint he alleged

4  defamation.  So we pointed out in our first motion to dismiss

5  defamation can't --

6       THE COURT:  In federal court.

7       MR. BAILEN:  In federal court, I'm sorry, in federal

8  court the first motion to dismiss that we filed we pointed out

9  defamation can't stand here.  That's when the court granted him

10  the leave to amend.  He amends, takes out the defamation claim

11  against my clients and then asserts a false light claim and

12  that's what we litigated in the second motion to dismiss.

13       THE COURT:  Okay, but in that second motion to

14  dismiss that you litigated in federal court I guess his filing

15  in that instance had been within three years of viewing the

16  first article so that argument wasn't presented in federal

17  court as to the first article.

18       MR. BAILEN:  No, no, actually the first article we

19  did present that.  We presented that argument, I'm sorry, yes,

20  absolutely, we've always presented the argument about the

21  October 11, 2010.  That was presented because that article was

22  barred.  Again the federal --

23       THE COURT:  And Judge Hazel found that article was

24  barred by the statute of limitations or never reached it?

25       MR. BAILEN:  He never reached it because again it was

1   part of the state claims.

2           THE COURT:  Yes.

3           MR. BAILEN:  And he never addressed either way.  I

4   don't think you can read into Judge Hazel's ruling either way

5   how he viewed the state claims.  For whatever reason with

6   respect to one of the defendants there might have been a couple

7   of defendants that filed for the motion for attorney's fees,

8   you know.  He doesn't get into the allegations with respect to

9   my clients as to whether or not these were in any way colorable

10  claims.

11          THE COURT:  Okay, and you say that the Fourth Circuit

12  case involving the newspaper article from Connecticut in that

13  case the article in Connecticut was not an article about

14  prisons in general.  It was specifically about the prison in

15  Virginia where the Connecticut prisoners were being housed.

16          MR. BAILEN:  The lion share there, the purpose of the

17  article was about the Connecticut prisoners going down there

18  and that's why the New Haven advocate was interested in writing

19  a piece about a Virginia prison was because there were

20  Connecticut residents who were prisoners, people who were being

21  convicted of crimes in Connecticut were being sent to that

22  prison.  Whether the article also had mentioned other prisons

23  or other places around the country I don't recall.  It might

24  have talked about how this is common that states will you know

25  essentially contract with other states or private prisons to

1  handle their prisoner population.

2            THE COURT:  But the principal subject of the article

3  was the Virginia prison.

4            MR. BAILEN:  But absolutely and there was specific

5  reference to this warden, the plaintiff in that case --

6            THE COURT:  Okay.

7            MR. BAILEN:  -- in the article.

8            THE COURT:  Okay, have a seat.  So how can you

9  distinguish Young then from your case?

10           MR. KIMBERLIN:  Young involved defamation.

11           THE COURT:  It's personal jurisdiction issue.

12           MR. KIMBERLIN:  Yeah, well a couple reasons, first of

13 all in Young it was one article involving one issue or one

14 statement.  In my case we have a, I've alleged a conspiracy.

15 I've alleged a campaign.

16           THE COURT:  But the false light really, I mean you've

17 told us here your complaint is they're accusing you of swatting

18 which is defamation.  It may be false light and conspiracy

19 can't exist in the absence of some other tort.  So the

20 underlying tort will get back to the defamation and/or false

21 light.  So you're basically talking about defamation anyway.

22           MR. KIMBERLIN:  Well not really because I'm saying

23 that the false light becomes outrageous.  The defamation just

24 could be a false statement about somebody and it's a simple

25 defamation.  You know in this particular complaint I only have

1  defamation against two people that aren't even here, two

2  defendants.  You know I'm alleging false light in this case

3  because of a campaign to destroy me, my ability to earn a

4  living, to portray me as a swatter of conservative bloggers, to

5  destroy my ability to have contracts with the State Department

6  or anybody else.  As far as the complaint, you know, and I

7  think that I was probably being a little cautious because of

8  the way Judge Hazel had handled the case in federal court about

9  not making the complaint a thousand pages long.  I mean these

10 people have spent years calling me a swatter.  There are

11 hundreds of articles out there, there are probably thousands of

12 tweets.  Did I want to list all of those in the complaint?  I

13 don't think Your Honor would want that.  I don't think a jury

14 would want.  I don't think these guys would want it.  You know

15 in a complaint I tried to say that this is a campaign to

16 portray me in false light, not that this specific you know each

17 one of these are the only ones.  That's not what I did.  My

18 complaint says there's a campaign to portray me in false light.

19 You know Mr. Bailen, I like Mr. Bailen.  You know we just

20 settled two cases.  You know we talk all the time, but you know

21 he says this is four articles by Breitbart.

22          THE COURT:  Yes.

23          MR. KIMBERLIN:  Those four articles mentioned in the

24 complaint, but I also say there's a campaign by these

25 defendants to do this.  There's a conspiracy by these

1   defendants to do this.

2           THE COURT:  Right.

3           MR. KIMBERLIN:  This makes it much broader and you

4   know he's talking about personal jurisdiction.  And you know it

5   was Breitbart --

6           THE COURT:  But of the four that you chose I would

7   assume you would pick the best four.  And the four that you

8   chose as he points out I think don't even mention you.

9           MR. KIMBERLIN:  Obviously they don't mention me by

10  name.  They mention me in context.  They impute and this is a

11  part of the campaign.

12          THE COURT:  But stop for a second because the one in

13  2010 --

14          MR. KIMBERLIN:  That's forget it.

15          THE COURT:  -- couldn't possibly have --

16          MR. KIMBERLIN:  I'm not going to argue that.  That's

17  beyond the statute of limitations.

18          THE COURT:  So why did you stick it in the complaint

19  then?

20          MR. KIMBERLIN:  Because it shows context.  It shows

21  that's where it started.  Mr. Breitbart is a I don't know if

22  you know anything about him, but he was a right wing

23  conservative activist extremist, tea bagger whatever you want

24  to call him and you know he has a very powerful blog and he can

25  sic his blog on people like he did with Acorn.  You know they

 1   destroyed Acorn because of Breitbart.  You know Mr. Bailen is a
 2   lawyer being sued by Shirley Siroid by Breitbart.  So my point
 3   is that just gave context to the complaint.  And I'm not saying
 4   that that specific article you know has anything to do with
 5   swatting, it doesn't.  It's beyond the statute of limitation.
 6              THE COURT:  Okay.
 7              MR. KIMBERLIN:  But it's part of the story.  You know
 8   it's just like me being convicted of something 40 years ago
 9   doesn't have anything to do with the complaint, but it has
10   context, you know.
11              THE COURT:  Yes.
12              MR. KIMBERLIN:  And so you know to lay out a
13   statement of facts that's context.  But you know personal
14   jurisdiction and campaign and destruction of me and my employer
15   you know, it was Breitbart that posted my photo and a picture
16   of activists sitting in my office in Maryland you know to talk
17   about State Department introduces Arab visitors to convicted
18   bomber Brett Kimberlin.  It was Breitbart that said Kimberlin
19   funders --
20              THE COURT:  Stop for just a second, go back to the
21   one you just talked about.
22              MR. KIMBERLIN:  Yeah.
23              THE COURT:  You said your complaint here is that a
24   campaign to destroy you by accusing you swatting --
25              MR. KIMBERLIN:  Uh-huh, right.

1          THE COURT:  And the article you just read to me is an

2    article where they post a picture of you and they said State

3    Department introduces Arab diplomats, Arab somebody to

4    convicted bomber.  Well you are a convicted bomber so none of

5    that would be true, I'm sorry none of that would be untrue.

6          MR. KIMBERLIN:  The context here is to destroy my

7    ability to have a contract with the State Department.  And then

8    they go again go after my funders.  Of course these things you

9    know they can say that I'm a bomber.  They can do all that kind

10   of stuff all day long.

11         THE COURT:  You agree they can say it?

12         MR. KIMBERLIN:  I can say that, yeah.  I don't have

13   any problem with that.

14         THE COURT:  Okay, but then you just read me an

15   article where they said I complained about it.

16         MR. KIMBERLIN:  No, I said when you read the article

17   and the article talks about squatting or something like that,

18   to make me appear in false light that's what this is about.

19         THE COURT:  Yes.

20         MR. KIMBERLIN:  To make me appear as something, if

21   something happened 40 years ago doesn't have anything to do

22   with what I'm doing now.

23         THE COURT:  Yes.

24         MR. KIMBERLIN:  You know I'm not out bombing people.

25   I'm not out committing crimes.  I'm running a nonprofit.  I'm

 1   the director of a nonprofit.

 2          THE COURT:  Okay.

 3          MR. KIMBERLIN:  I work with young people.  You know I

 4   work with the State Department.  I meet with congressmen all

 5   day long.  And that's what I do.  It's not, you know to portray

 6   me as a criminal swatter because of something happened 40 years

 7   ago is false light.  That's what they're doing.  That's just

 8   like what they did with Acorn.

 9          THE COURT:  We get back to it all gets down to them

10   portraying you as a swatter.

11          MR. KIMBERLIN:  It comes down to portraying me as a

12   swatter.

13          THE COURT:  Right.

14          MR. KIMBERLIN:  And, you know, if Mr. Bailen or the

15   Court or any of the other defendants you know wants more

16   specificity in this complaint, I mean it's 61 pages long as it

17   is.

18          THE COURT:  You know you yourself in your complaint

19   in the 61 pages frequently use the term impute --

20          MR. KIMBERLIN:  Yeah --

21          THE COURT:  -- or imply as opposed to putting forth

22   in quotes from an article from a blog so and so defendant

23   reported that Brett Kimberlin is a swatter.  Well I did some of

24   that.

25          MR. KIMBERLIN:  Well, I did some of that.  I mean,

1  there are places in there that I said that.  But, I mean, the

2  case law on these types of torts is you can impute and the

3  opinion even allows --

4           THE COURT:  Let me tell you, the case law on

5  defamation, liable, even intentional infliction for emotion

6  distress is there's a heightened pleading requirement for each

7  of those torts and particularly with defamation and liable

8  you're required to give them notice by telling them what it is

9  that they said precisely that is actionable.  When it is that

10 they said it and to whom they said it.  Generally those are the

11 requirements for defamation and liable because it's so easy to

12 say somebody defamed me and so hard to defend unless you know

13 specifically what it is that they said; to whom they said it

14 and when it was that it's said.  So that's the law of Maryland

15 with respect to those two torts.

16          MR. KIMBERLIN:  Well, but --

17          THE COURT:  -- and with respect to intentional

18 infliction, that's generally a disfavored tort.  And there

19 there's a heightened pleading requirement just as there is for

20 fraud --

21          MR. KIMBERLIN:  Right.

22          THE COURT:  And if you're claiming punitive damages

23 typically.

24          MR. KIMBERLIN:  Well I mean of course the Supreme

25 Court, I'm not sure of the case but you know it says even

1   opinion can form the basis of a liable claim.  You know so if

2   somebody says I believe that he's a criminal swatter, you know,

3   that can be actionable under liable according to the Supreme

4   Court.  And so you know --

5            THE COURT:  Well that's not briefed and that's not

6   before me.  I'm not aware of that but you may be right.

7            MR. KIMBERLIN:  Well --

8            THE COURT:  I'm not saying you're wrong.

9            MR. KIMBERLIN:  I think Mr. Bailen could cite the

10  case.

11           THE COURT:  You may like him but he's not going to

12  cite it for you.

13           MR. KIMBERLIN:  He's not going to cite it for me but

14  I think he could.

15           THE COURT:  We'll never know I bet.

16           MR. KIMBERLIN:  But I would be happy to cite it for

17  you later on.  But you know the case law is pretty clear that

18  you can impute false light.  You don't have to say it directly,

19  but you know this complaint has to do with a campaign, a

20  sustained campaign, a persistent campaign, a vile campaign.

21  You know it wasn't one article written about some podduck

22  prison down in Virginia, you know.  We're talking about every

23  day.  We're talking about everybody blog about Brett Kimberlin

24  day.  You know how many people on earth have had an everybody

25  blog about them day, you know.  I don't know of any, maybe

1   Prophet Mohammed, you know, but anybody else?  I mean they

2   don't even blog about everybody blog about Hillary Clinton or

3   anybody, just me, you know, why?  Because they don't like the

4   work I do as a nonprofit director.

5            THE COURT:  Okay.

6            MR. KIMBERLIN:  Okay, and that's the point.  You know

7   when you talk about personal jurisdiction for these guys they

8   wanted to destroy me like they wanted to destroy Planned

9   Parenthood or MPR or Acorn, you know.  And a court has

10  jurisdiction over those things.

11           THE COURT:  Let me ask you this.  Is it correct that

12  Judge Hazel in dismissing your complaint in federal court --

13           MR. KIMBERLIN:  Yeah --

14           THE COURT:  -- in the 31-page opinion --

15           MR. KIMBERLIN:  Uh-huh.

16           THE COURT:  -- as Mr. Bailen seems to recall but he's

17  not positive or not certain that Judge Hazel found among other

18  things that you had failed to prove the existence of a

19  conspiracy among the defendants?

20           MR. KIMBERLIN:  No, he didn't.

21           THE COURT:  He didn't say that?

22           MR. KIMBERLIN:  Mr. Bailen was you know partially

23  correct.  But RICO conspiracy there's a difference between the

24  RICO conspiracy and you know just a plain old conspiracy.

25  So --

1          THE COURT:  Well plain old conspiracy versus what

2    other kind of conspiracy is there?  A conspiracy is a

3    conspiracy.

4          MR. KIMBERLIN:  Well I think under the RICO

5    conspiracy there's you know there's certain elements that

6    you --

7          THE COURT:  There are additional elements.

8          MR. KIMBERLIN:  You know the RICO is a very hard to

9    play.  A RICO case in federal court is very difficult.

10         THE COURT:  And I'm not disputing there may be

11   additional elements to the RICO claim, but my only question was

12   whether or not as part of his finding Judge Hazel found that

13   you had failed to prove the existence of a conspiracy.  And

14   your recollection is he did not say that.

15         MR. KIMBERLIN:  No, I don't believe that he said

16   that.

17         THE COURT:  Okay.

18         MR. KIMBERLIN:  You know I have one of the

19   interesting things you know some of the defendants asked for

20   Rule 11 sanctions against me for filing the case in federal

21   court --

22         THE COURT:  Yes.

23         MR. KIMBERLIN:  -- and the judge, Judge Hazel you

24   know issued a decision and I have it right here.  He said these

25   claims by Mr. Kimberlin were not frivolous as evidenced by the

1   court's lengthy memorandum opinion issued on March 17, 2015.

2           THE COURT:  Okay.

3           MR. KIMBERLIN:  That's what he said.  So you know

4   filed to find bad faith as Mr. Bailen talks about I think the

5   judge would have found Rule 11.  He didn't.  I mean he could --

6           THE COURT:  Well he said he didn't ask for sanctions.

7           MR. KIMBERLIN:  No, he didn't ask for sanctions.  The

8   other defendants asked for sanctions.  But the point is the

9   judge said that it wasn't frivolous.  And like I said earlier

10  if it were frivolous it had been frivolous the judge could have

11  said this is frivolous.  I'm going to dismiss it.

12          THE COURT:  Yes.

13          MR. KIMBERLIN:  He didn't.  He said I'm going to

14  dismiss it without prejudice, send it over to state court and

15  you guys can deal with state claims over there.

16          THE COURT:  Okay.

17          MR. KIMBERLIN:  And so and as far as the you know

18  anti slap I don't know any case where anti slap has ever been

19  won in Maryland.  I mean it's considered you know one of the

20  weakest anti slap statutes in the entire country, you know.

21  And you know there's several cases out there where people have

22  raised anti-slap arguments and you know the courts have

23  rejected them all.  I don't think they can even cite a case.

24  And you know if they were going to hit me with anti-slap

25  they've got to go after the ACLU.  They've got to go after

1  judicial blogs, they got to go after everybody out there that's

2  filing.  I mean I'm the director of a nonprofit that deals with

3  you know holding the people accountable.

4          THE COURT:  I understand --

5          MR. KIMBERLIN:  And you know you can't say that I

6  can't sue people.  I've only sued five people or five suits in

7  the last five years.  And I've won two or three of them.

8          THE COURT:  Yes.

9          MR. KIMBERLIN:  You know so what are you talking

10  about anti slap.  I'm not trying to silence anybody.  They can

11  talk about me all day long and they do --

12          THE COURT:  I know.

13          MR. KIMBERLIN:  Right there.

14          THE COURT:  20,000.

15          MR. KIMBERLIN:  They talk about me all day long.

16          THE COURT:  Okay.

17          MR. KIMBERLIN:  So just don't call me a swatter.

18  Don't call me a criminal.

19          THE COURT:  Well those are two different things.  I

20  mean yes, it's 40 years ago but the fact remains you have a

21  criminal record.

22          MR. KIMBERLIN:  So.

23          THE COURT:  Okay.

24          MR. KIMBERLIN:  They can talk about that.

25          THE COURT:  Well --

1              MR. KIMBERLIN:  Who's going to care?

2              THE COURT:  -- you said don't call me a criminal.

3              MR. KIMBERLIN:  Don't call me --

4              THE COURT:  I mean just upon your record -- a

5    swatter --

6              MR. KIMBERLIN:  -- for anything --

7              THE COURT:  I understand.  It all gets back to as we

8    have discussed don't call you a swatter, okay.

9              MR. KIMBERLIN:  Don't call me a swatter.

10             THE COURT:  Let me take -- now you have anything to

11   say in response?

12             MR. BAILEN:  Real brief.  Just on the anti-slap,

13   anti-slap motions are filed all the time regardless of how many

14   lawsuits the plaintiff files and that's not simply the basis

15   for our claim as I argued before.  Secondly I just want to make

16   sure the relief that we're requesting is clear.  We'd like a

17   dismissal with prejudice on the fact that it fails to state a

18   claim, motion to dismiss for failure to state a claim.  To the

19   extent the Court doesn't grant that we would say there is no

20   personal jurisdiction.  And then obviously the motion for anti-

21   slap we want the attorney's fees and so forth.  And with

22   respect to the attorney's fees I submitted the affidavit that

23   you requested with respect to the last hearing.  That was based

24   on my representation of Red State and Breitbart at that

25   hearing.  Because I no longer am representing Red State and the

1  fact that they're dismissed I would ask that the an award to

2  the extent that our grant's won that it would be cut in half in

3  other words because I'm splitting those fees between those

4  clients.  I just want to make the record clear on that.  I

5  don't know if Your Honor is going to address that today or not.

6            THE COURT:  Okay.

7            MR. BAILEN:  Is the issue.

8            THE COURT:  Okay, just give me one second.

9            MR. BAILEN:  And just so the record is clear I was

10 not sued by Shirley Siroid.  I represented a defendant in that

11 case.

12           THE COURT:  Okay, let me tell you with respect to the

13 anti-slap the problem I have is that on a motion to dismiss

14 finding based upon this record that he acted in bad faith which

15 I think I would be required to find.  And given what Judge

16 Hazel did and particularly since Judge Hazel didn't award

17 sanctions as to and I understand you didn't apply for them, but

18 an award amount to the other defendants I end this case.  I am

19 not going to grant you attorney's fees under the anti-slap

20 provisions of the Maryland statute, okay.

21           MR. BAILEN:  One thing that Your Honor focused on

22 which was the October 2010 article.  That's been in the

23 complaint since the beginning.

24           THE COURT:  Yes.

25           MR. BAILEN:  And he had noticed obviously when he was

 1  given the first opportunity so this is you know having to

 2  defend that.  I mean clearly that would in my view would be --

 3          THE COURT:  I understand, there was one of three

 4  articles, okay.  I'm taking a 10 minute recess.  I'll come back

 5  and then we'll finish up with these motions, okay.

 6          THE CLERK:  All rise.

 7          THE CLERK:  Court stands in recess.

 8          (Recess)

 9          THE CLERK:  All rise.

10          THE COURT:  You may be seated.  Sorry to keep you

11  waiting, I forgot I had a conference call that I had to attend

12  to at 11:30.  Okay, so give me one moment.  Okay, so then we're

13  to Blaze Inc. Mercury Radio and Glenn Beck.

14          MR. SHOLDER:  Good morning, Your Honor, Scott

15  Shoulder on behalf of DeBlase Inc. Mercury Radio Arts and Glenn

16  Beck.

17          THE COURT:  Okay.

18          MR. SHOLDER:  I'll keep this brief, Your Honor,

19  because I feel like much has been covered already in the last

20  defendants.  But I would like to reiterate that this case

21  really boils down to a feud between Mr. Kimberlin and a number

22  of the other defendants.  My clients were are a media

23  organization, national media organizations that in Mr.

24  Kimberlin's words have been caught up in a much bigger

25  campaign, this long running campaign arguments between him and

 1   many other bloggers and commentators.  I'll refer collectively

 2   to my clients as the Blaze defendants just for -- the Blaze

 3   defendants' involvement in this series of events is limited to

 4   one day in May of 2012 where they were essentially exercising

 5   their First Amendment rights to report on matters they believed

 6   were of public interest, reporting on historical facts that are

 7   in the record that nobody disputes including Mr. Kimberlin and

 8   provide a forum for witnesses to tell their stories about their

 9   experience with Mr. Kimberlin and their theories and thoughts

10   on this swatting situation.

11           One of the articles also as we were discussing before

12   doesn't actually even mention swatting so if what Mr. Kimberlin

13   is concerned about is this, it's only really swatting is at

14   least one of our articles that really only deals with this

15   whole State Department issue so we would, I would suggest that

16   that should no longer be in consideration.  But that said, most

17   of the points here have already been made.  But with respect to

18   personal jurisdiction the Blaze defendants like some of the

19   other defendants here are not subject to personal jurisdiction

20   in Maryland.  They're based in New York and to the extent that

21   the argument is being made that jurisdiction should be based on

22   internet presence, the Blaze.com is a nationwide news website

23   available to everybody in the country and presumably outside of

24   the country including Maryland.  There's been no active

25   reaching into the State of Maryland for purposes of engaging in

1   any activity and the case law is clear that referencing a

2   subject that happens to live in Maryland isn't sufficient to

3   establish personal jurisdiction over the speaker who is in

4   another state.

5          I wanted to point out that the ALS Scan case that Mr.

6   Kimberlin referenced before that does set forth this three

7   factor test for establishing jurisdiction over a speaker who

8   transmits electronic information over the internet, but that

9   case actually did not find that personal jurisdiction was

10  appropriate in that particular circumstance.  In the Hair v.

11  Ritchie case it's much different situation from what we have

12  here.  In that case the website was designed for users to

13  submit comments and stories about other people but with a

14  specific geographic bent.  In particular this plaintiff was in

15  Baltimore and the defendants submitted commentary and stories

16  through the website's Baltimore section.  The Blaze defendants

17  don't have this type of local commentary available.  It's

18  nationwide and worldwide news and opinion content on a number

19  of topics not necessarily relevant to Maryland.  As I mentioned

20  the only reference to Maryland is passing reference in some of

21  these materials that Mr. Kimberlin lives in the state and

22  that's all.

23         With respect to conspiracy I wanted to point out that

24  in the federal case there was a ruling on the enterprise

25  element of RICO which is essentially the conspiracy aspect.

1   And Judge Hazel held that Mr. Kimberlin had not pled an ongoing

2   organization with various associates functioning as a unit.  So

3   there was no, there essentially was no conspiracy.  So just to

4   clarify the record there was a ruling on that.

5            THE COURT:  So he found there was no enterprise but

6   he didn't use the term conspiracy.

7            MR. SHOLDER:  Not that I can see, no.

8            THE COURT:  But he did find there was no enterprise.

9            MR. SHOLDER:  No enterprise.

10           THE COURT:  Ongoing enterprise.

11           MR. SHOLDER:  Correct, no ongoing enterprise and

12  various associates did not function as a continuing unit, so

13  those two together yes go to the enterprise element.

14           One thing that we wanted to raise as well I don't

15  know that it's come up in detail yet is the intentional

16  infliction of emotional distress claim.  As a matter of law

17  it's clear in the Maryland case law that Mr. Kimberlin doesn't

18  and couldn't sustain a claim under this tort.  It's a rarely

19  viable claim as Your Honor implied before.  It's used

20  sparingly.  Conduct has to be so atrocious that you know, I

21  think the language is utterly intolerable on an uncivilized

22  society.  What happened here does not rise to that level.  The

23  case law specifically says that claims based on statements that

24  are allegedly defamatory or otherwise harmful simply doesn't

25  rise to the level of extreme and outrageous conduct necessary

1  to state a claim for intentional infliction of emotional

2  distress.

3          We've discussed conspiracy.  But actually with

4  respect to both conspiracy and the tortious interference claim

5  without an underlying tort there can be no tortious

6  interference, there can be no conspiracy.  You know we've gone

7  to great lengths in our papers to discuss why the underlying

8  tort stated in the complaint failed, but I just wanted to

9  reiterate that without any independently wrongful act for

10  tortious interference there can be no tortious interference and

11  conspiracy is not an independent tort in and of itself without

12  some sort of underlying act.

13          I also wanted to mention that as far as we can tell

14  tortious interference conspiracy and the claim for punitive

15  damages and I believe the anti-slap motion although Your Honor

16  has already addressed that were not referenced in Mr.

17  Kimberlin's opposition brief so we would say that they're

18  unopposed.  There is no argument and opposition to our

19  positions.

20          Really what this comes down to and you referenced

21  this before and the other defendants have as well is for us

22  this is a defamation claim in disguise.  Mr. Kimberlin takes

23  various theories that don't fit this case and tries to throw

24  them out there to state some sort of claim but the fact of the

25  matter is that it just doesn't fit with this case.

1          THE COURT:  And <u>Young</u> is the Fourth Circuit case,

2     right?

3          MR. SHOLDER:  Sorry?

4          THE COURT:  <u>Young</u> is the Fourth Circuit case?

5          MR. SHOLDER:  Yes.

6          THE COURT:  Okay.

7          MR. SHOLDER:  That's correct.

8          THE COURT:  You can have a seat.  Mr. Kimberlin is

9     there anything you want to add to what you've previously

10    argued?

11         MR. KIMBERLIN:  Yes --

12         THE COURT:  Specifically as it relates to this

13    defendant I'll hear you as to the others.

14         MR. KIMBERLIN:  Specifically he states regarding

15    personal jurisdiction that they didn't direct things into

16    Maryland but you know that's simply not the case.  I mean Mr.

17    Beck with the I mean they specifically called me a swatter.

18    Beck, do you know what swatting is?  Victims tell Beck how they

19    were targeted by terrorists, Brett Kimberlin.  Meet Soror's

20    funded domestic terrorists whose job is terrorizing bloggers

21    into silence.  You know this is Mr. Beck.  I mean this guy has

22    got millions of people watching and reading his stuff.  Why is

23    the State Department partnering with speedway bomber Brett

24    Kimberlin?  Possible Kimberlin related attack on the Red State

25    editor-in-chief.  You know that's talking about swatting.  So

1  you know --

2           THE COURT:  Yes, but understand the distinction

3  there, okay.  Is a possible Kimberlin related --

4           MR. KIMBERLIN:  Right.

5           THE COURT:  -- Red State attack, okay.  That's saying

6  one it's possible, it's not stating a fact and two it's saying

7  related.  So that maybe somebody who resents the fact that

8  they're attacking you on their own without own without your

9  encouragement, without your knowledge is doing this.  So

10  there's a vast difference between them saying possible

11  Kimberlin related Red State attack as opposed to them saying

12  Brett Kimberlin is swatting.  Those are two hugely different

13  things.

14           MR. KIMBERLIN:  Well I understand.  If it were just

15  one single article talking about that, but it was a campaign of

16  swatting saying that I was a criminal swatter.

17           THE COURT:  Okay.

18           MR. KIMBERLIN:  Brett Kimberlin, everybody blog about

19  Brett Kimberlin Day, you know in sum Long v. Percoa in Court of

20  Appeals Maryland you know they found that there was an invasion

21  of privacy by persistent and vile attacks on this family.  And

22  you know the court upheld it.  And I've alleged here not simply

23  false light, but I've alleged false light invasion of privacy.

24  That's my claim, false light invasion of privacy.  You know I

25  lived a quiet life.  I was the director of a nonprofit, you

1   know, I don't blog.  I don't tweet, you know, I don't do any of

2   that stuff.  My company has, my nonprofit has a blog.  I don't

3   run the blog you know, it's not me.  I have a wife.  I have two

4   kids, you know.  They go to Montgomery County Schools, private

5   schools in D.C. and these people invaded my privacy.  That's

6   what they did.  They created this false, I had people come to

7   my house.  I had death threats, hundreds of death threats come

8   to me in Maryland because of stuff that these guys wrote.  A

9   lot of stuff that Beck wrote, you know his readers read that

10  stuff, sent me death threats.  Said that my head was going to

11  be chopped off, you know, my wife was going to be found dead.

12  You know they're going after my kids, Army of Davids are coming

13  after you, Mr. Kimberlin.  I'm going to break your neck.  I'm a

14  marine.  You know all these guys they were out front taking

15  picture of my kids, you know following us.  I had to put 24/7

16  you know security system around my house.  I had to call 9-1-1

17  three or four times because people were out in front of my

18  house you know doing stuff.  That's what this is all about.

19  This is targeted harassment.  It comes from the false light

20  invasion of privacy.  That's what we're talking about here, not

21  just false light, they called me a swatter, but creating a

22  campaign of vigilante justice to come after me, to destroy me,

23  to intimidate me.  You talk about wanting to silence me, that's

24  what these guys wanted to do.  They wanted to silence me.  They

25  wanted to silence justice through music.  They want to make

 1   Brett Kimberlin destroyed off the, you know in prison.  They
 2   tried to have me imprisoned.  Judge Hazel found that Mr. Frey
 3   used the power of his office as a district attorney in LA to
 4   have me arrested.  He flew to Dallas and met with the FBI, told
 5   them I was a swatter.  He you know he --
 6            THE COURT:  Okay, but that issue is not before me.
 7            MR. KIMBERLIN:  But my point is it's an invasion of,
 8   it's false light invasion of privacy.  It's a bigger issue than
 9   defamation.  These people tried to minimize it and say it --
10            THE COURT:  Okay, but I'm just dealing with the
11   motions before me.
12            MR. KIMBERLIN:  Okay, and it's a campaign --
13            THE COURT:  As to these particular events.
14            MR. KIMBERLIN:  It's a campaign and you know this
15   case that I just mentioned the Summit Long v. Percola that was
16   a sustained campaign against this family.  And the court found
17   that there was an invasion of privacy in this case.  And that's
18   what we're talking about here.  They invaded my privacy.  And
19   they need to be held into account.  And you know for them this
20   swatting thing was an intentional false narrative designed by
21   Mr. Walker to create this everybody blog about Brett Kimberlin
22   Day to bring in all those other bloggers including Mr. Beck and
23   Maltin and all these other people to come down on me with this
24   vile campaign to destroy me.  They don't want me in business.
25   They don't want me alive.  They don't want me free into this

```
 1   society.

 2          THE COURT:  Okay.

 3          MR. KIMBERLIN:  And so you know, if I didn't allege a

 4   conspiracy I'll amend the complaint and allege the conspiracy.

 5   I'll show where the conspiracy, the conspiracy I mean I thought

 6   I did in the complaint by saying that everybody blog about

 7   Brett Kimberlin Day it's a kind of an agreement that everybody

 8   is going to blog about Brett Kimberlin Day.  I mean about Brett

 9   Kimberlin.  That's a conspiracy.  That's an agreement.  These

10   bloggers were all a part of that.  They all agreed to blog

11   about me to accuse me of nefarious conduct.  Why?  To destroy

12   me and my ability to earn a living.  That's actionable.

13          THE COURT:  But we've been through repeatedly, first

14   and I don't minimize --

15          MR. KIMBERLIN:  Yeah --

16          THE COURT:  -- or don't mean to minimize you know

17   what you go through.  Okay, I'm not minimizing that.

18          MR. KIMBERLIN:  Right.

19          THE COURT:  But we've been through repeatedly for

20   instance blog about Brett Kimberlin, if they all agreed to do

21   that wouldn't be actionable.  What we've agreed, not

22   necessarily what we've agreed but what you've alleged to me is

23   potentially what is actionable is that they all get together

24   and conspire and agree that they are going to specifically

25   accuse you of ongoing criminal conduct specifically in this
```

1  case engaging in swatting.  That is at the heart of what you

2  say is what they are doing and what gives rise to your claim

3  from everything you've articulated here in court today.

4          MR. KIMBERLIN:  And, and --

5          THE COURT:  Okay, so not just blogging about Brett

6  Kimberlin you've said to me a couple times they can blog about

7  me all they want, those are your words.

8          MR. KIMBERLIN:  Right.

9          THE COURT:  So it's not just this blogging, it's

10 making specific accusations.

11         MR. KIMBERLIN:  Exactly and at this stage in the

12 proceeding motion to dismiss, you know the allegations and the

13 complaint have to be accepted as true.

14         THE COURT:  Yes, allegations are fact.

15         MR. KIMBERLIN:  Okay, so I'm alleging that they, that

16 these defendants agreed in a conspiracy --

17         THE COURT:  That's a conclusion.

18         MR. KIMBERLIN:  Okay, that and I cannot 100 percent

19 prove that at this point but I don't have to.  I have alleged

20 it in my complaint that they have conspired to say that I'm a

21 swatter who wants to silence conservative bloggers you know for

22 whatever reason and therefore they're going to call me a

23 swatter so they can use that false narrative to create a

24 vigilante action against me which they did.

25         THE COURT:  I understand.

1            MR. KIMBERLIN:  And that's the reason and so at this

2   stage of the proceeding I mean obviously we're on motion for

3   summary judgment --

4            THE COURT:  I understand.

5            MR. KIMBERLIN:  -- or directed verdict, you know.

6   You can say well you haven't proved it.  You didn't show this

7   blah, blah, blah, but at this stage, you know, let me go

8   through discovery, let me get some discovery from these guys.

9   Let me get their e-mails.

10           THE COURT:  Okay.

11           MR. KIMBERLIN:  Let me --

12           THE COURT:  Have a seat.

13           MR. KIMBERLIN:  Okay.

14           THE COURT:  Because I've heard all of the arguments.

15           MR. KIMBERLIN:  All right.

16           THE COURT:  Okay, so --

17           COUNSEL:  Your Honor, may I address a couple of

18  points in response to Mr. Kimberlin?

19           THE COURT:  No.

20                      JUDGE'S RULING

21           First with respect to the motions at Docket Entry 44

22  by the defendants Malkin and Twitchy, at 46 with respect to the

23  motion by Breitbart; at 48 I've already basically well 48 and

24  49 the motion by the defendants Blaze, Inc., first based upon

25  the authority of the Fourth Circuit case Young, I find that

1   there is no personal jurisdiction in this case over those

2   defendants.  I think the Supreme Case the National Enquirer

3   case is very distinguishable where you have a subscription

4   service and in that particular case to the extent they had a

5   lot of subscribers in California, they're obviously deriving

6   substantial revenues from California, but that's not here.

7   None of these are running subscription services, so I find the

8   arguments that defendants make with respect to the issue of

9   personal jurisdiction in each instance are persuasive and the

10   Court has no personal jurisdiction over any of those

11   defendants.

12        In the alternative to the extent that the Court did

13   have personal jurisdiction I will adopt the arguments of the

14   defendants on their motion to dismiss that the claim should be

15   dismissed except as follows:  I do not believe that this Court

16   should apply a one year statute limitations because the law of

17   the State of Maryland in my view until the Court of Special

18   Appeals has overruled is that the statute of limitations for

19   false light is three years.  There is substantial language in

20   the Court of Appeals that suggest that maybe the Court of

21   Special Appeals should revisit their opinion, but it's not up

22   to me to reverse the Court of Special Appeals.  And so until

23   such time as that case is reversed I agree to be bound by it.

24        To the extent that any of their arguments are

25   predicated upon the finding that you're a public figure, I

 1   don't believe that that is an issue that the Court could decide

 2   on this motion to dismiss.  So I don't find that you are a

 3   public figure for purposes of these motions to dismiss.  And to

 4   the extent that the Court is asked to grant relief under the

 5   slap suit statute, I find with respect to that statute that

 6   there's no evidence based upon these motions that I could find

 7   at this time that he's acting in bad faith which I would be

 8   required to apply the slap suit statute.  However, given the

 9   fact that this is basically a reiteration of what has been

10   filed in the federal courts because basically the enterprise

11   under RICO is almost identical to the concept of a civil

12   conspiracy and since the motions to dismiss were pending in

13   federal court I think somebody said since October of last year

14   that you've had a long time to know what they are alleging in

15   terms of the absence of any conspiracy among them and the

16   failure of the complaint to set that forth that the dismissal

17   is granted without leave to amend as to these defendants.  So,

18   the dismissal as to those defendants is final.

19          Turning to 55 there's Mr. Hoge's motion to sanction

20   the plaintiff and find the plaintiff in contempt of court.

21   This relates to pleadings that were allegedly filed by Mr.

22   Kimberlin relating to a motion for alternative service on Akbar

23   who's now been dismissed and I noticed that Mr. Kimberlin's

24   motion for alternative service had been previously denied by

25   Judge Albright.  So in light of the fact that motion's been

1  denied by Judge Albright, I decline to take further action at

2  this time, although it would be of enormous concern to the

3  Court if I were to find that any party was filing documents

4  with the Court that had been altered or amended as Judge Ryan

5  obviously expressed a great deal of concern.

6          Now I have a motion at Docket Entry 58, which dealt

7  with and this is by Mr. Godfrey, is he here?

8          MR. GODFREY:  Yes, Your Honor.

9          THE COURT:  Come on up.

10          MR. GODFREY:  May I approach?

11          THE COURT:  Yes, and this is the motion at tab 58 for

12  defendant Mandy Nagy's motion to appoint counsel and extend the

13  time which was unopposed.  But let me ask this because I'm

14  troubled by appointing an attorney to act for a ward because if

15  I do that potentially then whatever, I'm assuming jurisdiction

16  and maybe what we do here binds the ward.  The party who was

17  sued is really the mother.  Now she was sued apparently in a

18  representative capacity.  But if there is no such

19  representative capacity, why can't the mother hire you to file

20  the motion to dismiss on her behalf alleging she's not the

21  guardian of this ward.  She can't be sued.  In that way I don't

22  have to go through having somebody appointed or going through a

23  Guardian Ad Litem proceeding to get somebody appointed to hire

24  you as an attorney for a ward who is not even in Maryland.  I

25  mean I agree she ought to be, somebody ought to be represented

1   but really it's the mother that's been sued, isn't it?

2   Although they claim it's in a representative capacity.

3         MR. GODFREY:  If I may Bruce Godfrey appearing for

4   the first time, Your Honor, greetings to counterpart Mr.

5   Kimberlin.  As I read Mr. Kimberlin's complaint as it's drafted

6   in its latest amended form, I believe that he has in fact named

7   Mandy Nagy, that's how she pronounces her surname.

8         THE COURT:  Give me one second to look.

9         MR. GODFREY:  As I read the header and as I read the

10   line.

11         THE COURT:  Yes, but I'm just trying to get to, okay,

12   in paragraph 11 he says Mandy Nagy is a blogger.  She's

13   currently legally incompetent therefore she can't be sued.  And

14   her legal representative is her mother who is the entity the

15   person that has been sued although in her representative

16   capacity.  But she's really the defendant.

17         MR. GODFREY:  I'm not sure that that is accurate,

18   Your Honor.  You know --

19         THE COURT:  Well let me say this, it's accurate

20   enough for me that if the mother will hire you to represent her

21   in her representative capacity I'll let you enter your

22   appearance and file your motion.

23         MR. GODFREY:  Okay.

24         THE COURT:  And that is easier I think than trying to

25   appoint you for somebody who may be in need of a ward although

1  nobody's ever, I mean there's no proceeding in Maryland to

2  declare she's in need of a ward or to appoint somebody to act

3  in her stead.  It's just I think much cleaner and better and

4  easier to let the legal representative hire you.

5           MR. GODFREY:  Your Honor, I am informed speaking as

6  an officer of the court, I am informed --

7           THE COURT:  Yes.

8           MR. GODFREY:  -- but do not independently know that

9  no such order or statutory provision --

10          THE COURT:  Yes.

11          MR. GODFREY:  -- in New Jersey.  I am informed but do

12 not know because a) the Supreme Court of New Jersey has not

13 licensed me and I have not petitioned for that license.

14          THE COURT:  Okay.

15          MR. GODFREY:  And b) my information comes primarily

16 from Ms. Nagy's stepfather, Victor Ashrafi who is a member of

17 the New Jersey bench.

18          THE COURT:  Let me just stop you for a second, okay.

19          MR. GODFREY:  Certainly.

20          THE COURT:  Let me ask you this as a practical matter

21 if what you want to do is to stop this, why sue an incompetent

22 person?  Why don't you just dismiss her and let's get rid of

23 this piece of it?

24          MR. KIMBERLIN:  I have, I've been in discussions

25 about doing that over the last couple of weeks.

1           THE COURT:  Okay, well let's bring them to an end.

2    Why are you going to pursue an incompetent person?

3    Strategically how does that help you?

4           MR. KIMBERLIN:  It has to do with removal of false

5    content.  If they remove the content I'll dismiss it.

6           MR. GODFREY:  Your Honor, I do not stipulate that the

7    content, I do not agree that the content is false.  But let's

8    assume that Mr. Kimberlin's right and I'm wrong, Ms. Nagy is a

9    stroke survivor.  She is barely able to communicate according

10   to both her mother and her stepfather.

11          THE COURT:  Okay.

12          MR. GODFREY:  She can't remove anything.  She's not

13   really doing much --

14          THE COURT:  I don't want to get into the merits of

15   it.  Let's get back to why can't the mother hire you?

16          MR. GODFREY:  I suppose that might be possible, Your

17   Honor.

18          THE COURT:  Good, have the mother have you and then

19   you can file.  But I will do this.  I'll defer or I'll delay

20   the time for Ms. Nagye is it?

21          MR. GODFREY:  Nagy, yes.  It's Hungarian.

22          THE COURT:  So it's pronounced Naj?

23          MR. GODFREY:  Naj.

24          THE COURT:  I'll delay the time for her to respond

25   for at least 30 days.

1              MR. GODFREY:  Okay.

2              THE COURT:  From today's dater, so that gives you

3    plenty of time to get the mother to authorize you, to retain

4    you to represent her as the alleged legal representative of

5    this ward.

6              MR. GODFREY:  Very well, Your Honor, thank you.

7              THE COURT:  And then you can file your motion to

8    dismiss and then we'll take it up.

9              MR. GODFREY:  Thank you.  If I may, Your Honor, one

10   other point --

11             THE COURT:  Okay.

12             MR. GODFREY:  -- as court officer I may be compelled

13   to correct I'm sure it was an innocent mistake by Mr.

14   Kimberlin.  I happen to represent a party in the federal claim

15   as well.  I do not represent here, Mr. Frey.  Judge Hazel did

16   not find that Mr. Frey did anything.  Only that Mr. Kimberlin's

17   pleading as it state was sufficient to survive a 12(b)(6)

18   motion.

19             THE COURT:  Okay, so your observation is noted for

20   the record.  But on paper technically this motion is denied in

21   its current form except that I will extent the time for the

22   defendant Mandy Nagy to respond by 30 days from today's date

23   and in the meantime you can get the mother to retain you so

24   then we can deal with the other merits.

25             MR. GODFREY:  Thank you.  May I stand down?

```
 1                THE COURT:  Yes, absolutely.

 2                MR. GODFREY:  Thank you, sir.

 3                MR. KIMBERLIN:  Could I make a comment?

 4                THE COURT:  No.

 5                MR. KIMBERLIN:  Okay.

 6                THE COURT:  Okay, so then at 64 we have a defendant

 7    Capitol Strategies motion to dismiss for insufficiency of

 8    service of process.  But now it's alleged that he subsequently

 9    served them with new process he says.

10                MS. SIROIS:  Yes, Your Honor, may I?

11                THE COURT:  Sure come on up.  And for the record?

12                MS. SIROIS:  Christina Sirois, and if I may enter a

13    limited appearance for the purpose for this motion only

14    pursuant to Rule 2-131 on behalf of Dan Backer and DB Capitol

15    Strategies.

16                THE COURT:  Good luck.

17                MS. SIROIS:  Good luck.

18                THE COURT:  Under that new rule I hope you have the

19    written fee agreement.

20                MS. SIROIS:  Yes, I do.

21                THE COURT:  Okay, so you've entered it in writing?

22                MS. SIROIS:  I'm sorry?  I have it with me.  Do I

23    need to enter it?

24                THE COURT:  Yes, you do.

25                MS. SIROIS:  Okay, I can.
```

1           THE COURT:  And it's got to be in writing and it's

2    got to spell out the limits of the representation.

3           MS. SIROIS:  Yes.

4           THE COURT:  Okay, actually I think isn't there

5    supposed to be an approved form now, the administrative judge

6    has to approve these?

7           MS. SIROIS:  It is from the, I'm sorry, it is from

8    the statute form.

9           THE COURT:  Yes, I think that these are potentially

10   so problematic that I think internally the administrative judge

11   is requiring -- call down to Cathy and ask.  But I'll let you

12   argue in the meantime.

13          MS. SIROIS:  Okay, thank you.

14          THE COURT:  But I guess my issue is he said he

15   subsequently served these defendants with new process in which

16   case that would make this motion moot, right?  He says new

17   summons was issued and that the defendants were subsequently

18   served.

19          MS. SIROIS:  The only reason that he sent service

20   which was sent after August 24 was because we filed this

21   motion.

22          THE COURT:  Right.

23          MS. SIROIS:  So --

24          THE COURT:  But if you got new summonses --

25          MS. SIROIS:  But those summons were before we filed

 1  this motion and they were sent out before the time limits of

 2  Rule 2-507 which provides 120 days from the issuance of the

 3  original summons.  So the original summons was issued on April

 4  22nd.

 5            THE COURT:  Right, but he got new summonses and he

 6  served --

 7            MS. SIROIS:  In July.

 8            THE COURT:  -- and he served you.

 9            MS. SIROIS:  It was served, it was not sent until

10  after August 24th and that was an additional 39 days after the

11  second summons.

12            THE COURT:  Right, but the summons is on their face

13  the new summonses you got were valid summonses, right?

14            MS. SIROIS:  As far as I'm aware, yes.  But that

15  doesn't change the time period under the rules for dismissal.

16            THE COURT:  Okay.

17            MS. SIROIS:  He still allowed that to lapse and then

18  also the only reason he sent the service, yes, the complaint

19  was because we filed this motion.

20            THE COURT:  Okay, but in my view frankly that rule

21  really is designed to basically not let plaintiffs file matters

22  and let them sit and take no action.  But where even they don't

23  act within a 120 days they did take timely action thereafter.

24  I'm not going to dismiss this lawsuit, so that motion is

25  denied, thank you.

1          MS. SIROIS:  Thank you, Your Honor.

2          THE COURT:  Okay, and then let's see so the

3    plaintiff's motion to compel the preaction disclosure at tab 21

4    all of that is moot in light of the fact that he dismissed Ace

5    of Spades.  Which then let me ask you this, Mr. Kimberlin, as

6    we all know this matter was originally set for a scheduling

7    hearing.  Mr. Walker asked that it be continued.  That was

8    denied so all defendants through counsel showed up for their

9    hearing as they were required to.  You did not show up.  Matter

10   of fact I had dismissed it by the time you called and only

11   based upon your phone call did I later agree not to dismiss it

12   but to set this matter.  You basically informed the Court that

13   you mistakenly assumed that Mr. Walker's motion should be

14   granted.

15         MR. KIMBERLIN:  Oh no --

16         THE COURT:  But why should these defendants have to

17   pay their attorneys because of your mistake?  Basically why

18   shouldn't you at least be responsible for their billing for

19   their time to be here on behalf of their clients for that last

20   hearing, and I basically mean only for counsel that have hired

21   counsel represent them, not Mr. Walker, okay.

22         MR. KIMBERLIN:  Okay.

23         THE COURT:  But for defendants who had to go out and

24   retain counsel those counsel showed up as they were required

25   to.  Those clients got a bill for that time which was wasted

1   time because of a mistake that you made, even it was a good

2   faith mistake it still was a mistake that you made.  And why

3   should that --

4            MR. KIMBERLIN:  Well --

5            THE COURT:  -- they have to pay for your mistake?

6            MR. KIMBERLIN:  First of all you know I apologized

7   personally to Mr. Bailen.  I apologized to Mr. Sholder.  When I

8   saw the motion come up through the continuance I contacted the

9   clerk of the court.  I asked you know whether the hearing was

10  going to be held.  I mean I only live 15 minutes from here and

11  the clerk said she didn't know if it was going to be held.  She

12  sent me over to the assignment office.  The assignment office

13  after some time you know said they didn't know what was going

14  on.  I was trying to determine whether to come to the hearing

15  and then the assignment office said they were going to patch me

16  through to the clerk, your law clerk or something.

17           THE COURT:  Right.

18           MR. KIMBERLIN:  Finally I was able to get through

19  and --

20           THE COURT:  But you're talking about the day of the

21  hearing?

22           MR. KIMBERLIN:  Yeah --

23           THE COURT:  Because when we got your call it was an

24  hour late and we had already been here for an hour.

25           MR. KIMBERLIN:  I know and I had been trying to get

1  an answer from the clerk of the court and she told me to call

2  back.  She didn't know what was going on this and that.  And at

3  first they didn't answer the phone.  And then finally when they

4  answered they said they didn't know and they put me over to the

5  assignment office.  I mean this took some time, a little bit of

6  time and I told your clerk, I don't know who it was I talked to

7  but I said you know I thought that the case was going to be

8  continued and she said the lawyers are in the courtroom now.

9  We can patch you in and hold the hearing that way.  Let me call

10  you back.  And so I waited and then she did call me back and

11  she said that the Court had already made some rulings on some

12  other motions and that you had decided that I didn't need to be

13  patched into the court.

14       THE COURT:  Right because the case hadn't been set

15  for a hearing on the motions.  The case was just set for a

16  scheduling order --

17       MR. KIMBERLIN:  Right.

18       THE COURT:  Sorry for scheduling hearing --

19       MR. KIMBERLIN:  Uh-huh.

20       THE COURT:  But the scheduling order says right on

21  the face of it if you fail to appear you run the risk that your

22  case will be dismissed.  So I mean we weren't set that day to

23  argue the motions.  We were set that day for a scheduling

24  hearing and you didn't show up and that's why I initially

25  dismissed it because they were all here and you weren't.

1        MR. KIMBERLIN:  Right, and you know like I said it
2   was a miscommunication.  I didn't do it I mean like I said I
3   immediately when the court opened I was on the phone calling to
4   see if it was going to be held.  And by the time I ended up
5   getting to your chambers which isn't easy to do.  I mean they
6   don't just automatically patch a person to the chambers
7   especially pro se litigant.  By the time they did that and I
8   said look I can be there in a few minutes if you want --
9        THE COURT:  Why do you wait until the morning to
10  check?
11       MR. KIMBERLIN:  Because he just filed the motion the
12  day before, two days before and I didn't even get the motion.
13  I went to case search and looked on case search and it said
14  that he had filed a motion.  So I said well this case might not
15  even go forward, let me call the court.  But that thing didn't
16  show up on case search until the day before the hearing.  So
17  when I as soon as the court opened on that morning I started
18  calling the court, the clerk to say is the case going to be
19  continued or you know or is the case going forward.  And when
20  they told me it was going forward and I talked to your clerk I
21  said you know patch me through and let me participate.  And the
22  other thing --
23       THE COURT:  Let me see the file for a second.
24       MR. KIMBERLIN:  And the other thing is you know it
25  wasn't a total waste of the lawyers' times.  I mean they came

1   in.  They had several motions that were heard.

2           THE COURT:  No they weren't.  There were no motions

3   heard.

4           MR. KIMBERLIN:  There were motions pro hoc vicit and

5   there was Walker's motion was here.  You denied his motion for

6   a continuance.  That was ruled on.

7           THE COURT:  Just give me one second.  Give me one

8   second.

9           MR. KIMBERLIN:  Go ahead.

10          THE COURT:  Okay, Mr. Walker's motion was filed on

11  July 13th.

12          MR. KIMBERLIN:  Right.

13          THE COURT:  The hearing was set on July 17th.

14          MR. KIMBERLIN:  And when you file a motion it doesn't

15  always show up on case search right away.

16          THE COURT:  Okay.

17          MR. KIMBERLIN:  So it wasn't, I mean I wasn't doing

18  it intentionally.  I didn't do it --

19          THE COURT:  Yes, I'm not accusing you of doing it

20  intentionally.

21          MR. KIMBERLIN:  And I you know I apologized.  You

22  know I have, I know that there were some motions that were

23  ruled on here.  They had to be ruled on anyway and so --

24          THE COURT:  I don't believe there was any motion that

25  was ruled.  Pro hoc vicit motions are granted routinely as long

1  as they're in proper form.

2          MR. KIMBERLIN:  Right.

3          THE COURT:  So they may have been ruled on but that's

4  I mean that's just me signing off on paper.

5          MR. KIMBERLIN:  You know it was a scheduling hearing.

6  It wasn't a motion to dismiss or anything like that.  I mean I

7  apologize to the Court.  I apologize to them.  And you know I

8  would ask the Court not to find that I acted intentionally or

9  with malice or anything and --

10         THE COURT:  I'm absolutely not finding you acted

11 intentionally with malice.

12         MR. KIMBERLIN:  And you know that I think it would be

13 you know, it would be burdensome for me to pay those attorney's

14 fees.  I mean you're talking $3,000 to pay for that hearing and

15 I think it would be unwarranted and under the circumstances and

16 that's why I ask you not to do so.

17         THE COURT:  Okay, who was seeking attorney's fees?

18         COUNSEL:  On behalf of Breitbart.

19         THE COURT:  Come forward for one second.

20         MR. BAILEN:  One at a time or --

21         THE COURT:  One at a time.  So what fees were you

22 seeking?

23         MR. BAILEN:  If I remember correctly from our

24 affidavits we submitted we asked for one hour for our time in

25 court and then an hour for preparation.

1              THE COURT:  And that's as divided as between two

2    clients?

3              MR. BAILEN:  Right that would have been I had two

4    clients at the time so I would seek 50 percent of that and I

5    had my associate James Remoser who is actually here today as

6    well.  He was here at the hearing on --

7              THE COURT:  But he's learning so much watching you so

8    he's getting well compensated.  So what are your hourly fees?

9              MR. BAILEN:  For this case, for the multiple

10   defendants my collective fee was 590.

11             THE COURT:  Okay, so your collective fee for both

12   defendants?

13             MR. BAILEN:  Yes for one hour was $590 per hour.

14             THE COURT:  And so you're seeking one half of two

15   hours because you're saying you were two hours --

16             MR. BAILEN:  Right, I mean my affidavit submitted the

17   hours for Mr. Remoser as well, but --

18             THE COURT:  Okay --

19             MR. KIMBERLIN:  But he's asking for fees for him and

20   his associate.

21             THE COURT:  No, the 590 is just for him.

22             MR. BAILEN:  Just for me, yeah.

23             MR. KIMBERLIN:  But he means to ask for --

24             THE COURT:  He may have but I'm not giving him that.

25   I'll give you one half of one hour because I think some of the

1 preparation you get -- so enter judgment against you in his

2 favor for 295?

3          MR. BAILEN:   295.

4          THE COURT:   295, you prepare the order.   Next, who

5 was next?   Thank you.   And for the record?

6          MR. SHOLDER:   Scott Sholder on behalf of the Blaze

7 defendants.

8          THE COURT:   And what were you seeking?

9          MR. SHOLDER:   Your Honor, we were seeking my fees for

10 preparation and attendance at the hearing as well as travel

11 expenses from New York.

12          THE COURT:   What's your hourly?

13          MR. SHOLDER:   My hourly is 315.

14          THE COURT:   Okay, I'll award you fees in the amount

15 of $315.   Who is next?

16          MR. SHOLDER:   Thank you, Your Honor.

17          MR. OSTRONIC:   Again, Your Honor, Patrick Ostronic on

18 behalf of Mr. Hoge.   Your Honor I am pro bono counsel for Mr.

19 Hoge but put in for one hour at an hourly rate of 150.

20          THE COURT:   But you're pro bono?

21          MR. OSTRONIC:   I'm acting as pro bono with the idea

22 that if anything like this happened that we could assess fees.

23 This is a complete waste of my time, complete utter waste of my

24 time for this.   And I have in fact in this court for you in a

25 previous litigation with Mr. Kimberlin was awarded $600 in fees

 1 | for sanctions against him.  That was another one.  That one has
 2 | not yet been paid but I don't think 150 is unreasonable in this
 3 | case.

 4 |             THE COURT:  Okay.

 5 |             MR. OSTRONIC:  Especially since it's an ongoing
 6 | manner.  My time is valuable.

 7 |             THE COURT:  Okay, I'll award you fees in the amount
 8 | of $150.

 9 |             MR. OSTRONIC:  Thank you, Your Honor.

10 |             THE COURT:  Now Mr. Kimberlin I'm doing that not
11 | because they think that you acted intentionally, not that I
12 | think it was purposeful.  But it seems to me it's just you made
13 | a mistake and I understand that.  But the defendants should not
14 | have to pay for your mistake although I've reduced the amount
15 | of the award substantially in light of the fact that you're
16 | representing yourself and there may be some financial issue.
17 | But you should at least bare part of the expense that they
18 | incurred by virtue of your mistake.  So it's not to punish you
19 | but I just don't think that they should be unfairly saddled
20 | with that mistake because of a mistake that you made.

21 |             I think that then -- so counsel when the fees are
22 | awarded, if you submit orders I'll sign those orders, okay.
23 | And my law clerk will give you his e-mail number.  You can e-
24 | mail the order to him.

25 |             I think that's the matters that are pending for

1  today.

2          MR. KIMBERLIN:  I just have one question.  You

3  mentioned Judge Albright denied a motion for alternate

4  service --

5          THE COURT:  Correct.

6          MR. KIMBERLIN:  And in your commentary you said that

7  Mr. Akbar had been dismissed.

8          THE COURT:  No, sorry, I meant to say the Ace of

9  Spades had been --

10         MR. KIMBERLIN:  Oh, okay, I just wanted to clarify

11 that, number one.  And number two it's my understanding that

12 Judge Albright denied that because it was she thought she

13 was --

14         THE COURT:  I have no clue why Judge Albright denied

15 it.

16         MR. KIMBERLIN:  Yeah, no --

17         THE COURT:  It's not before me but given the fact

18 that the underlying motion was denied --

19         MR. KIMBERLIN:  Yeah --

20         THE COURT:  -- then I'm less interested in pursuing

21 the allegations that Mr. Hoge was raised in that case --

22         MR. KIMBERLIN:  Okay.

23         THE COURT:  -- because he really wasn't the person

24 involved.  But I am saying don't understand from that that's

25 some statement by me that I'm unconcerned about people filing

1  altered documents.  I'm not, okay.

2          MR. KIMBERLIN:  Okay.

3          THE COURT:  But I'm not taking other further action

4  in light of that combination of factors.  Mr. Walker --

5          MR. WALKER:  Your Honor it's one thing I've raised

6  several motions which is Mr. Kimberlin has chronically failed

7  to serve me in this case.  In fact the first time in this case

8  he's ever served me was last week.

9          THE COURT:  So is the written motion that you filed

10 that I overlooked?

11         MR. WALKER:  I brought it up in my motion to strike

12 his motion to strike.  I brought it up on my opposition to his

13 motion for sanctions.

14         THE COURT:  Okay, well let's do this, when you refile

15 your motion to dismiss just recite it because I am not --

16         MR. WALKER:  Okay.

17         THE COURT:  -- it's not before me.  I don't see it.

18 Okay, we'll take it --

19         MR. WALKER:  I understand that, Your Honor.  Just

20 also as a matter of mechanics I know you've stricken my motion

21 to dismiss.  There were a number of exhibits I put in to help

22 build the case for res judicata apply in this case.  Can we at

23 least make sure that those are not removed from the courthouse?

24         THE COURT:  They won't be removed.

25         MR. WALKER:  Huh?

 1          THE COURT:  They will not be removed.

 2          MR. WALKER:  Okay, so I want to make sure I don't

 3  have to redo that part.

 4          THE COURT:  No, you can refer to them in your renewed

 5  motion to dismiss.

 6          MR. WALKER:  I appreciate that, Your Honor.

 7          THE COURT:  Okay.

 8          MR. WALKER:  Thank you.

 9          THE COURT:  Then I think that's everything.  I think

10  it's for the reasons I set forth on the record the motion to

11  dismiss is granted.  If you want to submit an order you can

12  send it to my clerk and I'll sign the order as long as it

13  comports with what I said.  Okay, but you can just say it's

14  dismissed for reasons set forth on the record in open court

15  without getting into the reasons.

16          COUNSEL:  Thank you, Your Honor.

17          THE COURT:  Okay, thank you all very much.

18          THE CLERK:  All rise.

19          THE CLERK:  Court stands in recess.

20          (The proceedings were concluded.)

21

22

23

24

25

√ Digitally signed by Caroline G Gibson

## DIGITALLY SIGNED CERTIFICATE

**DEPOSITION SERVICES, INC.** hereby certifies that the foregoing pages represent an accurate transcript of the duplicated electronic sound recording of the proceedings in the Circuit Court for Montgomery County in the matter of:

Civil No. 403868

BRETT KIMBERLIN

v.

NATIONAL BLOGGERS CLUB, et al.


By:


_____
Caroline G Gibson
Transcriber